# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NORMA MELGOZA,           )
                              )
        Plaintiff,      )
                              )     Case No. 17-cv-6819
vs.                        )
                              )     Honorable Mary Rowland
RUSH UNIVERSITY MEDICAL CENTER,   )     Honorable Gabriel A. Fuentes
                              )     Jury Trial Demanded
        Defendant.     )
_____)

## DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

       Defendant, Rush University Medical Center ("Rush"), by its attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submits this Statement of Undisputed Material Facts in connection with its motion for summary judgment.[1]

## I.      The Parties

       1.      Plaintiff, Norma Melgoza ("Melgoza") (female, national origin Mexican-American) is currently employed as a Director at Rush. (Ans. ¶¶ 5, 26, 63, Tab 1.)

       2.      Rush is an Illinois not-for-profit corporation with its principal place of business at 1653 West Congress Parkway, Chicago, Illinois. (Ans. ¶ 6, Tab 1.)

---

[1] Deposition testimony is cited as "([name] [page no. and line], Tab [#]);" Defendant's Answer and Affirmative Defenses to the Amended Complaint is cited as "(Ans. ¶ [#], Tab [#]);" declarations are cited as "([name] Decl. ¶ [#], Tab [#]);" deposition exhibits and declaration exhibits are cited as "([name] Dep. / Dec. Ex. [#], Tab [#]);"and Plaintiff's Amended Complaint is cited as "(Cmplt. ¶ [#], Tab [#])." All cited materials are contained in Defendant's Appendix of Materials in Support of its Motions for Summary Judgment. All statements contained herein are set forth for purposes of Defendant's Motion for Summary Judgment only, are not admissions by Rush, and may not be used for any purpose other than Defendant's Motion for Summary Judgment, including without limitation any other proceeding in this lawsuit.

## II.     Jurisdiction & Venue

3.      The Court has subject matter jurisdiction over Melgoza's federal claims under the Equal Pay Act, 29 U.S.C § 216(b), Title VII, § 2000e-5(f)(3) and 28 U.S.C. § 1331, and her Illinois Human Rights Act claim pursuant to 28 U.S.C. § 1367. (Ans. ¶ 7, Tab 1.)

4.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391. (Ans. ¶ 8, Tab 1.)

## III.    Rush's Relevant Policies

### A.      Equal Employment Opportunity and Affirmative Action

5.      Rush maintains an Equal Employment Opportunity and Affirmative Action Policy ("EEO Policy"). (Plaintiff's Dep. Ex. 3, Tab 2.) The EEO Policy provides, in relevant part, that:

> The Medical Center will customarily post job vacancies, and continue to use internal promotions, where appropriate, for filling positions.

(Plaintiff's Dep. Ex. 3, ¶ 9.05, Tab 2.)

### B.      Rush's Anti-Harassment and Discrimination Policies

6.      At all times relevant to this lawsuit, Rush maintained written policies for handling complaints of harassment and discrimination. (Schopp, 135:3-10, Tab 3; Melgoza, 27:15-29:23, Tab 4.)

7.      In October 1984, Rush issued a Prohibition Against Harassment ("Anti-Harassment Policy"), which provides, in relevant part:

> Rush strictly prohibits sexual harassment of any employee. Rush strictly prohibits all other forms of harassment of any employee based upon that person's race, color, religion, ethnicity, national origin, age, disability, or any other category protected under state or federal law.

> *        *        *

> RUMC has an "open-door" policy. This means that any employee who feels harassed is required to immediately and personally report the harassment to any one or all of the following people: Assistant Vice President of Human Resources,

Employee Relations Department, Manager, Supervisor, Other Officer of the
Medical Center.

\*  \*  \*

Reprisals or retaliation against the employee reporting the allegation of
harassment will not be tolerated.

(Plaintiff's Dep. Ex. 4, Tab 5.)

  8. On February 3, 2015, Rush approved a Non-Discrimination Policy, which

provides, in relevant part:

> it is the policy of Rush University Medical Center and Rush University that
> discrimination, harassment, or unequal treatment of any person, whether a
> member of the medical center community (*e.g.*, employees, faculty, house staff,
> students, a member of the public seeking patient care or any other services from
> the medical center, medical staff applicants, patients and their families, domestic
> partners, friends) because of race color, sexual orientation, gender identity and/or
> expression, religion, national origin, ancestry, age, material or parental status,
> disability, veteran's status, or any other category protected by federal or state law
> or county or city ordinance, is prohibited and will not be tolerated.

\*  \*  \*

Please See [Anti-Harassment Policy].

(Plaintiff's Dep. Ex. 6, Tab 6.)

  9. On December 13, 2016, Rush approved a Prohibition against Harassment,

Discrimination and Sexual Misconduct Policy ("Anti-Harassment / Discrimination Policy")

which provides, in relevant part:

> The Medical Center strictly prohibits all forms of unlawful discrimination and
> harassment of and by any member of the Medical Center community, including
> but not limited to students, members of the faculty, employees, volunteers, guests
> and vendors.

(Melgoza, 28:23-29:7, Tab 4, Plaintiff's Dep. Ex. 5, Tab 7.)

  10. The Anti-Harassment / Discrimination Policy sets forth a procedure for

registering a complaint, and specifically provides that "[r]eprisals or retaliation against the

individual reporting the allegation of discrimination or harassment will not be tolerated by Rush University Medical Center." (Plaintiff's Dep. Ex. 5, Tab 7.)

11.      Pursuant to the Anti-Harassment / Discrimination Policy, all complaints or concerns regarding harassment, discrimination or retaliation, should be made to Rush's Equal Opportunity Officer. Confidential reports can also be made through The Rush Hotline, or via a web reporting tool at rush.ethicspoint.com. (Plaintiff's Dep. Ex. 5, Tab 7.)

12.      Rush's non-retaliation policy applied to any employee complaint or concern. (Schopp, 106:2-21, Tab 3.)

13.      Melgoza was aware that complaints about discrimination should be taken to HR. (Melgoza, 88:2-5, Tab 4.)

14.      Rush also provided extensive training related to anti-discrimination, anti-harassment and diversity. (Schopp, 75:13-14, 141:4-8, Tab 3; Melgoza, 31:3-8, Tab 4.)

**C.      Rush's Promotion Policy**

15.      Pursuant to Rush policy and procedure, new or vacant positions are posted internally in Rush's applicant tracking system for a minimum of 5 days. Thereafter, it is posted externally. (Barginere, 80:14-19, 81:6-7, Tab 8; Wallace, 119:16-20, Tab 9.)

> If the hiring manager is first considering internal Rush candidates, Recruitment and Career Services will post the open position on the Rush internal web page for five (5) business days prior to posting externally.

(Hiring: Requisition, Recruitment, Evaluation, and Selection, RUSH 000123, Tab 33.)

16.      Positions at an Associate Vice President level or above are posted internally on an intranet site that directs interested employees to apply through the applicant tracking system. (Wallace, 119:21-120:5, Tab 9.)

17.      Alternatively, an employee can be promoted from his/her current position when the scope of his/her job changes or the importance of the job in terms of its strategic priority

changes. (Barginere, 81:13-14, Tab 8, Wallace, 120:6-121:15, Tab 9, Mulroe 30(b)(6), 118:12-24, Tab 10.)

**D.    Rush's Equal Pay Policies**

18.    Rush maintains a Position Evaluations and Equal Pay policy ("Equal Pay Policy"). (Plaintiff's Dep. Ex. 53, Tab 11.) The Equal Pay Policy provides, in relevant part, that:

> The Medical Center complies with all state and federal regulations for protected classes regarding equal pay.

(Plaintiff's Dep. Ex. 53, Tab 11.)

19.    Rush has taken steps to ensure that state and federal regulations for equal pay are complied with by taking equal pay into account, on an ongoing basis, when setting compensation to ensure that comparable roles are paid similarly with similarly situated experience and performance, and by periodically engaging an outside firm to assist with an objective assessment of Rush's compensation - including equity - across the organization. (Wallace, 136:2-19, 32:5-16, Tab 9.)

**IV.    Rush's Operational Structure & Personnel**

20.    Rush is part of a multi-faceted non-profit healthcare organization that includes Rush Health, Rush Oak Park Hospital, Rush Copley Medical Center, and Defendant Rush. (Ans. ¶ 10, Tab 1.)

21.    Starting in 2004, Peter Butler ("Butler") served as Executive Vice-President/Chief Operating Officer. (Butler, 8:14-17, Tab 12.) In that role, he was generally responsible for the day-to-day operations of Rush. (Butler, 8:18-23, Tab 12.) In approximately 2010 or 2011, Butler became President / Chief Operating Officer, and then in 2013 or 2014, he became President. (Butler, 9:14-20, Tab 12.) Butler retired from his role as President in July 2016. (Butler, 7:18-20, Tab 12.)

22.     Michael Dandorph ("Dandorph") started at Rush in May 2013 as Executive Vice President for Clinical Affairs. (Dandorph, 13:17-24, Tab 13.) In that role, he had responsibility over the operations of the hospital, the faculty practice plan and Rush Oak Park Hospital. (Dandorph, 14:3-11, Tab 13.) In 2015, the title of Chief Operating Officer was added as part of a planned succession for Butler, and Dandorph added the HR and IT departments to his portfolio. (Dandorph, 15:12-16, 18: 10-17, Tab 13.) He also began to get more actively involved in the strategic planning and managed care initiatives of the enterprise. (Dandorph, 19:9-18, Tab 13.) In July 2016, Dandorph became President of Rush. (Dandorph, 15:17, Tab 13.)

23.     Cynthia Barginere ("Barginere") started as Chief Nursing Officer at Rush in May 2011. (Barginere, 11:20-12:2, Tab 8.) As Chief Nursing Officer, Barginere was responsible for nursing practice across the organization, nursing operations across the hospital and served as an adjunct professor / associate dean for the College of Nursing. (Barginere, 12:3-10, 13:10-14, Tab 8.) In May 2015, Barginere began serving as Senior Vice President / Chief Operating Officer for Rush University Hospital. (Barginere, 28:5-16, Tab 8.) In that role, Barginere has operational and P&L responsibility for the hospital, and some corporate duties including security and environmental services that service the entire campus. (Barginere, 29:11-20, Tab 8.)

24.     Mary Ellen Schopp ("Schopp") served as Senior Vice President / Chief Human Resources Officer for Rush from 2010 to October 2018. (Schopp, 13:7-13, 17:22-24, Tab 3.) Lynne Wallace ("Wallace"), formerly of Rush, was the Vice President of Human Resources beginning in October 2016, and oversaw the HR partnership function across all entities of Rush, HR communications and employee recognition. (Wallace, 5:22-24, 6:5-6, 7:19-8:4, Tab 9.)

25.     Michael Mulroe ("Mulroe") started at Rush in the fall of 2003 as Director of Purchasing. (Mulroe, 13:3-5, 14:7-9, Tab 14.) During his tenure, he was promoted to Assistant

Vice President, Associate Vice President and ultimately Vice President in 2010. (Mulroe, 19:7-11, 19:23-20:3, 30:8-23, Tab 14.)

26.     Leo Correa ("Correa") (male, Mexican-American) was employed at Rush from 2005 until January 2017. (Correa, 63:1-4, 90:10-15, Tab 15.) In December 2013, Correa was promoted to the Associate Vice President, Clinical Affairs, Cancer Services. (Correa, 72:18-73:24, Tab 15.) He was responsible for managing and overseeing the entire cancer service line at Rush including nearly 500 employees and a "very, very large" budget. (Correa, 180:9-15, 83:9-13, Tab 15.) Moreover, the areas that he was responsible for were specifically identified as the most profitable service line at Rush. (Correa, 83:13-16, Tab 15.)

## V.     The Cancer Service Line

27.     The cancer service line is an aggregation of the clinical services that support a cancer diagnosis for patients across the system, organized around those clinical disease sites and designed to optimize the experience for those patients. (Barginere 86:8-13, Tab 8.)

28.     Barginere and Dr. DeCresce[2] served as co-leads for the cancer service line planning, and were tasked with assembling a multi-disciplinary team from across the organization to define the vision for the cancer center and to create an action plan for how Rush could operationalize that vision. (Barginere 87:2-3, 16-22, Tab 8; Correa, 78:18-22, Tab 15.)

29.     In 2016, all clinical areas related to cancer were restructured to fall within one structure: the cancer service line. (Barginere, 89:15-90:6, Tab 8.) Rush's service line approach is a true patient-centered approach to the delivery of healthcare services and is organized in the way that cancer patients experience healthcare. (Plaintiff's Dep. Ex. 95, RUSH007173, Tab 16.) Putting cancer related departments under the cancer leadership allows for better integration and coordination of care. (Mulroe 30(b)(6), 81:15-24, Tab 10.)

_____

[2] Dr. DeCresce was the Acting Medical Director of the Cancer Center. (Correa, 78:17-18, Tab 15.)

30.     It was not uncommon for Rush to restructure or reassign departments. (Melgoza, 325:10-326:5, 334:2-12, 339:22-340:13, 341:19-2, 375:3-7, 376:20-377:3, 383:21-384:1, 384:17-385:4, 401:7-14, 506:8-10, Tab 4.)

31.     In this case, the regulatory aspect of the bone marrow transplant, the breast imaging / mammography, the radiation oncology, the gyne-oncology, and the neuro-oncology departments were reassigned from under the hospital to the cancer center. (Barginere, 91:6-11, 16-18, Tab 8; Correa, 188:4-189:2, Tab 15.)

32.     The cancer center at Rush in June 2016 was primarily under the Rush University Medical Group organization. Brian Smith[3] had administrative responsibility, and Correa was the Associate Vice President responsible for the cancer center. (Barginere 92:3-9, Tab 8.)

## VI.     Melgoza's Employment & Compensation at Rush

### A.     Melgoza's Employment

33.     Melgoza began her employment at Rush in 2006 as Assistant Vice President.[4] (Ans. ¶ 15, Tab 1; Melgoza, 32:23-33:1, Tab 4.) Beginning in November 2010, Melgoza worked as an Associate Vice President for Rush. (Ans. ¶ 20, Tab 1.) As an Associate Vice President, Melgoza had various managerial duties and was responsible for various departments. (Ans. ¶¶ 20, 23, Tab 1.)

34.     Melgoza reported directly to Robert Clapp[5] ("Clapp") beginning in 2006 until he passed away in 2012. (Melgoza, 456:22-457:1, Tab 4.) She then reported to Mulroe. (Melgoza, 457:4-6, Tab 4.)

---

[3] Brian Smith was the Vice President of Clinical Affairs and Executive Director, Rush University Medical Group. (Correa, 73:7-9, Tab 15.)
[4] Rush consolidated the Assistant Vice President and Associate Vice President roles "years ago" because there was confusion about the differentiation between them. (Wallace, 21:20-22:3, Tab 9; Mulroe 30(b)(6), 92:19-24, Tab 10.)
[5] Clapp worked for Rush from January 2006 until his death in August 2012. (Butler, 23:7-13, Tab 12.) At the time of his death, he was a Senior Vice President. (Melgoza, 427:15-17, Tab 4.) Before that, he was the Executive Director of Rush. (Melgoza, 427:17-19, Tab 4.)

35.     Rush eliminated Melgoza's position as Associate Vice President on or about July 14, 2016. (Ans. ¶ 44, Tab 1.)

36.     Specifically, Barginere advised Mulroe that Rush had decided to move radiation oncology, breast imaging, and BMT under the cancer service line. (Mulroe 30(b)(6), 77:7-78:23, Tab 10.) Mulroe was asked to think through the impact that would have on his portfolio (*i.e.*, the departments that report up to him through Melgoza). (Mulroe 30(b)(6), 77:15-23, Tab 10; Barginere 30(b)(6), 7:18-8:3, Tab 17.)

37.     At the time, Melgoza was responsible for the three departments that were to be moved under the cancer service line. (Barginere, 91:8-14, Tab 8.) With the migration of these three departments under cancer, the remaining portfolio of departments was not large enough to warrant an Associate Vice President position. (Mulroe 30(b)(6), 84:20-23, 90:3-20, Tab 10.) Accordingly, Mulroe took on responsibility for the remaining non-cancer related portfolio that had been under Melgoza, and Melgoza's Associate Vice President position was eliminated. (Mulroe 30(b)(6), 84:23-85:2, 87:9-88:8, 101:10-13, Tab 10.)

38.     After Melgoza's Associate Vice President ("AVP") position was eliminated, Rush provided Melgoza the option of accepting another position at Rush or seeking severance. (Ans. ¶ 57, Tab 1.) Melgoza accepted a Director position in the cancer center. (Ans. ¶ 44, Tab 1; Wallace, 79:4-10, Tab 9.) The radiation oncology, breast imaging and BMT departments stayed under Melgoza, and went under the cancer service line. (Mulroe 30(b)(6), 85:24-86:9, Tab 10.)

39.     After accepting the Director position, Melgoza reported to Correa until he left Rush in January 2017. (Melgoza, 457:12-16, Tab 4.) After a brief period reporting directly to Dr. DeCresce, Melgoza began reporting to Patty Nedved[6] ("Nedved") in approximately March 2017.

---

[6] Nedved (Caucasian, female) was the interim chief administrative officer for the cancer service line from February 2017 to November 2018. (Nedved, 36:13-15, 51:14-17, Tab 18.)

(Melgoza, 457:22-458:11, Tab 4.) Nedved transitioned to a new position in Rush, and in November 2018, Melgoza began reporting to Joshua Ellis ("Ellis").[7] (Ellis, 44:14-17, 49:2-12, Tab 19.)

### B. Melgoza's Compensation

40.     As an AVP, Melgoza had a base salary as well as management incentive compensation ("MICP"). (Chen, 14:14-15, Tab 20.) The MICP is 15% of base salary at target, and 22.5% at max of base salary. (Chen, 14:15-17, Tab 20.) Melgoza was also entitled to medical and dental benefits, life insurance, and AD&D. (Chen, 14:24-15:5, Tab 20.)

41.     AVPs are slated into a grade in the management salary structure based on job description, responsibilities, skills and education. (Chen, 20:2-20; Tab 20.) Rush uses market data to develop a salary range for each grade level. (Schopp, 36:17-24, Tab 3.) Each grade level has a minimum, mid-point and maximum pay level. (Schopp, 40:22-41:3, Tab 3; Chen, 22:14-23:1, Tab 20.) Salary ranges are revised annually based on salary budget surveys, and pay levels usually change between 2% and 3%. (Chen, 74:15-12, Tab 20.) In addition, each employee's performance is evaluated annually and his or her manager makes the decision as to how much increase to apply to the employee's salary (*i.e.*, annual merit increase) based on performance as well as the position of base salary within the range for his or her grade level. (Chen, 36:7-11, 40:20-41:11, 86:24-87:7, Tab 20.) Annual merit increases are approved by the manager's manager. (Chen, 36:21-37:6, Tab 20.)

42.     As a Director, Melgoza had a base salary. (Schopp, 49:9-12, Tab 3.) Directors are also slated into a grade in the management salary structure. (Chen, 12:11-12, Tab 20.) Melgoza was assigned to the highest grade level for directors. (Chen, 137:14-24, Tab 20.)

---

[7] Ellis became interim chief administrative officer for the cancer service line in November 2018 (Ellis, 44:14-17, Tab 19.)

43.     When an employee's salary reaches the max pay level in his/her grade, he/she would continue to get lump sum increases. (Schopp, 173:18-24, Tab 3.) In addition, the max pay level can move with the market and an employee would continue to earn up to the max pay level again. (Schopp, 173:24-174:5, Tab 3.)

44.     As a Director, Melgoza was not eligible for the MICP. (Chen, 17:19-20, Tab 20.) Nevertheless, when she transitioned to her new role, Rush provided Melgoza with an incentive pay that is not generally available to other Directors. Specifically, Rush provided, and continues to provide, Melgoza with the opportunity to earn up to 15% of her current compensation as a departmental incentive target. (Wallace, 82:5-8, Tab 9.) A departmental incentive plan (or "shadow incentive plan") is created to keep incentive eligibility when an employee is transferred to a position that is no longer eligible for a formal incentive plan. (Chen, 18:2-8, Tab 20.)

45.     Melgoza therefore has not lost any incentive compensation by virtue of her transition to a Director. (Chen, 138:1-8, Tab 20; Wallace, 53:11-22, Tab 9.)

46.     Melgoza's 2014 wages, tips and other compensation totaled $171,783, and Medicare wages were $189,283. (Chen, 13:17-14:2, Tab 20.)

47.     Melgoza's 2015 wages, tips and other compensation totaled $172,540, and Medicare wages were $190,540. (Chen, 15:24, Tab 20.)

48.     Melgoza's 2016 wages, tips and other compensation totaled $182,319.44, and Medicare wages were $200,319.44. (Melgoza 2016 W-2, RUSH000397-8, Tab 21.)

49.     Melgoza's 2017 wages, tips and other compensation totaled $182,307, and Medicare wages were $200,307. (Chen, 17:6-7, Tab 20.)

50.     Melgoza's 2018 wages, tips and other compensation totaled $195,480.76, and Medicare wages were $213,980.76. (Melgoza 2018 W-2, RUSH007556-7, Tab 22.)

51.     Melgoza's base pay has never decreased during her employment at Rush. (Melgoza, 113:2-4, Tab 4; Wallace, 53:20-22, Tab 9.)

52.     Melgoza is paid in line with her male and/or non-Mexican-American counter parts. (Plaintiff's Dep. Ex. 140, Tab 32.)

53.     Melgoza alleges that, throughout her tenure as an AVP, Rush paid Melgoza less than her male and/or non-Mexican-American colleagues including, Mike Mulroe (VP, Hospital Operations), Scott Sonnenchein (VP, Hospital Operations), Edward Conway (VP, Clinical Affairs for Administration and Finance), Mike Lamont (VP, Facilities Management), Dr. Anthony Perry (VP), Mike Dandorph (Executive Vice President for Clinical Affairs and Chief Operating Officer), Richard Davis (VP, University Affairs and Principal Business Officer, Rush University), Kurt Olsen (VP, Talent Management and Leadership Development), Jeremy Strong (AVP, Business Operations and Interventional Platform), Tim Carrigan[8] (AVP), Leo Correa (AVP, Clinical Affairs), Shaun Cooper (AVP, Rush Children's Hospital), Ryan Schlifka[9] (AVP, Strategic Planning and Program Development), John Pontarelli (AVP), David Rice (attorney), Ray LaBrec (AVP, Capital Projects), Joseph Anderson[10] (AVP, Human Resources Operations) and Josh Ellis[11] (AVP, RUMG Administration). (Cmplt. ¶ 32, Tab 31; Melgoza, 55:10-56: 2, 58:21-23, 63:6-16, 64:22-24, 551:23-552:2, 583:20-23, 596: 20-22, Tab. 4; Plaintiff's Dep. Ex. 140, Tab 32; Dandorph, 13:17-24, 15:12-16, Tab 13, Mulroe 30(b)(6), 116:17, Tab 10.)

54.     Generally speaking, VPs would have a broader range of responsibility and more people and more resources associated with their job than an AVP. (Butler, 38:4-7, Tab 12.) But, there were other criteria used. (Butler, 38:8-9, Tab 12.) "Some responsibilities have a lot of

---

[8] Promoted to AVP in late 2016 or early 2017.
[9] Hired after July 1, 2016.
[10] Hired after July 1, 2016.
[11] Hired after July 1, 2018.

people and a lot of resources, but it might be a department or area that can work fairly independent of others where there are other areas that have to work collaboratively across many part of the medical center; so they may not have as many people and resources, but the leadership required to work with others becomes an important difference in criteria that could result in a higher title than would be given just based on the number of resources and people associated with the job." (Butler, 39:9-20, Tab 12.)

55. Generally speaking, AVPs are responsible for leadership of their departments, driving performance, motivating individuals, creating and articulating a vision for where they want to take their operation or function, driving employee engagement, having a passion for the role, and ensuring Rush is delivering the utmost quality care for its patients. (Mulroe 30(b)(6), 119:19-120:8, Tab 10.).

56. AVP positions cannot be compared by number of departments and dollar amount of revenue. (Mulroe, 124:6-8, Tab 14.) There are other factors that must be assessed in terms of scope. (Mulroe, 124:17-18, Tab 14.) There are a number of AVP roles across Rush with their own unique job descriptions and duties. (Wallace, 20:18-21, 23:3-11, Tab 9.)

## VI. Melgoza's Discrimination / Hostile Work Environment Claims

### A. Mulroe

57. Melgoza complained informally in the hallway to Barginere that Mulroe was difficult to work with, and she felt that it was because she was a woman. (Barginere, 107:11-108:3, Tab 8.) Barginere spoke to Mulroe and Nisha Lulla[12] ("Lulla"), and could not substantiate the claim in that Lulla (a woman) had no complaints against Mulroe at all. (Barginere, 108:20-109:3, Tab 8.)

---

[12] Lulla was Mulroe's direct report. (Barginere, 108:16-19, Tab 8.)

58.     Barginere did not receive any other complaints about Mulroe from Melgoza or anyone else at Rush. (Barginere, 109:7-17, Tab 8.)

59.     On August 20, 2014, Dandorph emailed Melgoza, requesting feedback on Mulroe in connection with Mulroe's annual review. Melgoza emailed Dandorph in response to his request. (Dandorph, 67:3-24, Tab 13; Plaintiff's Dep. Ex. 48, Tab 23.) Specifically, Melgoza wrote:

> Another area for enhancement is around general politeness, open appreciation for contributions and inspiring professionals without using traditional authority. I have discussed with him that his style can be viewed as too "rough" or impolite. He introduces himself as my "boss" or the "boss" of others. At one meeting, the Siemens Representatives asked him if being my "boss" was his claim to fame? It was a light hearted way to laugh about an uncomfortable situation. He also issues commands -- misunderstood by some and perceived as undervaluing the individual. I spoke to him about this. He was open and willing to listen. Perhaps coaching about how to work with diverse professionals would be beneficial.

(Plaintiff's Dep. Ex. 48, Tab 23.)

60.     Dandorph does not recall that any other women complained about Mulroe's style. (Dandorph, 69:9-11, Tab 13.)

61.     Melgoza did not report Mulroe to HR. (Melgoza, 694:6-10, Tab 4.)

**B.    Dandorph**

62.     In 2013, Melgoza met with Dandorph to discuss her career progression and interest in continuing to develop as a leader at Rush. (Dandorph, 51:4-52:2, Tab 13.)

63.     Melgoza alleges that Dandorph made an unwanted sexual advance to Melgoza after she expressed her desire to grow within the organization. Dandorph informed Melgoza that he once had a Cuban girlfriend, that he did not marry his Cuban girlfriend, and that he owned a boat but desired to purchase a larger boat. (Cmplt. ¶ 38, Tab 31.) He did not say anything about Melgoza's looks, ask her to be his girlfriend or ask her to go on his boat. (Melgoza, 135:22-136:16, Tab 4.)

64. Dandorph denied informing Melgoza that he once had a Cuban girlfriend. (Dandorph, 54:8-11, 101:24-102:2, Tab 13.) Dandorph never even had a Cuban girlfriend. (Dandorph, 54:12-15, 101:24-102:2, Tab 13.) While Dandorph does have a boat, he does not recall discussing his boat with Melgoza. (Dandorph, 54:16-20, Tab 13.)

65. Melgoza did not report Dandorph to HR. (Melgoza, 135:5-8, Tab 4.)

**C. Melgoza's Concerns Regarding Pay**

66. In 2006, while working as an Assistant Vice President, Melgoza reported to Clapp that she believed she was paid less than men because she is a woman. (Melgoza, 66:12-67:3, 72:10-73:13, Tab 4.)

67. Clapp worked with HR, which in turn performed a market review for her salary as an Assistant Vice President, which in turn resulted in an upward adjustment in her salary of 6% or 8%. (Melgoza, 67:20-24, Tab 4.)

68. Melgoza asked Mulroe for a pay equity review in writing on April 14, 2015. (Mulroe 30(b)(6), 54:10-12, Tab 10; Plaintiff's Dep. Ex. 43, Tab 24.) A pay equity review is an analysis of an individual's job description compared to market, internal comparables in the organization, and performance to determine whether an individual is being paid fairly. (Wallace, 12:16-23, Tab 9.)

69. Thereafter, Rush completed the pay equity review, and determined that Melgoza's compensation was appropriate. (Mulroe 30(b)(6), 58:13-17, Tab 10.)

70. The record does not reveal any other requests from Melgoza regarding her pay aside from the 2006 and 2015 requests.

71. Melgoza did not, at any time, file a complaint with HR regarding her belief that she was being retaliated against for her reports about her pay. (Melgoza, 73:14-74:5, 76:2-12, Tab 4.)

### D.  Interim Cancer Position

72.     On February 8, 2017, Melgoza met with Dr. Bianco[13] to discuss the interim cancer position. (Ans. ¶ 66, Tab 1; Bianco, 89:3-6, Tab 25.)

73.     Dr. Bianco was looking for a replacement for Correa "as fast as [he] could" on an interim basis. (Bianco, 95:2-22, Tab 25.) After discussing potential candidates with Barginere and Dandorph, he interviewed Melgoza, Nedved and Jeremy Strong[14] ("Strong"). (Bianco, 97:6-15, Tab 25.)

74.     During his interview of Melgoza, Dr. Bianco did not say anything regarding her national origin. (Melgoza, 144:9-15, Tab 4.)

75.     Rather, Melgoza alleges that Dr. Bianco called her a snob, specifically in reference to the fact that Melgoza had graduated from Smith College. Melgoza alleges further that Dr. Bianco stated that only snobs go to Smith college. (Melgoza, 144:16-22, 147:13-15, Tab 4.)

76.     Accordingly to Melgoza's allegation, Dr. Bianco never made any comment directly referencing her gender. Rather, the alleged comment was based on Smith College, which Melgoza interpreted to be a reference to her gender because Smith is a women's college. (Melgoza, 144:16-22, 147:13-15, Tab 4.)

77.     Based on the interview, Dr. Bianco was not impressed with Melgoza and decided not to offer her the interim cancer position. (Bianco, 111:22-116:5, Tab 25.) Specifically, Dr. Bianco concluded that her depth of knowledge regarding the service line was not impressive, and she did not come across as someone who was proactive with an ability to lead and manage nurses, administrators and medical assistants, to work on the budget and have external

---

[13] The interim cancer position reported to Dr. Bianco. (Bianco, 89:3-16, Tab 25.)
[14] At this time, Strong was AVP, hospital operations. (Strong, 30:6-7, 31:1-4, Tab 26.)

relationships with other partners in the hospital and outside the hospital.. (Bianco, 111:22-24, 113:19-115:13, Tab 25.)

78.     Dr. Bianco, Barginere and Dandorph made a collective decision to offer the position to Nedved. (Bianco, 130:13-16, Tab 25.) Based on her interview, Dr. Bianco thought Nedved was very impressive, very articulate, energetic and "ha[d] the right does of leadership skills that this job require[d]." (Bianco, 119:20-24, Tab 25.) In addition, Nedved was not going to lose her current position by taking on the interim cancer position. (Bianco, 99:1-9, 126:11-13, Tab 25.)[15]

79.     Nedved filled the cancer position on an interim basis in addition to maintaining her existing AVP role of professional nursing practice. (Nedved, 37:6-9, 46:20-24, Tab 18.)

80.     Nedved started at Rush in 2007 as Director of nursing systems. (Nedved, 16:13-17, Tab 18.) In 2009, she was promoted to AVP of professional nursing practice. (Nedved, 18:9-17, Tab 18.) As AVP of professional nursing practice, Nedved was responsible for all of the training, education and preparation of all nurses at Rush, and for leading large scale practice changes for clinicians and staff. (Nedved, 17:8-22, 20:17-23:7, Tab 18.)

81.     In 2014, while maintaining her AVP role, she took on the interim AVP role for psychiatric behavioral health for 6 months. (Nedved, 23:12-15, Tab 18.) In addition, while maintaining her AVP role, she took on the role of interim chief nursing officer from June 2015-December 2016. (Nedved, 24:2-11, Tab 18.)

---

[15] The fact that this was an interim position was "tricky for someone to apply to, because if you have a stable position and the stable position you're coming from is a very important one, they're going to replace you the minute you step out. And then if you end up not being the final person on the [interim] job, you're out of a job." (Bianco, 99:1-9, Tab 25.)

### E. Chief Administrative Officer, Oncology Service Line

82.     On November 1, 2017, Melgoza applied for the chief administrative officer ("CAO"), cancer service line position. (Schopp, 187:11-14, Tab 3; Melgoza, 113:22-114:5, 115:22, Tab 4.) Rush had "big plans" for the CAO, cancer service line position, and wanted someone with a national reputation for running a cancer center with lots of experience. (Bianco, 130:19-131:1, Tab 25.)

83.     Melgoza interviewed with Dr. DeCresce and Dandorph, among others, for the CAO position. (Schopp, 193:15-18, Tab 3; Dandorph, 106:21-107:6, Tab 13.) Dean Ranga Krishnan, who was running the cancer service line, was the final decision-maker for the CAO, cancer service line position. (Dandorph, 108:20-24, Tab 13.)

84.     On December 2, 2017, Melgoza reported to Schopp that Dr. DeCresce wore a Donald Trump mask (the "Mask") to intimidate and harass her during the interview because she is Mexican-American. (Schopp, 193:23-194:8, Tab 3; Plaintiff's Dep. Ex. 17, Tab 27.)

85.     Schopp and Wallace immediately investigated Melgoza's report. (Schopp, 194:9-21, Tab 3; Wallace, 147:13-15, Tab 9.) Schopp and Wallace interviewed Melgoza (twice), Dr. DeCresce (twice), and Dr. Jokich. (Schopp, 194:9-195:10, Tab 3; Plaintiff's Dep. Ex. 59, Tab 28.) They were not able to validate Melgoza's allegations in the course of the investigation because, among other reasons, Melgoza's physical description of the Mask was inconsistent with the Mask retrieved from Dr. DeCresce's office and Melgoza's description of how the Mask surfaced during the interview changed between two separate interviews with her. (Schopp, 200:11-201:11, Tab 3; Wallace, 149:20-22, Tab 9; Plaintiff's Dep. Ex. 59, Tab 28.)

86.     The Mask was ultimately returned to Dr. DeCresce after the investigation closed with an instruction to remove it from Rush property. (Schopp, 198:4-12, 199:12-15, Tab 3; Wallace, 152:20-23, Tab 9.)

87.     The CAO, cancer service line position was not filled internally because none of the candidates were qualified. (Schopp, 187:19-188:3, Tab 3.) Thereafter, in May 2018, Rush retained Korn Ferry to search for an executive to fill the CAO, oncology service line position at Rush. (Schopp, 188:3-4, 206:5-13, Tab 3; Basara, 23:5-8, Tab 29.)

88.     Korn Ferry presented over 12 people to Rush for its consideration, including Melgoza. (Basara, 35:21-24, 38:19-24, Tab 29.)

89.     Rush made the decision to move forward in the process with other candidates that were stronger and a better fit. (Basara, 51:10-52:3, Tab 29.)

90.     The CAO, oncology service line position was not filled based on Korn Ferry's search. (Basara, 53:6-19, Tab 29.)

91.     Rush paid Korn Ferry between $100,000 and $150,000 for this search. (Basara, 71:3-7, Tab 29.)

92.     The CAO, oncology service line position has not been filled to date. (Ellis, 51:18-22, Tab 19.)

**F.     Chief Administrative Officer, Neuroscience Service Line**

93.     Barginere was the hiring manager for the CAO, neuroscience service line position. (Barginere, 112:6-24, Tab 8.) Barginere interviewed two candidates for the position: Melgoza and Deval Daily ("Daily"). (Barginere, 113:15-17, Tab 8.)

94.     Barginere chose Daily for the CAO, neuroscience service line position. (Barginere, 114:1-2, Tab 8.) Barginere chose Daily because of the breadth of her experience. (Barginere, 114:4-6, Tab 8.) Daily had been the service line administrator for neurosciences for several years, and had worked with physician leaders in neurology and neurosurgery as well as having stepped out on the ambulatory care sites while maintaining responsibility for budgets, hiring and construction. (Barginere, 114:6-16, Tab 8.)

95.     Daily started at Rush in 2007 as manager of business operations. (Daily, 11:5-6, 11:19-20, Tab 30.) In 2014, Daily was director of hospital operations and took on a second position as service line administrator for neurosciences. (Daily, 14:6-7, 15:17-16:5, Tab 30.) After almost three years, Daily took on another role as director of business development for off-sites. (Daily, 18:19-19:1, Tab 30.) Daily interviewed for and took the role of AVP of clinical operations in June or July 2017. (Daily, 22:22-24, 23:7-11, Tab 30.) Daily subsequently interviewed for and took on the role of CAO, neuroscience service line in January 2019. (Daily, 41:2-20, 42:7-9, Tab 30.)

## VII.    Melgoza's EEOC Complaint

96.     On May 8, 2017, Melgoza filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (Ans. ¶ 88, Tab 1; Cmplt. Ex. A, Tab 31.)

97.      On August 24, 2017, Melgoza received a "right to sue" letter for the Charge. (Ans. ¶ 90, Tab 1; Cmplt. Ex. B, Tab 31.)

98.     This lawsuit followed. (Cmplt., Tab 31.)

**DATED: November 15, 2019**

Respectfully submitted,

SEYFARTH SHAW LLP


By: /s/ James C. Goodfellow, Jr.
James C. Goodfellow, Jr.
Attorney for Defendant
Rush University Medical Center

Amanda A. Sonneborn
James C. Goodfellow, Jr.
Thomas Horan
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
E-mail: asonneborn@seyfarth.com
jgoodfellow@seyfarth.com
thoran@seyfarth.com

*Attorneys for Rush University Medical Center*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, does hereby certify that he served the foregoing document with the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to the following at their e-mail addresses on file with the Court:

Ashley Lauren Orler
Rebekah Susan Mintzer
Melanie Elysia Baker
Golan Christie Taglia LLP
70 W. Madison Street
Suite 1500
Chicago, IL 60602
312-263-2300
alorler@gct.law
rsmintzer@gct.law
mebaker@gct.law

Peter M. Katsaros
Gillian G. Lindsay
HAHN LOESER & PARKS LLP
125 South Wacker Drive, Suite 2900
Chicago, IL 60606
(312) 637 - 3015
pkatsaros@hahnlaw.com
glindsay@hahnlaw.com
*Counsel for Plaintiff*
*Norma Melgoza*

*/s/ James C. Goodfellow, Jr.*
James C. Goodfellow, Jr.