**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NORMA MELGOZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17-cv-6819 |
| vs. | ) | |
| | ) | Honorable Mary Rowland |
| RUSH UNIVERSITY MEDICAL CENTER, | ) | Honorable Gabriel A. Fuentes |
| | ) | Jury Trial Demanded |
| Defendant. | ) | |
| | ) | |

## RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Defendant, RUSH UNIVERSITY MEDICAL CENTER ("Rush"), pursuant to in accordance with Local Rules 56.1(a) and 56(b)(3)(C), respectfully submits its response to Plaintiff, NORMA MELGOZA's ("Plaintiff") Statement of Additional Material Facts. (Dkt. No. 168.)

## Introduction

Plaintiff's law suit centers on claims: (1) whether Rush has violated the Equal Pay Act during her time as an Associate Vice President from 2014 through 2016; (2) whether Rush violated Title VII or the Illinois Human Rights Act in connection with her pay; (3) whether Rush retaliated against her for engaging in alleged protected activity; and (4) whether Plaintiff experienced any actionable harassment during her employment at Rush. Plaintiff's voluminous statement of additional facts is rife with violations of Local Rule 56.1, in that it is composed almost entirely of statements that are either immaterial to Plaintiff's claims, not supported by the record, not supported by the documents cited, or rely on documents that Plaintiff herself created and has not authenticated. Moreover, many of her statements contain legal arguments as a means to pack additional pages of argument where otherwise constrained by the 25 page limit for

memoranda of law. As set forth below, the Court should disregard Plaintiff's statements of additional fact. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *IA Rana Enterprises, Inc. v. City of Aurora*, 630 F. Supp. 2d 912, 918 (N.D. Ill. 2009) (disregarding statements of fact for failure to cite any evidence in support of the facts alleged and statements of "fact" that were argumentative rather than discrete factual contentions); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities."); *Padilla v. Bailey*, 2011 WL 3045991, at *2 (N.D. Ill. July 25, 2011) (striking from the record statements of fact that mischaracterized the record). Rush identifies the offending assertions below.

## I.      Melgoza's Qualifications and Background.

1.      Melgoza has a Bachelor of Arts from Smith College and a Master's Degree in Public Administration in Health Policy and management from the Robert F. Wagner Graduate School of Public Service at New York University ("NYU"). (Exhibit AAA; Exhibit B 9:2-10; 276:14-277:16; 278:14-283:17; Exhibit BBB.) Melgoza received academic awards both at Smith College and NYU, and was the recipient of the Robert F. Wagner Public Service award during her years at NYU. *(Id.,* Exhibit CCC)

## RESPONSE:

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.).

2.      Melgoza was born at Cook County Hospital in Chicago, Illinois, and was raised in the Pilsen, Little Village, and Back of the Yards neighborhoods in Chicago, Illinois. (Exhibit B 302:7-303:11; Exhibit CCC, P00001022-3.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.).

3.    Melgoza is a fellow with the American College of Health Care Executives and is certified in healthcare management. (Exhibit B 285:23-286:15; Exhibit DDD.) In October 2013, Melgoza received a leadership executive program certificate from the American College of Health Care Executives. (Exhibit B 286:17-288:2; Exhibit BBB.) Melgoza was selected by the National Latino Forum for Healthcare Executives as a scholarship recipient for her leadership abilities and commitment to patient excellence. (Exhibit B 288:21-290:4; Exhibit BBB.) Melgoza was a board member for National Forum for Latino Healthcare Executives from 2013-2015 and advocated for the inclusion, promotion and advancement of Latino and Mexican-American healthcare professionals at Rush and nationwide. (Exhibit DDD; Group Exhibit KKK, Pl. Ex. 10, Pl. Ex. 12.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). Further, the documents[1] cited do not support Melgoza's assertion that she was selected by the National Latino Forum for Healthcare Executives as a scholarship recipient "for her leadership abilities and commitment to patient excellence." *Malec*, 191 F.R.D. at 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.") Moreover, the documents cited do not support Melgoza's assertion that she "advocated for the inclusion, promotion and advancement of Latino and Mexican-American healthcare professionals at Rush and nationwide." *Id.*

4.    Melgoza has extensive healthcare industry experience that spans over 25 years. (Exhibit DDD.) Melgoza started her healthcare career at NYU's Health Research Program as a

---

[1] Pl. Ex. 10 and Pl. Ex. 12 were not attached to Plaintiff's Statement of Additional Facts.

research fellow in 1992 where she evaluated the impact of HIV/AIDS education for healthcare providers. (Exhibit B 278:14-283:17; Exhibit DDD.) Melgoza was a director for the Smith College Alumnae Association from 2005 to 2008, where she advocated for diversity and access to higher education for young women and under-represented minority students. (Exhibit B 283:18-284:21; Exhibit DDD.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). Further, whether Melgoza has "extensive" healthcare experience is conclusory. *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations).

5.      Melgoza was part of the Cook County Hospital's AIDS ward where she worked side by side with the first pioneers who developed comprehensive models for care of patients suffering from the HIV/AIDS epidemic in the late 80s. (Exhibit B 132:10-133:5.) Melgoza also worked at the Hispanic Health Alliance and Alivio Medical Center where she focused on HIV/AIDS education and implemented immunization outreach strategies to reduce the outbreak of measles, mumps, rubella and other communicable diseases within the Latino community of Chicago. *(Id.)*

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). Further, the documents cited do not support the assertions in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") I

6.      In 1994, Melgoza worked at Lutheran Medical Center in Brooklyn, New York as an evening/weekend administrator. (Exhibit BBB.) From 1995 through 2006, Melgoza contributed to various healthcare initiatives including Illinois Kid Care Program for uninsured women and children at Mount Sinai Hospital. (Exhibit B 10:23-12:19; Exhibit BBB.) Melgoza duplicated this program across Illinois at other healthcare systems through the Metropolitan

HealthCare Council. (Exhibit B 12:20-15:9; Exhibit BBB.) Melgoza also ran marketing and outreach programs at the federally qualified healthcare centers throughout the Westside of Chicago. (Exhibit B 11:8-15:9; Exhibit BBB.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F.

Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material

facts - that is, facts which are relevant to the outcome of the issues presented by the movant's

summary judgment motion.). Further, the documents cited do not support that Melgoza

"duplicated this program across Illinois at other healthcare systems through the Metropolitan

HealthCare Council" alone, or that Melgoza "ran marketing and outreach programs at the

federally qualified healthcare centers throughout the Westside of Chicago" alone. *Malec*, 191

F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are

nullities.") I

7.     After graduating from NYU's graduate program in healthcare management, Melgoza continued her career at Mount Sinai Health System as assistant to the President, and was eventually promoted to director of Health Programming and Community Affairs. (Exhibit B 9:13-10:16; Exhibit BBB.) In 2003, she was promoted to director of service lines, where she was responsible for the oncology services and research operations which included the institutional review board and clinical trials in cancer and operations. (Exhibit B 15:10-25:23; Exhibit BBB.) In 2005, Melgoza was promoted to Assistant Vice President of service lines of cancer, medicine, geriatrics, women & children, and surgery for Mount Sinai Hospital. (Exhibit B 25:24-27:1; Exhibit BBB.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F.

Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material

facts - that is, facts which are relevant to the outcome of the issues presented by the movant's

summary judgment motion.).

## II.    Melgoza's Employment at Rush as an Assistant Vice President.

8.    In November 2006, Melgoza began her employment at Rush as Assistant Vice President, and continued in that role through October 2010. (Exhibit B 32:20-33:1; Exhibit BBB.) As Assistant Vice President, Melgoza's responsibilities included management of radiology, non-invasive cardiology, neurodiagnostics, breast imaging, bone marrow transplant, bone marrow transplant clinic, photopheresis, the emergency department, and center of bioterrorism and emergency management. (Exhibit B 33:1-50:17; Exhibit BBB; Exhibit EEE.) In addition, Melgoza was the executive leader for the cancer services, the executive leader for primary care services, and the executive leader for research. *(Id.)* Melgoza prepared and managed operational and capital budgets for her departments, developed hiring plans, and focused on improving patient outcomes. *(Id.)*

## RESPONSE:

Rush admits that Plaintiff began her employment at Rush as an Assistant Vice President.

As for the remainder of this paragraph, to the extent that Plaintiff intends this paragraph to address her duties during the relevant time period of 2014 through 2016, this statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). The documents cited do not support that Melgoza's responsibilities included management of the "center of bioterrorism and emergency management." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") The documents cited do not support that Melgoza "developed hiring plans." *Id.* Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander v. Cit Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 882-3 (N.D. Ill. 2002) (plaintiff's notes excluded as hearsay); *Lupescu v. Napolitano*, 700 F. Supp. 2d 962, 967 (N.D.

Ill. 2010) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

9.      Between 2006 and 2010, additional responsibilities were added to Melgoza's portfolio, including radiation oncology, medical physics the Chest Pain Center for ST-elevation myocardial infarction (heart attack), dialysis, transfer center, transfer center agreements, inpatient plasmapheresis and the opening of new cancer facilities at Rush Oak Park in breast and radiation oncology and medical physics. (Exhibit B 235:6-12, 335:11-356:7, 369:1-7, 372:24-375:2; Exhibit BBB; Exhibit EEE.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.).The documents cited do not support that Melgoza's portfolio included "for ST-elevation myocardial infarction (heart attack), "inpatient plasmapheresis" or "the opening of new cancer facilities at Rush Oak Park." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

10.      In 2006, Melgoza was appointed cancer conference coordinator for Rush's Cancer Committee, where she oversaw eight of Rush's multi-disciplinary cancer conferences representing 1,600 cancer cases. (Exhibit B 376:8-19; 380:11-18; Exhibit BBB; Exhibit EEE.)

**RESPONSE:**

Rush admits that in 2006, Plaintiff was appointed cancer conference coordinator.

As for the remainder of this paragraph, to the extent that Plaintiff intends this paragraph to address her duties during the relevant time period of 2014 through 2016, this statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). The documents cited do not support that Melgoza "oversaw eight of Rush's multi-disciplinary cancer conferences representing 1,600 cancer cases." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

11.     As an Assistant Vice President, Melgoza was a primary executive leader in the implementation of the hospital-wide EPIC software system and the migration to an innovative picture archiving system (PACS) for the new, non-invasive platform in the new hospital tower and development of EPIC for the emergency department, the 911 emergency response center, radiology, cardiology, breast imaging and radiation oncology. (Exhibit B 36:4-40:2, 45:1-10; Exhibit BBB; Exhibit EEE.) As the executive leader of the transfer center, Melgoza introduced new technology to facilitate the transfer of patients from hospitals throughout Illinois and Iowa by assigning inpatient beds with priority based on acuity and clinical algorithms. (Exhibit B 71:12-72:3, 372:24-375:2; Exhibit BBB.) Melgoza integrated clinical services into the transfer center such as transplant, neurology and neurosciences, cardiology, women and children, and other critical care clinical disciplines. *(Id.)* She negotiated and signed over 30 transfer agreements across Illinois and Iowa. *(Id.)* Melgoza also designed the chest pain center at Rush to lower Rush's response to ST-Elevation myocardial infarctions from 172 minutes to the national standard of 90 minutes in order to streamline operations between the emergency department and cardiology. (Exhibit BBB, Exhibit EEE, Group Exhibit KKK, P00001268-87.)

**RESPONSE:**

Rush admits that Plaintiff had oversight responsibility for the transfer center and that she negotiated and signed over 30 transfer agreements with hospitals in Illinois and Iowa.

As for the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

12.     Melgoza is a founding member of Rush's Diversity Leadership Council (now called the Diversity Leadership Group), and also a member of Rush's Women's Leadership Council. (Exhibit EEE; Group Exhibit FFF, P00000385.) The Diversity Leadership Council and the Women's Leadership Council were established to increase gender diversity in leadership, and to promote equitable compensation at Rush. (Exhibit B 90:14-20; RUSH000905-924; Group Exhibit FFF.) Melgoza was vocal in promoting opportunities for diverse leaders in healthcare, particularly those of Mexican-American and Latino descent given Rush's patient population and its location within the city of Chicago. (Exhibit B 179:11-24, 288:21-290:4; Exhibit Q 125:12--20; Group Exhibit FFF.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.) Further, the documents cited do not support the statements made in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of

Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

13.     Mike Dandorph ("Dandorph"), President of Rush, was an executive sponsor of the Diversity Leadership Counsel. (Exhibit C 28:22-29:15; Exhibit N.) Dandorph admitted in his personal self-evaluation that he is not an excellent leader. (Exhibit GGG.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.). Further, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, Plaintiff failed to authenticate Exhibit N because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also failed to lay any foundation for the admission of Exhibit N which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

14.     Melgoza was the first and only female Mexican-American executive at the AVP level or higher at Rush until her demotion in 2016. (Exhibit C 56:12-16; Exhibit Q 23:17-23; 25:17-21.) According to Robert Clapp ("Clapp"), Executive Vice President and Executive Director of Rush Hospitals, and Melgoza's former supervisor, Melgoza was the first woman executive leader since the organization's founding in 1837. (Exhibit B 32:20-22; 72:10-73:1; 111:10-21, 252:12-17; Exhibit TT; Exhibit HHH.) There are no individuals of Mexican national origin within the top 100 executive leadership positions at Rush. (Exhibit Q 25:17-21; Exhibit C 34:11-17; Exhibit O 75:24-76-4; 126:13-16; Exhibit NNN.)

**RESPONSE:**

Rush admits that Robert Clapp was Melgoza's former supervisor, and that Clapp testified

that Plaintiff was the first woman executive leader since the organization's founding in 1837.

As for the remainder of this paragraph, the documents cited do not support the remainder

of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by

citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit HHH

because she failed to submit evidence "sufficient to support a finding that the item is what the

proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff

failed to lay any foundation for the admission of Exhibit HHH which constitutes inadmissible

hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay);

*Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing

a motion for summary judgment.").

15.     Peter Butler ("Butler"), former Rush President, was a member of the Diversity
Leadership Council. (Exhibit Q 21:18-22:15.) Butler was familiar with the Women's Leadership
Council and efforts to shine light on women's leadership issues at Rush. (Exhibit Q 31:1-33:2.)
In his retirement farewell at Rush, Butler referred to Rush as a "candy shop" because of his
ability to advance in multiple areas. (Exhibit Q 126:13-19.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A

statement of additional facts must be limited to material facts.). Further, this statement is

comprised entirely of Plaintiff's conclusions regarding Butler's testimony. *De*, 912 F. Supp. 2d

at 713 (A statement of additional facts is not the proper province of conclusory allegations).

**III.     Melgoza's Promotion to Associate Vice President.**

16.     In November 2010, Melgoza was promoted to Associate Vice President ("AVP")
at Rush, and worked as an AVP until July 14, 2016. (Exhibit AAA ¶ 20; Exhibit B 68:12-69:4,
95:13-14, 115:17-20, 226:16-19; Exhibit BBB.) Melgoza's scope was expansive and covered
both complex clinical areas requiring regulatory expertise and support functions. (Exhibit B

384:17-396:12; Exhibit M; Exhibit BBB; Exhibit EEE; Group Exhibit KKK, P00001268-87, Pl. Ex. 9, Pl. Ex. 10, Pl. Ex. 11, Pl. Ex. 12, Pl. Ex. 13.)

**RESPONSE:**

Rush admits that Melgoza was promoted to AVP in November 2010.

As for the remainder of this paragraph, the documents[2] cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit M and Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M and Exhibit EEE which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

17.     During her tenure as AVP, additional departments were added to her portfolio, including: (1) guest relations; (2) interpreter services at Rush's main campus and Rush Oak Park; (3) volunteer services; (4) campus wide security services for the clinical operation and academic facility; (5) emergency preparedness at Rush Oak Park; (6) environmental services; (7) linen processing; (8) linen distribution; (9) radiation safety; and (10) occupational safety. (Exhibit B 384:17-396:12; Exhibit M; Exhibit EEE.)

**RESPONSE:**

Rush admits that Melgoza's portfolio included guest relations, interpreter services, volunteer services, the security department, environmental services and occupational safety.

As for the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit M and

---

[2] Pl. Ex. 9, Pl. Ex. 10, Pl. Ex. 11, Pl. Ex. 12, and Pl. Ex. 13 were not attached to Plaintiff's Statement of Additional Facts.

Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M and Exhibit EEE which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

18.     Melgoza retained the operations that she had been responsible for as an Assistant Vice President, including: (1) breast imaging at Rush main campus and Rush Oak Park; (2) radiation oncology at Rush main campus and Rush Oak Park; (3) medical physics at Rush main campus and Rush Oak Park (4) bone marrow transplant; (5) bone marrow clinic; (6) photopheresis; (7) dialysis; (8) plasmapheresis; (9) joint venture between Rush Radiosurgery and Rush; and (10) emergency management at Rush main campus and Rush Oak Park. (Exhibit B 326:17-328:1, 344:4-11, 355:11-356:7, 359:10-12, 365:19-366:9, 369:1-7; Exhibit M; Exhibit EEE; Group Exhibit LLL, P00001071-2.) Melgoza continued her executive leadership function with the cancer committee, the Diversity Leadership Group, the Women's Leadership Council, served as a voting member of the Institutional Review Board, and was the services leader for cancer, dermatology, research and primary care. (Exhibit B 70:23-71:8; 379:4-13; Exhibit E; Exhibit DDD; Exhibit EEE.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.) Further, the documents cited do not support that Plaintiff retained the following operations: bone marrow clinic, photopheresis or joint venture between Rush Radiosurgery and Rush. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, the documents cited do not support the Plaintiff's assertion that she was the services leader for cancer, dermatology, research, and primary care. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). In addition, Plaintiff failed to authenticate Exhibit M and Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal

Rule of Evidence 901. Plaintiff also failed to lay any foundation for the admission of Exhibit M

and Exhibit EEE which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3

(plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider

only admissible evidence in assessing a motion for summary judgment.").

19.     As AVP, Melgoza was responsible for budgets exceeding $200 million in
revenue, a budget of $80 million, over 700 full time employees, 3.1 million cleanable clinical
square feet, and between nine (9) and eleven (11) clinical support departments at one time.
(Exhibit B 77:1-10; Exhibit BBB; Exhibit III, P00001124-30; Group Exhibit MMM, Pl. Ex. 49.)
Melgoza also had level 4 purchasing authority to spend up to $1,000,000. (Exhibit B 305:19-
307:2.) Executives with purchasing power over $500,000.00 are usually Vice Presidents.
(Exhibit JJJ 34:14-36:4.)

**RESPONSE:**

Rush admits that Plaintiff had level four purchasing authority.

As for the remainder of this paragraph, the documents[3] cited do not support the first and

third sentences in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly

supported by citation to the record are nullities.") Further, Plaintiff failed to authenticate Exhibit

MMM because she failed to submit evidence "sufficient to support a finding that the item is what

the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff

failed to lay any foundation for the admission of Exhibit MMM which constitutes inadmissible

hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay);

*Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing

a motion for summary judgment.").

20.     As AVP, Melgoza also was an executive on call, serving as the most senior level
executive for the entire Rush campus. (Exhibit B 313:22-315:1; Exhibit C 89:24-91:18; Exhibit
TTT 44:23-45:22; Exhibit R 53:18-54:18; Exhibit EEE.)

---

[3] Pl. Ex. 49 was not attached to Plaintiff's Statement of Additional Facts.

**RESPONSE:**

Rush admits that, as an AVP, Melgoza periodically served as the executive on call.

As for the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE, which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

21.     Rush consistently rated Melgoza's job performance as exceeding expectations. (Group Exhibit KKK.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.).

22.     Rush's corporate organizational charts reflected Melgoza's and others responsibilities and were modified from time to time. (Group Exhibit LLL.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

**IV.     Melgoza Complained of Unequal Pay and Requested an Equitable Review of Her Salary Before She Was Demoted.**

23.     Throughout her employment, Melgoza has kept contemporaneous notes regarding her daily activities. (Exhibit B 159:1-162:18; Exhibit F; Exhibit L; Exhibit M; Exhibit N; Exhibit U; Exhibit II; Exhibit QQ; Exhibit CCC; Exhibit HHH; Exhibit III; Group Exhibit MMM.)

Melgoza also created a timeline of her daily activities and meetings at Rush. (Exhibit B 162:19-164:4; Exhibit M; Exhibit HHH; Group Exhibit MMM, Pl. Ex. 31.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.). Further, Exhibit F, Exhibit QQ, Exhibit CCC and Exhibit III do not support the first sentence in this paragraph, and the documents[4] cited do not support the second sentence in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, Plaintiff failed to authenticate Exhibit L, Exhibit M, Exhibit N, Exhibit U, Exhibit II, Exhibit HHH and Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit L, Exhibit M, Exhibit N, Exhibit U, Exhibit II, Exhibit HHH and Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

24.     Prior to 2016, there was a single woman Vice President at Rush. (Exhibit E; Group Exhibit LLL, P00000919; Exhibit NNN.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

25.     From 2006 through the present, Melgoza expressed her interest in advancing her career at Rush. (Exhibit UU; Group Exhibit KKK; Group Exhibit MMM, P00001172-1241.) During Melgoza's tenure as an AVP, she met with senior executives at Rush on multiple occasions to inform them about her interest in working as a Vice President, and eventually, the

---

[4] Pl. Ex. 31 was not attached to Plaintiff's Statement of Additional Facts.

Chief Operating Office position given her vast portfolio and extensive experience. (Exhibit W 51:19-52:12; Exhibit M; Exhibit HHH; Group Exhibit MMM.)

**RESPONSE:**

Rush admits that from 2006 through the present, Plaintiff expressed her interest in advancing her career at Rush, and that Plaintiff informed Mulroe that her goal was to become Chief Operating Officer. Nevertheless, these statements are entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.).

Further, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Plaintiff failed to authenticate Exhibit M, Exhibit HHH and Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit M, Exhibit HHH and Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). Finally, whether Plaintiff has "extensive" experience is conclusory. *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations).

26.     In 2006, Melgoza notified her then supervisor, Robert Clapp, that she was undercompensated based upon the size of her portfolio and the number of responsibilities and duties she was expected to complete. (Exhibit B 66:12-73:13; Exhibit M.) Melgoza informed Clapp of her belief that she was underpaid because she was a woman. *(Id.)*

**RESPONSE:**

Rush admits the statements contained in this paragraph.

Nevertheless, to the extent that Plaintiff intends this paragraph to address her employment during the relevant time period of 2014 through 2016, this statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). Further, Plaintiff failed to authenticate Exhibit M because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

27.     Melgoza made numerous requests for a higher salary given her highly-favorable performance reviews and increased responsibilities. *(Id.;* Exhibit B 139:22-144:5, 242:20-247:12; 254:1-11, 507:12-508:6, 528:11-535:22; Exhibit S 131:23-133:18; Exhibit X 55:2-57:11; Exhibit HHH; Group Exhibit KKK.)

**RESPONSE:**

Rush admits that Plaintiff made requests for a higher salary.

Nevertheless, to the extent that Plaintiff intends this paragraph to address her employment during the relevant time period of 2014 through 2016, this statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.). Further, none of the documents cited support the statement that Plaintiff made these requests due to her "highly-favorable performance reviews and increased responsibilities", including Exhibit B 139:22-144:5, 242:20-246:9, 246:14-247:12 and Group Exhibit KKK. *Malec*, 191 F.R.D. at

583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit HHH because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit HHH which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

28. Rush executives, including its former President, were aware of Melgoza's complaints that women at the AVP level were not being promoted to Vice President positions. (Exhibit Q 35:12-36:11; Exhibit M; Exhibit HHH.)

**RESPONSE:**

Rush admits that Melgoza told Butler that she felt she was not at the right title level. (Exhibit Q 36:1-5), but this paragraph is conclusory to the extent that it states that Rush executives were aware of Plaintiff's complaints that women at the AVP level were not being promoted to VP positions. *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). This statement also mischaracterizes Butler's testimony, in that Butler did not testify that other executives were aware of Plaintiff's feelings regarding her title. *Padilla v. Bailey*, 2011 WL 3045991, at *2 (N.D. Ill. July 25, 2011) (striking from the record statements of fact that mischaracterized the record).

As to the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit M and Exhibit HHH because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff has failed to lay any foundation for the admission of Exhibit M and Exhibit HHH which

constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

29.     Melgoza met with Dr. David Ansell ("Dr. Ansell") throughout her employment to discuss her ignored requests for equal pay and Mulroe's refusal to conduct a salary review. (Exhibit B 149:7-150:2; Group Exhibit MMM.) Dr. Ansell told Melgoza that her days would be numbered if she complained to HR. (Exhibit B 526:18-527:7; 694:6-19.)

**RESPONSE:**

The documents cited do not support the first sentence in this paragraph. *Malec*, 191

F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are

nullities.") Further, the alleged incident with Dr. Ansell is immaterial because it took place in

2013, which is outside the relevant time period for Plaintiff's complaint (Ex. B., 525:19-527-:7).

*De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.).

Further, Plaintiff failed to authenticate Exhibit MMM because she failed to submit evidence

"sufficient to support a finding that the item is what the proponent claims it is" in accordance

with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the

admission of Exhibit MMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp.

2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court

may consider only admissible evidence in assessing a motion for summary judgment.").

30.     On April 14, 2015, Melgoza hand-delivered a memorandum addressed to Mulroe, requesting an equitable review of her salary based on the expansive scope of her duties. (Exhibit AAA ¶ 40; Exhibit B 528:11-535:22; Exhibit S 135:4-139:9; Exhibit OOO.) Melgoza met with Mulroe to discuss her request for a salary review in order to be treated equitably and in-line with other AVPs. *(Id.;* Exhibit M, Exhibit HHH.) Melgoza put this request in writing because Mulroe had repeatedly ignored her previous requests. (Exhibit B 528:11-534:21; Exhibit M, Exhibit HHH.) Mulroe tossed Melgoza's memorandum, and dismissively ended the meeting without further discussion. (Exhibit B 533:16-535:22; Exhibit M.)

**RESPONSE:**

Rush admits that Melgoza hand-delivered a memorandum addressed to Mulroe, dated April 14, 2015, which stated "Equity in Salary - Please review my salary based on the dynamic span of my portfolio, education and experience. I want to be treated and compensated equitably for my effort based on the market" or that she had a conversation with Mulroe when she delivered it. (Exhibit B 528:11-529:1; Exhibit OOO).

As for the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit M and Exhibit HHH because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M and Exhibit HHH which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

31.     On May 18, 2015, Melgoza complained of harassment and discrimination to Senior Vice President and Chief Operating Officer Cynthia Barginere ("Barginere"), who did not investigate the complaint. (Exhibit T 107:11-108:5; Exhibit SS.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

32.     On January 6, 2016, Melgoza participated in a focus group sponsored by the Women's Leadership Council. (Exhibit B 137:16-139:15; Exhibit F; Exhibit HHH; Group Exhibit FFF, P00000399-409.) Schopp was present at the meeting. *(Id.)* During this meeting, Melgoza publicly stated that Mulroe failed to address her wage complaints and that Rush failed pay her equitably. (Exhibit B 137:16-139:15; Exhibit HHH.) Melgoza was a vocal member of the Women's Leadership Council. (Exhibit O 113:4-11; Group Exhibit FFF.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.). The documents cited do not support the statements in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit F and Exhibit HHH because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit F and Exhibit HHH which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

33.    Rush never investigated Melgoza's complaints. (Exhibit B 254:24-255:4; Exhibit O 137:17-138:9; Exhibit X 154:6-12; Group Exhibit MMM.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

**V.     Melgoza's July 2016 Demotion.**

34.    On July 14, 2016, Rush demoted Melgoza from her position as AVP to Director. (Exhibit RR ¶ 44; Exhibit B 95:1-24, 223:19-224:9; Exhibit Y 12:1-14.) Melgoza was not

offered a severance package and Human Resources did not make themselves available to discuss a severance package or the reasoning behind Melgoza's demotion. (Exhibit B 96:6-102:6, 223:19-224:3, 226:16-231:8; 243:3-244:13; Exhibit L; Exhibit M; Exhibit N; Group Exhibit MMM, Pl. Ex. 32, Pl. Ex. 34.) Melgoza's demotion was not performance based. (Exhibit B 98:11-19; 227:10-228:12; Exhibit S 181:16-19; Exhibit L.)

**RESPONSE:**

Whether Melgoza was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Further, the documents[5] cited do not support the statements in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, Plaintiff failed to authenticate Exhibit L, Exhibit M, Exhibit N, and Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit L, Exhibit M, Exhibit N, and Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

35.     As a result of the demotion, Melgoza's salary was capped due to the salary grading system at Rush. (Exhibit B 224:1-225:4, 230:1-5; 231:9-14, 246:7-15; Exhibit M; Exhibit HHH; Group Exhibit MMM, P00000502, P00000519, P00001011) As Director, Melgoza is at the highest level salary grade, and has no room for growth or promotion. (Exhibit B 243:3-244:13; Exhibit Y 12:1-18, 21:8-24:11, 100:22-101:20, 102:22-103:14; Exhibit X 87:23-88:7; Exhibit O 42:3-5; Exhibit LL; Exhibit NN; Exhibit OO; Exhibit PP; Exhibit WWWW.) As Director, Melgoza is no longer eligible for the Management Incentive Compensation Program ("MICP"). (Exhibit Y 17:12-20; Group Exhibit MMM, P00001011; Exhibit PPP.) Instead, Melgoza is eligible to participate in a "shadow incentive plan," which involves a different payout

---

[5] Pl. Ex. 32 and Pl. Ex. 34 were not attached to Plaintiff's Statement of Additional Facts.

schedule from the MICP. (Exhibit Y 17:21-18:20; Exhibit X 82:5-8; Exhibit EE 70:19-76:18; Exhibit HH; Exhibit QQ.)

**RESPONSE:**

Rush admits that Melgoza was assigned the highest grade level for directors. Further, Plaintiff misrepresents the record when she states that her salary was capped or that there is no room for growth or promotion. Salary ranges are revised annually based on salary budget surveys, and pay levels usually change between 2% and 3%. (Exhibit Y 74:15-12.) Rush admits that, as a Director, Plaintiff was not eligible for the MICP. Nevertheless, when she transitioned to her new role, Rush provided, and continues to provide, Plaintiff with the opportunity to earn up to 15% of her current compensation as a departmental incentive target, something not normally offered to Directors. (Exhibit X 82:5-8.)

As for the remainder of this paragraph, whether Melgoza was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Further, Plaintiff failed to authenticate Exhibit M, Exhibit HHH and Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M, Exhibit HHH and Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). Finally, Exhibit OO and Exhibit PP does not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

36.     Rush could have kept Melgoza as an AVP instead of demoting her two levels down to Director. (Exhibit T 96:12-18; Exhibit S 165:20-166:5; Exhibit W 85:13-86:20; Exhibit QQQ.)

**RESPONSE:**

Whether Melgoza was "demoted" is a legal conclusion, and what Rush could have done differently is purely speculative and conclusory. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations).

37.     Melgoza's job description was never updated despite her additional responsibilities, her promotion to AVP, and her demotion to Director. (Exhibit B 488:5-489-13; Exhibit X 58:9-21; Exhibit RRR.) Melgoza never received a finalized job description after her demotion. (Exhibit B 489:15-490:18.) When a job changes in a material way, the job description should be updated. (Exhibit Y 82:16-23; Exhibit SSS.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.). Further, whether Melgoza was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Moreover, Plaintiff failed to authenticate Exhibit SSS because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit SSS, which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

38.     Following Rush's alleged reorganization, Melgoza continued to perform the duties she was previously responsible for, including those which were allegedly transferred to Correa. (Exhibit S 165:20-166:5; Exhibit W 85:13-86:20, 102:15-103:1; Exhibit T 7:9-22, 8:24-10:10; Exhibit EEE.) After her demotion, Melgoza continued her oversight of cancer-related services. *(Id.)*

**RESPONSE:**

Rush admits that Melgoza continued her oversight of cancer-related services as a Director under Correa.

As for the remainder of this paragraph, whether Melgoza was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Further, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Moreover, Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also failed to lay any foundation for the admission of Exhibit EEE which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

39.     After her demotion, Melgoza was expected to meet budget deadlines for departments that were allegedly removed from her portfolio. (Exhibit B 387:5-401:6, 413:16-414:3; Exhibit HHH; Group Exhibit MMM, P00002053, Pl. Ex. 49, Pl. Ex. 50.) As Director, Melgoza maintains full oversight over budgets nearing $200 million. (Group Exhibit MMM, Pl. Ex. 50.)

**RESPONSE:**

This statement of fact is based solely on Plaintiff's own testimony, and mischaracterizes that testimony. Plaintiff testified that she continued to perform payroll functions, approving

invoices and contracts for volunteer services (Ex. B. 391:2-17) and guest relations (Ex. B., 394:8-11), *Padilla v. Bailey*, 2011 WL 3045991, at *2 (N.D. Ill. July 25, 2011) (striking from the record statements of fact that mischaracterized the record).

As for the remainder of this paragraph, the record[6] and documents cited do not support this remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, whether Plaintiff was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Moreover, Plaintiff failed to authenticate Exhibit HHH and Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit HHH and Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

40.    In or about March 2017, Melgoza's oversight of the dialysis department was given to Mulroe. (Exhibit B 371:13-372:4; Exhibit EEE.) Melgoza was assigned additional duties including apheresis and the cell processing lab. (Exhibit W 37:14-16; Exhibit DDD.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit EEE because she failed to submit evidence "sufficient to support a

---

[6] Pl. Ex. 49 and Pl. Ex. 50 were not attached to Plaintiff's Statement of Additional Facts.

finding that the item is what the proponent claims it is" in accordance with Federal Rule of

Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit EEE

which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's

notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only

admissible evidence in assessing a motion for summary judgment.").

## VI.    Advancement Within Rush.

41.    A Vice President's role typically includes duties outside of Rush's main campus. (Exhibit O 84:4-86:21.) Vice Presidents are typically responsible for three or more of Rush departments. (Exhibit TTT.) There is no limit on the number of AVPs or Vice President positions. (Exhibit Q 16:3-8.)

## RESPONSE:

Rush admits that there is no limit on the number of AVP or VP positions at Rush.

As for the remainder of this paragraph, the documents cited do not support the remainder

of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by

citation to the record are nullities."). Further, the record evidence cited does not support the

statement that the VP's role typically includes duties outside of Rush's main campus. Schopp

testified that "the senior vice presidents in general had responsibility or impact outside of the

four walls", but "could be inside the four walls potentially." (Exhibit O 86:14-16, 86:19-20.)

42.    Defendant's Compensation Guide for Managers defines an "equity adjustment" as "[a] pay increase given to increase an employee's base pay to make it more equitable with the pay rates of other, similarly performing employees in the same job." (Exhibit UUU.) The Compensation Guide further explains that "[i]nternal equity is the concept that jobs within an organization that are similar in scope, complexity, and responsibility should be paid similar amounts and that individuals within a job that are performing at the same level and have similar experience and competency should be paid similar amounts." *(Id.)* Employees may initiate a request to their leader for a salary equity review. (Exhibit X 15:8-21.) This involves an internal comparison between similarly situated employees within Rush to determine whether an individual is being fairly and equitably compensated. (Exhibit X 12:16-23.)

**RESPONSE:**

Rush admits this paragraph, but states that Plaintiff provides an incomplete reading of

Rush's pay policies and practices. A pay equity review includes not only an internal comparison,

but "an analysis of an individual's job description compared to market" and "an additional factor

would include performance, so looking at those [three] factors to determine whether an

individual is being paid fairly." (Exhibit X 12:16-23.)

## VII. The Male Vice Presidents.

### Mike Mulroe

43.     Mulroe started working at Rush in the fall of 2003 as Director of Purchasing.
(Exhibit S 13:1-14:14; Group Exhibit VVV, RUSH006807. ) Mulroe received his undergraduate
degree from Indiana University and a Master degree in business administration from Indiana
University Northwest. (Exhibit S 6:1-15.) As Director, Mulroe was responsible for Rush's
supply chain activities related to supplies, materials, contracting, and other non-labor expenses.
(Exhibit S 18:5-24; Group Exhibit VVV, RUSH005997-98.) When he became AVP, Mulroe had
additional responsibility over the clinical engineering and security departments. (Exhibit S 19:7-
21:18.) As AVP, in addition to the responsibilities he had previously, Mulroe obtained additional
oversight for the clinical engineering department, campus security, environmental care services,
and at some point, the pharmacy department. (Exhibit S 20:2-26:5; Group Exhibit VVV,
RUSH006911-12.) Mulroe's supervisor as AVP was Clapp. (Exhibit S 19:15-22.)

**RESPONSE:**

Rush admits this paragraph. For purposes of completeness, however, Mulroe's initial

position was Director of Purchasing and Contracting. (Group Exhibit VVV, RUSH005997.) As

Director of Purchasing and Contracting, Mulroe's responsibilities also included contracted

services. (*Id.*) As AVP, Mulroe picked up organizational responsibility for emergency

preparedness as well as oversight of the environment of care function within the medical center.

(Exhibit S 22:5-10.)

44.     Mulroe was promoted to Vice President of Hospital Operations in 2010, and he
maintained the same scope of job duties he had as AVP. (Exhibit S 33:2-34:3; Group Exhibit
LLL, P00001069; Group Exhibit VVV, RUSH06792-93.) Additionally, Mulroe became
responsible for assuring a partnership with corporate programs in Rush to demonstrate support
Rush's mission and vision. (*Id.*) Mulroe is also responsible for holding others accountable for

meeting Rush's standards for policies and procedures. *(Id.)* In Mulroe's opinion, a Vice President in operations drives results, drives engagement, develops plans for improvement, drives organizational results, and works within ICARE values of Rush. (Exhibit S 33:2-17.) Mulroe does not recall the size of his budget, how many full time employees he oversees, or the square footage of Rush that he manages. (Exhibit S 57:5-12; 59:18-60:6; 60:7-14; 60:16-23.) Mulroe's spending authority is limited to $250,000 and he does not have authority to negotiate transfer agreements. (Exhibit S 92:23-93:7; 98:4-17.) Mulroe's total compensation for 2018 was $398,696. (Group Exhibit VVV, RUSH007558.)

**RESPONSE:**

Rush admits that Mulroe was promoted to VP of Hospital Operations in 2010, and that his scope of job duties and responsibilities were similar to what he had already been doing. (Exhibit S 33:2-7.) For the purposes of completeness, however, Rush states that Mulore also has oversight over pharmacy, facilities capital project, emergency preparedness, the operational department, and medical center engineering. (Ex. S 40:6-42:5.) In addition to his oversight role, as a VP, Mulroe also is required to have strategic vision and drive results, engagement, and improvement for his departments such that they align with the values of Rush as an organization. (Ex. S 33:10-13; 35:17-36:11.)

Nevertheless, Plaintiff has not quoted accurately Mulroe's position description. *De*, 912 F. Supp. 2d at 712 (it is improper for a party to misstate the cited record). The documents cited do not support that Mulroe's spending authority is limited to $250,000 or that he does not have authority to negotiate transfer agreements. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

45.     In 2018, when Jeremy Strong and Vanessa Stacks to were promoted to Vice President positions, Mulroe's responsibilities for supply chain, environmental services, chaplains, and patient transport were removed from him. (Exhibit S 63:7-64:1.) Mulroe's salary did not decrease, he was not placed under a shadow incentive program, and he was not demoted to Director. (Group Exhibit VVV, RUSH007558, RUSH008218.)

**RESPONSE:**

Rush admits the first sentence in this paragraph. For purposes of completeness, however, at the same time Mulroe "picked up some additional responsibility related to representing the hospital from a quality and safety perspective, performance improvement, regulatory." (Exhibit S 63:22-64:1.)

As for the remainder of this paragraph, the second sentence in this paragraph constitutes factual or legal arguments and should be stricken. *Basta v. American Hotel Register Co.*, 872 F. Supp. 2d 694, 700 (N.D. Ill. 2012) (A statement of additional facts is not a vehicle for factual or legal argument).

### Scott Sonnenschein

46.     Scott Sonnenschein (male/Caucasian) graduated from Northwestern with a Bachelor's degree in industrial engineering and management science. (Exhibit R 6:12-21.) He obtained his Master's degree in 2001 or 2002 from the University of Chicago, which was paid for by Rush. *(Id.)* Prior to joining Rush, Sonnenschein was employed by McGaw as an alternate site territory manager. (Exhibit R 7:22-8:2.) Sonnenschein was hired by Rush in 1995. (Exhibit R 14:12-17; Group Exhibit WWW, RUSH006807.) By 1999, he was promoted to Assistant Vice President at Rush-Presbyterian-St. Luke's Medical Center with a base salary of $119,000. (Group Exhibit WWW, RUSH005871.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (A statement of additional facts must be limited to material facts - that is, facts which are relevant to the outcome of the issues presented by the movant's summary judgment motion.).

47.     In 2006, Sonnenschein became Vice President of Hospital Operations. (Exhibit R 15:13-14; Group Exhibit WWW, RUSH005871.) As Vice President, he was responsible for surgical care, interventional services, endoscopy, and all of nursing that fell under those groups. (Exhibit R 16:4-18; Group Exhibit WWW, RUSH006792-3.) His scope at Rush also included scheduling, the ear nose and throat clinic, interventional radiology, EP labs, cath labs, neuroendovascular, and procedure rooms. (Exhibit R 22:17-23:5; Group Exhibit WWW, P00001071.) As part of his budgeting responsibilities, he would review all expenses and revenue projections, full time employees, and all expense lines. (Exhibit R 26:22-27:22.) A rough

estimate of budget size for all departments would be in the hundreds of millions. (Exhibit R 29:9-24.) Sonnenschein's direct supervisor was Clapp until 2012. (Exhibit R 18:16-22.) Sonnenschein's budget and spending authority currently exceed on million dollars. (Exhibit R 42:9-12; 56:12-57:12.) He oversees roughly 350 full time employees, but does not know the square footage of Rush that he manages. (Exhibit R 28:9-24; 34:1-17.) Additionally, Sonnenschein does not have authority to negotiate transfer agreements. (Exhibit R 34:1-17.) Between 2015 through 2018, Sonnenschein's total compensation ranged from $398,320 to $413,668 per year. (Group WWW, RUSH005725, RUSH005708, RUSH007568, RUSH005710, RUSH007568.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that

Sonnenschein oversees roughly 350 full time employees, but does not know the square footage

of Rush that he manages. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported

by citation to the record are nullities.") Further, the documents cited do not support that

Sonnenschein does not have authority to negotiate transfer agreements. *Id.* Moreover, the

documents cited do not support that, between 2015 through 2018, Sonnenschein's total

compensation ranged from $398,320 to $413,668 per year. *Id.*

**Jeremy Strong**

48.     Jeremy Strong ("Strong") (male, Caucasian) was hired by Rush as a manager in October of 1999. (Group Exhibit XXX, RUSH001415.) Strong graduated from Rush in 2000 or 2001 with a Master's degree in health systems management. (Exhibit YYY 7:6-12.) In this role he oversaw the analytics for the surgical department, surgical pathology department, and communicative disorders areas. (Exhibit YYY 9:6-12.) His direct supervisor was Brad Henrichs, who was AVP in hospital operations. (Exhibit YYY 9:16-21.) In December 6, 2006, Strong was Administrator of Surgery Administration. (Group Exhibit XXX, RUSH001308.) After 2008, the Administrator role converted to a Director position and was supervised by Scott Sonnenschein. (Exhibit YYY 11:24-12:7.) As a Director, Strong had oversight for the business areas of the surgical departments, surgical pathology, communicative disorders, surgery support departments, and sterile processing department. (Exhibit YYY 13:2-14:1; Group Exhibit YYY, RUSH001367-8.) He also managed the billing, scheduling, budget, and supply expenses for those departments. *(Id.)* As a Director, Strong was responsible for approximately 100-120 full time employees, and had three (3) managers who were direct reports. (Exhibit YYY 17:13-18:17.)

**RESPONSE:**

Rush admits this paragraph. For purposes of completeness, however, Strong was appointed as a Director in 2010. (Exhibit YYY 12:8-12) Strong was also estimating that he was responsible for "about 100 to 120, something like that" full time employees. (Exhibit YYY 17:13-18:17).

49.     In July 2009, Strong became AVP for Business Operations at Rush University Medical Group, at a base salary of $133,000. (Group Exhibit XXX, RUSH001289.) As an AVP Strong's role expanded to include responsibility for the operating room, perioperative space, recovery, interventional radiology, cardiac cath, neuroendovascular, and electrophysiology and he was responsible for about 120-150 employees. (Exhibit YYY 22:16-24; Group Exhibit XXX, RUSH001290-1.) The budgets for these departments were in the $100-150 million range and included approximately 500-700 full time employees. (Exhibit YYY 23:5-24:15.) Around 2015, Strong added therapies, inpatient rehab facility, and JRB departments to his portfolio. (Exhibit YYY 31:5-32:4.) He had 500-700 full time employees under his management and six direct reports, but is unaware of how much square footage he managed. (Exhibit YYY 18:18-21; 23:5-24:15; 32:7-33:15.) Between 2015 and 2018, Strong's total compensation as an AVP raged from $204,683 to $251,337 a year. (Group Exhibit XXX, RUSH000425, RUSH000497, RUSH000499, RUSH007574, RUSH007354-5.) In January of 2019, Strong was promoted to Vice President of Supply Chain. (Exhibit YYY 42:15-19.) In this role, his primary responsibility is elevating the supply chain. (Exhibit YYY 47:1-48:2.) He has four (4) direct reports and approximately 230 full time employees. (Exhibit YYY 48:3-21.) He does not have authority to negotiate transfer agreements. (Exhibit YYY 65:20-66:5.) Strong's base salary as a VP is $270,000. (Exhibit YYY 54:1-19.)

**RESPONSE:**

Plaintiff misstates the cited record throughout this paragraph. *De,* 912 F. Supp. 2d at 712 (it is improper for a party to misstate the cited record). Strong testified that he became an AVP in approximately 2015. (Exhibit YYY 31:5-17) At that time he had therapies, inpatient rehab facility, and JRB "apartments" - not departments - added to his portfolio. (Exhibit YYY 31:5-17) JRB apartments is an independent living facility, and Strong had to manage the board relationship which is part of a trust that has its own separate board structure. (Exhibit YYY 31:3-4, 11-15) Strong testified that the approximate annual budget for OR was "a couple hundred million." (Exhibit YYY 23:5-12) The approximate annual budget for cardiac cath, neurovascular

and EP was "another 100 to 150 million." (Exhibit YYY 23:16-24:7) The documents cited do not support that, as an AVP, Strong had 500-700 full time employees under his management or that he was unaware of the square footage he managed. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Further, for purposes of completeness, however, as Strong's responsibilities as VP include "elevating supply chain to be more of a strategic arm of the organization instead of a support arm . . . with the goal of expanding supply chain coverage to not just the hospital but all of the clinics and eventually for the full system, so all of the hospitals and clinics for the entire system." (Exhibit YYY 47:4-13) He also still maintains responsibility for the therapy areas, the inpatient rehab, and the JRB apartments. (Exhibit YYY 47:13-15) Finally, the documents cited do not support that, between 2015 and 2018, Strong's total compensation, as an AVP, ranged from $204,683 to $251,337. *Id.* Finally, the documents cited do not support that Strong does not have authority to negotiate transfer agreements. *Id.*

## VIII. **The Male AVPs**.

### Leo Correa

50.     Leo Correa ("Correa") (male, Mexican-American) obtained his Bachelors of Science degree from the University of Illinois in Chicago, and his Master's degree from DeVry University. (Exhibit D 15:1-6; 18:24-19:7; Group Exhibit ZZZ, RUSH001587-91.) Prior to joining Rush, Correa was employed by Northwestern University, Robert H. Lurie Comprehensive Cancer Center as an Associate Administrative Director, Operations. In this role, he was responsible for 12-14 cancer research facilities. (Exhibit D 53:5-13; Group Exhibit *ZZZ,* Correa Dep. Pl. Ex. 1.) Correa was hired by Rush on April 4, 2005 as Practice Administrator in the Medical Oncology department at a base salary of $110,000 (Exhibit D 63:1-4; Group Exhibit ZZZ, RUSH001584.) Correa had direct oversight over the clinical and research operations, as well as budgetary and fiscal responsibilities, including a budget of approximately $100 to $150 million. (Exhibit D 132:17-24; 140: 5-10.) Correa managed approximately 17,000 to 18,000 square feet in the clinical operations, which did not include any of the department offices, administrative assistants, or research personnel. (Exhibit D 141:12-142:3.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that Correa

obtained his Master's degree from DeVry University or that he was employed by Northwestern

University as an Associate Administrative Director, Operations. *Malec*, 191 F.R.D. at 583

("Factual allegations not properly supported by citation to the record are nullities.").

51.     On December 23, 2013, Correa was appointed as AVP, Clinical Affairs-Cancer
Services at a base salary of $185,000. (Group Exhibit ZZZ, Correa Dep. Pl. Ex. 2.) His total
compensation was $220,213 in 2015 and $242,234 in 2016. (Group Exhibit ZZZ, RUSH000420;
RUSH000445.) As an AVP, Correa was responsible for directing and managing some clinical
oncology services for Rush University Medical Center. (Exhibit D 176:8-22; Group Exhibit
ZZZ, Correa Dep. Pl. Ex. 7.) It was Correa's responsibility to manage and oversee the entire
cancer service line at Rush. (Exhibit D 180:9-15.) Correa had at least three (3) people who
reported to him directly and managed a variety of support staff. (Exhibit D 82:8-15.) At times
Correa's budgets overlapped with Melgoza's, but he became Melgoza's supervisor in the fall of
2016. (Exhibit D 83:9-16; 65:12-23; 74:16-23.) Correa left Rush in January 2017. (Exhibit D
182:23-183:3.)

**RESPONSE:**

Rush admits this paragraph, except that the documents[7] cited do not support that, as an

AVP, Correa was responsible for directing and managing "some clinical oncology services" for

Rush. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the

record are nullities."). Further, for purposes of completeness, as an AVP, Correa "managed an

entire service line that I would say probably there was nearly 500 employees that made up the

cancer center. I don't recall the size of my budget, but it was very, very large. It was also at that

time the areas that I was responsible for were specifically identified as the most profitable

service line that we had at Rush at the time." (Exhibit D 83:9-16.)

**Shaun Cooper**

52.     Shaun Cooper ("Cooper") (male, Caucasian) received his Bachelor's degree from
the University of Illinois, Urbana-Champaign in 2000 and his Master's degree in health systems
management from Rush University in 2002. (Exhibit AAAA 6:18-7:14; RUSH001500.) Prior to

---

[7] Pl. Ex. 2 was not attached to Plaintiff's Statement of Additional Facts.

joining Rush, Cooper was employed with Cap Gemini Ernst & Young. (Exhibit AAAA 8:9-9:16; Group Exhibit BBBB, RUSH001428-32.) Cooper was hired by Rush in 2007 as Manager of decision support at a base salary of $105,000. (Exhibit AAAA 13:11-19; Group Exhibit BBBB RUSH001496.) In 2011, he became Director of financial operations at Rush. (Exhibit AAAA 20:4-10.) His base salary was around $130,000. (Exhibit AAAA 21:7-24.)

**RESPONSE:**

Rush admits this paragraph. For purposes of completeness, however, Cooper testified that

Cap Gemini Ernst & Young sold off their healthcare consulting division to Accenture, and he

continued his role with Accenture prior to joining Rush. (Exhibit AAAA 9:8-16) Cooper was

hired by Rush as Manager in the Budget & Decision Support Department with a starting salary

of $105,019.20. (Exhibit BBBB, RUSH 001496) As Director of financial support, Cooper gave a

"rough estimate" of "maybe 130" for his base salary in 2011. (Exhibit AAAA 21:7-13)

53.    In March 2015, Cooper was promoted to AVP, Rush Children's Hospital at a base salary of $159,500. (Exhibit AAAA 26:16-29:7; Group Exhibit BBBB, P1. Ex. 56, RUSH008218.) In this position, Cooper was responsible for the overall services of any pediatric patient that entered the Rush system and the direct oversight of the pediatrics department. (Exhibit AAAA 33:6-35:20; Group Exhibit BBBB RUSH000535-6.) Cooper had oversight of approximately 249 employees and eight (8) direct reports. (Exhibit AAAA 46:24-48:8; 67:18-69:3.) In December of 2018, Cooper became Chief Administrative Officer for the maternal and infant services, which expanded his scope to include obstetrics. (Group Exhibit BBBB, RUSH008218.) This new role had been re-defined and was not posted for other applicants to apply. (Exhibit AAAA 61:15-63:23.) His base salary was $220,000. (Exhibit AAAA 65:1-5; Group Exhibit BBBB RUSH008218.) He has approximately ten (10) direct reports and his direct supervisor is Cynthia Barginere. (Exhibit AAAA 69:4-6; 71:10-13.)

**RESPONSE:**

Rush admits this paragraph, except that the documents[8] cited do not support that "Cooper

was responsible for the overall services of any pediatric patient that entered the Rush system."

*Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record

are nullities.") Plaintiff also misstates the record related to Cooper's oversight of approximately

249 employees. Cooper testified that with respect to his oversight of the pediatric department

---

[8] Pl. Ex. 56 was not attached to Plaintiff's Statement of Additional Facts.

(which is 40% of his job) he is responsible for "all faculty that are employed by Rush in pediatrics, both physicians, as well as PhDs. It's also research, education and teaching and services related areas so currently it would include 113 physicians, and also it would include about 15 advance practice providers. These are nurse practitioners that would be also enrolled under there, all the clinic staff or all of our clinics, both on site and off site, and then administrative team, so that's the clinical aspect of it. On the graduate medical education side, there's 63 residents . . . then the team that obviously supports them, then support research enterprise, and it would be all the staff that work in our research enterprise. So we have about 58 people dedicated to research that supports pediatric care. It's about 7 million direct revenue. And then we would also employ the administration that provides the oversight of medical students that would rotate within pediatric areas as part of their medical school education." (Exhibit AAAA 47:4-48:5) Further, the documents cited do not support that "This new role had been re-defined and was not posted for other applicants to apply." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

**Josh Ellis**

54.     Joshua Ellis ("Ellis") (male, Caucasian) received his Bachelor's degree in community health services from Ohio University, and his Master's in healthcare policy and management from University of Massachusetts in 1998. (Exhibit CCCC 6:13-7:5; Group Exhibit DDDD, RUSH007233, RUSH007238.) Prior to joining Rush, Ellis worked at Northwestern Medical Faculty Foundation as a division administrator in the department of medicine, overseeing operations. (Exhibit CCCC 8:21-9:5; Group Exhibit DDDD RUSH007233-4.) Ellis was hired by Rush in 2006 as a Department Administrator for neurosurgery, physical medicine and rehabilitation at a base salary of $92,500. (Exhibit CCCC 11:3-15; Group Exhibit DDDD RUSH007230.) As Administrator, Ellis had less than 100 full time employees and was responsible for the clinical operations of the department, research operations, graduate medical education, faculty compensation, recruitment and hiring. (Exhibit CCCC 16:8-14; 17:18-23; Group Exhibit DDDD, RUSH007241-2.) In 2016, Ellis was promoted to director of administration. (Exhibit CCCC 15:10-12.) His base salary was about $140,000. (Exhibit CCCC 54:8-11.) In this role he was responsible for the financial management and clinical department administrators for all 15 medical groups departments. (Exhibit CCCC 26:3-11.) Ellis was also responsible for mentorship and development of administrators, as well as specific program development for the departments that he managed. (Exhibit CCCC 27:2-17.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that, as Administrator, Ellis had less than 100 full time employees. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, the documents cited do not support that, as director of administration, Ellis' base salary was about $140,000. *Id.*

55.     In 2018, Ellis was promoted to AVP of RUMG Administration at a base salary of about $208,000 and became eligible for the management incentive compensation program. (Exhibit CCCC 44:14-45:4; 58:12-59:3.) In this position, Ellis was responsible for providing oversight to all the clinical department administrators at Rush. (Exhibit CCCC 13:11-16.) He was responsible for a $300 million dollar budget, managed less than 1,000 full time employees and had less than 20 direct reports, but does not know the square footage of the areas he managed. (Exhibit CCCC 17:18-23; 33:22-34:2, 34:16-23.) He does not have authority to negotiate transfer agreements and he was not recommended by Korn Ferry as part of the national search for a cancer executive. (Exhibit CCCC 42:11-16; Exhibit DD 38:19-39:1.) In 2019, Ellis was named the Associate Vice President of Operations in Cancer Center, where he is responsible for the oversight of all practice operations. (Group DDDD, P00002208.) Ellis' duties include leading, directing, and managing the clinical oncology service line, as well as serving as the primary executive for Cancer Services within Rush and affiliated partnerships. Between 2015 and 2018, Ellis' total compensation raged from $119,399 to $251,337. (Group Exhibit DDDD RUSH00720, RUSH007209, RUSH007211, RUSH007458, RUSH007356-7.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that "[Elllis] was responsible for a $300 million dollar budget, managed less than 1,000 full time employees and had less than 20 direct reports, but does not know the square footage of the areas he managed." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, the documents cited do not support that "He does not have authority to negotiate transfer agreements." *Id.* Moreover, the documents cited do not support that "In 2019, Ellis was named the Associate Vice President of Operations in Cancer Center, where he is responsible for the oversight of all practice operations." *Id.* Rush notes that Melgoza failed to cite to the record in support of the statement that "Ellis' duties include leading,

directing, and managing the clinical oncology service line, as well as serving as the primary

executive for Cancer Services within Rush and affiliated partnerships." *Id.* The documents cited

do not support that "Between 2015 and 2018, Ellis' total compensation raged from $119,399 to

$251,337." *Id.*

## XII.    <u>The Women Comparators</u>.

### Vanessa Roshell-Stacks

56.     Roshell-Stacks ("Stacks") (female, African-American) earned her Master's degree
in Health Care Administration from the University of South Carolina in 2002. (Exhibit EEEE
6:17-7:2.) Prior to joining Rush, Stacks worked for healthcare institutions in finance and
operations. (Exhibit EEEE 8:14-10:20; Group Exhibit FFFF, RUSH008008-12.) Stacks was
recruited by Cynthia Barginere and was hired by Rush in May of 2015 as an AVP of care
management in care transitions, with a base salary of $187,000. (Exhibit EEEE 11:6-9; Group
Exhibit FFFF, RUSH008029, RUSH008034.) Her primary responsibilities were for care
management at both Rush Medical Center and Rush Oak Park, as well as management for patient
placement and the transfer center. (Exhibit EEEE 16:17-21:22.) These responsibilities included
nurse care management, social work, utilization review, and clinical documentation
improvement. (Exhibit EEEE 16:17-21:22; Group Exhibit FFFF, RUSH008006-7.) A copy of
Stacks' job description as AVP is attached as Exhibit . Stacks had five (5) direct reports and her
total budget for these support departments was less than $5 million. (Exhibit EEEE 23:21-24:6;
32:2-34:18.) From 2015 to 2017, reported to Cynthia Barginere and in 2018 she reported to Mike
Mulroe. (Exhibit EEEE 35:4-21.) Between 2016 and 2018, Stacks' total compensation ranged
from $206,542 to $247,322 a year. (Group Exhibit FFFF, RUSH004895-6, RUSH007572,
RUSH007368-9.)

## RESPONSE:

Rush admits this paragraph, except that the documents cited do not support that "Stacks

had five (5) direct reports and her total budget for these support departments was less than $5

million." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the

record are nullities.") Further, the documents cited do not support that "Between 2016 and 2018,

Stacks' total compensation ranged from $206,542 to $247,322 a year." *Id.*

57.     In December 2018, Stacks became Vice President for care coordination and
clinical documentation improvement at a base salary of $284,000. (Group Exhibit FFFF,
RUSH008218.) As Vice President, Stacks' role expanded to include responsibility of care
management at both Rush Medical Center and Rush Oak Park. (Exhibit EEEE 50:17-52:24;

62:6-10.) Stacks oversees approximately 800-900 full time employees. (Exhibit EEEE 53:24-55:23.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that "In December 2018, Stacks became Vice President for care coordination and clinical documentation improvement at a base salary of $284,000." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, for purposes of completeness, Stacks testified that her job responsibilities as VP include "care management, utilization review for both -- again, for both Rush Oak Park and for RUMC. I have EVS, transport, chaplaincy services. I have patient placement in the transfer center. I have linen services. I have -- I have a PMO office" and "I had CDI responsibility for Rush Oak Park and RUMC. I now have responsibility for clinical documentation across the enterprise." (Exhibit EEEE 50:21-51:5, 53:6-11.)

**Patricia Nedved**

58.     Patricia Nedved ("Nedved") (female, Caucasian) was hired by Rush in 2007 as Director of Nursing Systems. (Exhibit EE 16:13-17.) In this role, Nedved had about 19 employees under her direct supervision and was responsible for the training, education, and preparation for all nurses, as well as life support training for all physicians. (Exhibit EE 17:8-18.) Prior to joining Rush, Nedved was the Director of Nursing at Resurrection Medical Center. (Exhibit EE 14:9-19.) In 2009, she changed the name of the department to Professional Nursing Practice, and received the title of Associate Vice President. (Exhibit EE 18:9-14.) Nedved reported to Cynthia Barginere. (Exhibit EE 18:21-23.) As AVP of the Professional Nursing Practice, her duties expanded to work with the pharmacy, physicians, nursing, and she attended organization-wide patient safety and quality committees. (Exhibit EE 21:7-13, Group Exhibit GGGG, RUSH000533-4.) Nedved had 22 direct reports. (Exhibit EE 30:18-22.) In 2014, Nedved was interim AVP for psychiatric behavioral health for six (6) months, which involved leading the nursing and physician team in outpatient programs as well as the inpatient psychiatric units. (Exhibit EE 23:13-22.) In 2015, Nedved was interim chief nursing officer, and held that role for approximately 18 months. (Exhibit EE 24:2-11.)

**RESPONSE:**

Rush admits this paragraph. For purposes of completeness, however, Nedved's interim

roles were in addition to her role as AVP of professional nursing practice. (Exhibit EE 23:12-15,

24:2-11)

59.     Between 2014 and 2016, Nedved's primary responsibilities were in budgeting, finances, and operational safety of the areas that she managed. (Exhibit EE 25:17-24.) Nedved does not have experience in cancer-related departments. (Exhibit EE 52:3-53:3.) Her primary responsibilities were similar to chief nursing officer which included budgets, finances, recruitment, retention, performance improvement, patient experience, quality outcomes, accreditation. (Exhibit EE 55:14-24.) She had seven (7) direct reports, which were all director or practice managers. (Exhibit EE 57:15-22.) Between 2015 and 2018, Nedved's total compensation ranged from $182,599 to $291,972 a year. (Group Exhibit GGGG, RUSH000412, RUSH000456, RUSH000458, RUSH007560, RUSH007364-5.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that "Nedved

does not have experience in cancer-related departments." *Malec*, 191 F.R.D. at 583 ("Factual

allegations not properly supported by citation to the record are nullities."). Further, the

documents cited do not support that "Between 2015 and 2018, Nedved's total compensation

ranged from $182,599 to $291,972 a year." *Id.* Moreover, for purposes of completeness, Nedved

testified that she held the interim cancer service administrator job from February 2017 through

November 2018 during which time she had oversight responsibility of "the bone marrow

transplant clinic, plasmapheresis, the bone marrow and cellular transplant, breast imaging, the

Rad Onc clinical services, breast imaging, physician MSP, Rad Onc joint venture, apheresis,

cellular therapy." (Exhibit EE 51:8-52:2)

### Deval Daily

60.     Deval Daily ("Daily") (female, Asian) received her Bachelors of Science degree from the University of Illinois and her Masters of Science in health systems management at Rush University in 2007. (Exhibit ZZ 29:2-30:14; RUSH003531-3.) Daily joined Rush in 2007 as manager of business operations. (Exhibit ZZ 11:1-7; Group Exhibit HHHH, RUSH003533.) In 2012, Daily was promoted to Director of hospital operations at a base salary of approximately

$100,000, and her direct supervisor was Jeremy Strong. (Exhibit ZZ 14:5-15:10; Group Exhibit HHHH, RUSH003556.) In 2014, Daily took on the services for neurosciences, directly reporting to Jeremy Strong for director of hospital operations role, and to Scott Sonnenschein for the services role. (Exhibit ZZ 16:2-10; Group Exhibit HHHH, RUSH003550.) The services role included direct oversight of about 5-12 full time employees. (Exhibit ZZ 16:11-17:14.) Her base salary at the time was about $125,000-$130,000. (Exhibit ZZ 18:9-12; Group Exhibit HHHH, RUSH003550.)

**RESPONSE:**

Rush admits this paragraph, except that Plaintiff misrepresents the record when she states that Daily took on the "services for neurosciences". Daily testified that she became the service line administrator for neurosciences in 2014 while maintaining her director of hospital operations role. (Exhibit ZZ 15:20-16:10) Plaintiff also misrepresents the record when she states that her base salary at the time was "about $125,000-$130,000." Daily's salary was increased to $131,126 as a result of her promotion/the addition of the service line administrator role to her portfolio of responsibilities. (Exhibit HHHH RUSH 003550.)

61.     In summer 2017, Daily was promoted to AVP of clinical operations. (Group Exhibit HHHH, RUSH003527.) Her base salary in this role was about $190,000 and she was eligible for the management incentive compensation plan. (Exhibit ZZ 24:19-25:21; Group Exhibit HHHH, RUSH003527, RUSH003571, RUSH007350-51.) Her responsibilities included overseeing six (6) facilities, creating budgets over $25 million, and overseeing about 107 employees. (Exhibit ZZ 25:24-27:7; 32:3-24; Group Exhibit HHHH, RUSH003535-37.) Dailey's current position is AVP of clinical operations and CAO for the neurosciences services. (Exhibit ZZ 11:1-21; Group Exhibit HHHH, RUSH003623.) As CAO, Daily retained her duties and responsibilities as AVP. (Exhibit ZZ 41:2-16.) She received a ten (10) percent promotion, plus incentives, and was at the salary of $224,000 for both roles. (Exhibit ZZ 42:4-43:6.) The CAO role was new and she works with the physician leader to implement operational targets. (Exhibit ZZ 43:7-44:16.) Her direct supervisor is Cynthia Barginere. (Exhibit ZZ 47:16-18.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that "Daily's current position is AVP of clinical operations and CAO for the neurosciences services." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, The documents cited do not support that "As CAO, Daily retained her duties

and responsibilities as AVP." *Id.* Moreover, for purposes of completeness, Daily described the

physician service line director as "partners, so that's -- you know, he is the physician leader. So

he helps me work through some of the challenges we may have from a programmatic standpoint

or from a physician type of standpoint. And then I'm his administrative person that works with --

whether it's the physicians or the administrators to implement our operational targets that we've

trying to achieve." (Exhibit ZZ 44:4-16)

**Dina Pilipczuk**

62.     Dina Pilipczuk ("Pilipczuk") (female, Caucasian) joined Rush in 2010 as Director of nursing, finance and resource management. (Exhibit IIII 9:4-16.) She received an MBA in marketing and finance from Clarkson University in 1996. (Exhibit IIII 6:12-7:3.) Pilipczuk was a Director until 2012 when she was promoted to AVP. (Exhibit IIII 9:4-23.) As AVP, Nursing Financial and Resource Management Systems, Pilipczuk's main areas of responsibilities were financial management of the nursing division and patient placement in the Transfer Center. (Exhibit IIII 12:2-13:8; Group Exhibit JJJJ, RUSH006898.) From 2015 to 2017, Pilipczuk moved out of the Division of Nursing, became a direct report to Cynthia Barginere, and gained additional responsibility for the emergency department and clinical engineering. (Exhibit IIII 25:2-26:17.)

**RESPONSE:**

Rush admits this paragraph.

63.     In October of 2017, Pilipczuk became AVP of Hospital Operations and obtained additional oversight of food and nutrition, security, guest relations, and interpreter services—some of which were duties Melgoza had before being demoted to director. (Exhibit IIII 30:10-30:24.) Pilipczuk was responsible for identifying clinical, financial or strategic opportunities. (Group Exhibit HHHH, RUSH006911.) She was also accountable for decision support within Rush. *(Id.)* As AVP, her direct supervisor became Michael Mulroe. (Exhibit IIII 30:10-31:15; Group Exhibit JJJJ P00001253.) Pilipczuk's spending authority is limited to $100,000. (Exhibit IIII 37:12-20.) She oversees roughly 350 full time employees, but does not know how many square feet she manages. (Exhibit IIII 32:10-14; 16:16-20.) Between 2015 and 2018, Pilipczuk's total compensation ranged between $176,776 and $201,149. (Group Exhibit JJJJ, RUSH004092-4, RUSH007564, RU5H007352-3.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that "some of

[Pilipczuk's duties] were duties Melgoza had before being demoted to director." *Malec*, 191

F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, the documents cited do not support that "Pilipczuk was responsible for identifying clinical, financial or strategic opportunities" or that "She was also accountable for decision support within Rush." *Id.* Moreover, the documents cited do not support that "She oversees roughly 350 full time employees." *Id.* Finally, the documents cited do not support that "Between 2015 and 2018, Pilipczuk's total compensation ranged between $176,776 and $201,149." *Id.*

**Richa Gupta**

64.     Richa Gupta ("Gupta") (female, Asian) holds a Masters of health services administration from the University of Michigan School of Public Health. (Group Exhibit KKKK, P00000017, RUSH003963-70.) Gupta was hired by Rush in December 2010 as AVP, Performance Improvement, at a base salary of $190,000. (Group Exhibit KKKK, RUSH003962, RUSH003967.) As AVP, Gupta oversaw clinical outcomes and patient safety, performance improvement across Rush, and infection prevention and control activities. (Group Exhibit KKKK, RUSH003975.) Gupta was also responsible for hospital quality, clinical effectiveness, patient safety, and performance improvement within Rush. *(Id.)*

**RESPONSE:**

Rush admits this paragraph.

65.     In March 2015, Gupta was promoted to Chief Quality Officer. (P00000167.) This position is the same level as an AVP. (RUSH003936.) Her base salary was $231,816, and she was eligible for the management incentive compensation plan. *(Id.)* Gupta was later promoted to Chief Operating Officer of Rush University Medical Group. (P00002220.) Gupta's total compensation between 2014 and 2016 ranged from $242,751.92 to $284,103.16 per year. (RUSH004853-5.)

**RESPONSE:**

Rush admits this paragraph, except that the documents[9] cited do not support that "Gupta was later promoted to Chief Operating Officer of Rush University Medical Group." *Malec*, 191

---

[9] The record cited in this paragraph is Exhibit KKKK.

F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are

nullities.").

**Nisha Lulla**

66.     Nisha Lulla ("Lulla") (female, Asian) received a Masters in health science, health finance, and management from Johns Hopkins University in 2006. (Group Exhibit LLLL, RUSH003895.) Prior to Rush, Lulla was a senior associate at The Advisory Board Company in Washington, D.C. where she was responsible for improvement of clinical operations performance to address productivity throughout hospitals. *(Id.)* Lulla joined Rush in 2007 as an Administrative Fellow with a base salary of $50,000 per year. (Group Exhibit LLLL, RUSH003890.)

**RESPONSE:**

        Rush admits this paragraph, except that the documents cited do not support that Lulla

"received a Masters in health science, health finance, and management from Johns Hopkins

University in 2006" or that "Prior to Rush, Lulla was a senior associate at The Advisory Board

Company in Washington, D.C. where she was responsible for improvement of clinical operations

performance to address productivity throughout hospitals." *Malec*, 191 F.R.D. at 583 ("Factual

allegations not properly supported by citation to the record are nullities.").

67.     Lulla was promoted to Director of Supply Chain Management and Hospital Operations before being promoted to Associate Vice President of Hospital Operations in 2013. (Group Exhibit LLLL, RUSH003839.) Her base salary was $156,523 per year. *(Id.)* As an AVP, Lulla was responsible for decision support within Rush, as well as assuring a collaborative partnership with the academic, medical practice, and corporate programs in Rush University Medical Center in ways that demonstrate support for the corporation's mission and vision. (Group Exhibit LLLL, RUSH006911.) While an AVP, Lulla became responsible for food and nutrition services, as well as respiratory care, chaplains, and patient transport. (Exhibit S 54:19-55:7.) Between 2015 and 2017, Lulla's salary ranged from $189,398 to $227,318 per year. (Group Exhibit LLLL, RUSH004910-12.) Lulla left Rush in 2017 to pursue a career with Blue Cross Blue Shield. (Exhibit S 52:18-53:21.)

**RESPONSE:**

        Rush admits this paragraph, except that the documents cited do not support that "Lulla

was promoted to Director of Supply Chain Management and Hospital Operations." *Malec*, 191

F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, the documents cited do not support that, "While an AVP, Lulla became responsible for food and nutrition services, as well as respiratory care, chaplains, and patient transport." *Id.* Moreover, the documents cited do not support that "Lulla left Rush in 2017." *Id.*

IX. **Melgoza's Compensation.**

68. Male AVPs and Vice Presidents were paid more than Melgoza. (Exhibit MMMM.) These individuals include: Mulroe, Sonnenschien, Strong, (as Vice President and AVP), Cooper, Correa and Ellis. *(Id.)* In addition, the following female colleagues are substantially similar to and paid more than Melgoza: Gupta, Lulla, Nedved, Pilipczuk, Stacks, and Struck. *(Id.)*

**RESPONSE:**

This paragraph constitutes factual and legal argument, and must be stricken. *Basta*, 872 F. Supp. 2d at 700 (A statement of additional facts is not a vehicle for factual or legal argument). Further, Plaintiff has failed to support this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Specifically, Plaintiff failed to authenticate Exhibit MMMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit MMMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

69. Every position at Rush has a "grading scale" associated with it. The scale provides a minimum, mid-range, and maximum salary range. (Exhibit D 106:4-18.) As an AVP, Melgoza was assigned a salary grade 28, the same as Vice Presidents Mulroe and Sonnenschein. (Exhibit LL.) After her demotion to director, Melgoza is classified as salary grade 9. (Exhibit Y 26:5-17; Exhibit LL.)

**RESPONSE:**

Rush admits that certain positions, such as Director, have a grading scale that provides a minimum, mid-range, and maximum salary range. Rush admits that as an AVP, Melgoza was assigned grade 28. For purposes of completeness, when Plaintiff became a Director in 2016, she was assigned to the highest grade level for directors. (Exhibit Y 137:14-24)

As for the remainder of this paragraph, Plaintiff has failed to cite to the record in support of the statement that "Every position at Rush has a 'grading scale' associated with it." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Plaintiff misstates the record when she states that she was assigned the same grade as VPs Mulroe and Sonnenschein. Both Mulroe and Sonnenschein were "ungraded." (Exhibit LL.) Further, whether Melgoza was "demoted" is a legal conclusion. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations).

## X.    Melgoza's Post-Demotion Protected Activity and Retaliation.

### A.    Melgoza Meets with Rush Management to Voice Complaints about Her Demotion

70.    In January 2017, Correa announced his resignation which resulted in a vacancy that Rush needed to fill. (Exhibit NNNN.) On February 3, 2017, Melgoza received an email from Dr. Bianco's assistant, sent to Melgoza and Dr. Peter Jokich ("Jokich"), stating that Dr. Bianco wanted to "meet soon with both of you to discuss on *[sic]* Interim Leadership in the Cancer Center." (Exhibit OOOO.) On February 8, 2017, during the meeting between Melgoza and Dr. Bianco, Melgoza was blind-sided by learning for the first time that the meeting was actually an interview for the Interim Cancer Position, which was open due to Correa's resignation. (Exhibit V 105:7-107:2; Exhibit B 144:24-145:6, 204:20-24; Exhibit L; Exhibit M; Group Exhibit MMM, Pl. Ex. 30.)

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.). Further, the documents cited do not support that Correa's resignation "resulted in a vacancy that Rush needed to fill." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Moreover, the documents cited do not support that "Melgoza was blind-sided by learning for the first time that the meeting was actually an interview for the Interim Cancer Position." *Id*. In addition, Plaintiff failed to authenticate Exhibit L, Exhibit M and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit L, Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

71.     During the interview, Melgoza provided a copy of her resume to Dr. Bianco. (Exhibit B 144:6-145:6, 205:1-205:4; Exhibit RR ¶ 68; Exhibit L; Exhibit M; Group Exhibit MMM, Pl. Ex. 30.) He called her a "snob" when he saw that she attended Smith College. *(Id.)* He also said he knew of another woman who went to Smith who was also a snob. *(Id.)* Dr. Bianco engaged in little dialogue related to Melgoza's experience and qualifications, and the meeting lasted only about 20 minutes. (Exhibit B 205:14-17; Exhibit L; Exhibit M; Group Exhibit MMM, Pl. Ex. 30.)

**RESPONSE:**

Rush admits that, during the interview, Plaintiff provided a copy of her resume to Dr. Bianco. Rush admits that Plaintiff testified that Dr. Bianco called Plaintiff a snob, specifically in reference to Plaintiff's attending Smith College, that she testified that Dr. Bianco stated that he knew of another woman who went to Smith who was also a snob; and that she testified that the meeting lasted only about 20 minutes.

As for the remainder of this paragraph, Plaintiff failed to authenticate Exhibit L, Exhibit M and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Further, Plaintiff failed to lay any foundation for the admission of Exhibit L, Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

72.     On February 23, 2017, Melgoza met with Dr. DeCresce and informed him about her surprise interview with Dr. Bianco and his "snob" comments. (Exhibit M; Group Exhibit MMM, Pl. Ex. 30.)

**RESPONSE:**

Plaintiff has failed to support this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Specifically, Plaintiff failed to authenticate Exhibit M and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Further, Plaintiff failed to lay any foundation for the admission of Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); Lupescu, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

73.     On February 27, 2017, Melgoza met with Butler to discuss the hostile and discriminatory environment at Rush. (Exhibit GG ¶ 75, Exhibit M; Group Exhibit MMM, P00000634.) Butler encouraged her to focus on moving forward with her current departments. *(Id.;* Exhibit Q 46:8-48:4.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual

allegations not properly supported by citation to the record are nullities."). Further, Plaintiff

failed to authenticate Exhibit M and Group Exhibit MMM because she failed to submit evidence

"sufficient to support a finding that the item is what the proponent claims it is" in accordance

with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the

admission of Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See*

*Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F.

Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for

summary judgment.").

74.     On March 21, 2017, Melgoza met with Dr. Ansell to discuss her demotion and to
inform him of the ongoing retaliation against her. (Exhibit B 157:21-158:2; Exhibit M; Group
Exhibit MMM, Pl. Ex. 31.) Melgoza told Dr. Ansell that President Trump's anti-Latino behavior
had invaded Rush's culture. *(Id,;* Exhibit PPPP.) She also complained that Latinos were being set
aside for promotions. (Exhibit M, P00000064; Group Exhibit MMM, Pl. Ex. 31.)

**RESPONSE:**

Rush admits that Melgoza met with Dr. Ansell on March 21, 2017.

As for the remainder of this paragraph, the documents cited do not support the remainder

of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by

citation to the record are nullities."). Further, whether Melgoza was "demoted" is a legal

conclusion. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of

Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713

(A statement of additional facts is not the proper province of conclusory allegations). Moreover,

Plaintiff failed to authenticate Exhibit M and Group Exhibit MMM because she failed to submit

evidence "sufficient to support a finding that the item is what the proponent claims it is" in

accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for

the admission of Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

75.     On March 22, 2017, Melgoza met with Terry Peterson ("Peterson"), Rush Vice President of Governmental Affairs. (Exhibit RR ¶ 60; Exhibit B 221:14-21; Exhibit L; Exhibit M; Group Exhibit MMM, Pl. Ex. 31.) During the meeting, she told Peterson that she felt Rush had adopted the anti-Latino atmosphere that she felt was being promoted by President Trump. *(Id.)*

**RESPONSE:**

Rush admits that Melgoza alleges that she met with Peterson, Rush Vice President of Governmental Affairs, on March 22, 2017.

As for the remainder of this paragraph, the documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit L, Exhibit M and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit L, Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

76.     On March 27, Melgoza reported Dr. Bianco's "snob" comments to Schopp. (Exhibit RR ¶ 69; Exhibit B 74:14-21; Exhibit L; Exhibit M; Group Exhibit MMM, Pl. Ex. 31.) Melgoza recalls that Schopp told her that she [Melgoza] "let things happen to her" and that she should go back to Dr. Bianco to "teach him how to be a better leader." *(Id.;* Exhibit B 203:16-204:1)

**RESPONSE:**

Rush admits that Plaintiff testified that she reported Dr. Bianco's comments to Schopp, and that she testified that she recalled that Schopp told her that she "let things happen to her" and that she should go back to Dr. Bianco to "teach him how to be a better leader."

The documents cited do not support the remaining statements in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit L, Exhibit M and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit L, Exhibit M and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

77.     On April 7, 2017, Melgoza met with Peterson. (Exhibit M.) Melgoza informed him that Rush was displaying "Trump era" behaviors against Latinos. *(Id.;* Exhibit PPPP.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Further, Plaintiff failed to authenticate Exhibit M because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit M which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

78. On April 19, 2017, Antonio Bianco removed Melgoza's oversight/supervision of breast-imaging and assigned it to Shawnda Mays-Jackson, an individual without breast-imaging experience. (Exhibit B 143:2-10; Exhibit L; Exhibit HHH; Group Exhibit MMM, P00001266.)

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Further, Plaintiff failed to authenticate Exhibit L, Exhibit HHH and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit L, Exhibit HHH and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

### B. Rush's Retaliation Escalates after Melgoza Files Her EEOC Charge.

79. Melgoza filed her Charge of Discrimination ("Charge") with the EEOC on May 8, 2017 ("Charge"), which included detailed allegations of discrimination and retaliation committed against her by Rush executives Dandorph, Mulroe, Dr. Bianco, and Dr. DeCresce. (Exhibit B 143:22-144:5; Exhibit QQQQ, p. 2.) Rush HR informed Dandorph about Melgoza's Charge within a month or two after Melgoza filed it. (Exhibit C 94:23-95:8.) Dandorph was "offended" by Melgoza's accusations of misconduct against him contained in the Charge. (Exhibit C 97:20-98:1.)

**RESPONSE:**

Rush admits the first sentence in this paragraph. Rush admits the second and third sentences in this paragraph, but they are entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.) For purposes of completeness, however, Dandorph was offended by Plaintiff's accusations of misconduct against him in the Charge "by the fact that they were inaccurate." (Exhibit C 97:20-98:1.)

80.     Schopp believes that Mulroe knew about Melgoza's lawsuit. (Exhibit O 212:20-213:1.)

**RESPONSE:**

This statement is purely speculative and conclusory as to what Mulroe knew about

Plaintiff's lawsuit. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The

purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp.

2d at 713 (A statement of additional facts is not the proper province of conclusory allegations).F.

Supp. 2d

81.     On September 6, 2017, less than five months after Melgoza filed her EEOC
Charge and less than a week after she filed this lawsuit, she attended a dinner with the cancer
center staff, including Dr. DeCresce. (Exhibit B 210:21-211:22; Group Exhibit MMM, Pl. Ex.
26; Exhibit RRRR.) When he walked in, he went out of his way to avoid sitting next to Melgoza,
even though the only open seat at the table was next to her. *(Id.,* Exhibit B 211:22-212:17.) He
instead pulled up a chair on the other side of the table. *(Id.)*

**RESPONSE:**

Rush admits that Plaintiff went to a holiday party with the cancer center staff, including

Dr. DeCresce.

As for the remainder of this paragraph, the documents cited do not support the remainder

of the first sentence of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not

properly supported by citation to the record are nullities."). The second and third sentences of

this paragraph are conclusory. *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not

the proper province of conclusory allegations). Further, Plaintiff failed to authenticate Group

Exhibit MMM and Exhibit RRRR because she failed to submit evidence "sufficient to support a

finding that the item is what the proponent claims it is" in accordance with Federal Rule of

Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Group

Exhibit MMM and Exhibit RRRR which constitute inadmissible hearsay. *See Alexander*, 217 F.

Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

82.     Melgoza was removed from budgets that were under her control with the expectation of meeting deadlines. (Exhibit B 413:16-414:3; Group Exhibit MMM, P00001256.) Melgoza notified her supervisors Nedved and Ellis that the blockage of budgets prevented her from fulfilling her job and meeting expectations. *(Id.)*

**RESPONSE:**

The documents cited do not support this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit MMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

83.     On October 23, 2017, Melgoza applied for the position of Administrator of the Cancer Service Line after learning that another employee, Matt Goldstein, was in the process of interviewing for it. (Exhibit HHH; Group Exhibit MMM, Pl. Ex. 20, P00001175, 1182-1188.)

**RESPONSE:**

Plaintiff has failed to support this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Plaintiff failed to authenticate Exhibit HHH and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Further, Plaintiff failed to lay any foundation for the admission of Exhibit HHH and Group Exhibit MMM which constitute inadmissible hearsay. See Alexander, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay);

Lupescu, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

84.     Melgoza subsequently had multiple interviews, including interviews with Dr. DeCresce and Dandorph. (Exhibit HHH, Group Exhibit MMM, Pl. Ex. 20, P00001175, 1190-1203.) Dandorph did not recuse himself from the interview and testified that he did not see an ethical problem with doing so. (Exhibit C 107:4-107:19.)

**RESPONSE:**

Rush admits that Dandorph did not recuse himself from the interview.

As for the remainder of this paragraph, Plaintiff has failed to support the first sentence and the remainder of the second sentence of this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, Plaintiff failed to authenticate Exhibit HHH and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Moreover, Plaintiff failed to lay any foundation for the admission of Exhibit HHH and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). Group Exhibit MMM which appears to contain hearsay statements. *See Lupescu v. Napolitano*, 700 F. Supp. 2d at 967.

85.     As part of Schopp and Wallace's investigation (the "Report") into Melgoza's report that Dr. DeCresce wore a Donald Trump mask during her interview for the Administrator of the Cancer Service Line position, Schopp and Wallace interviewed Dr. DeCresce on December 4, 2017 and December 5, 2017. (Exhibit SSSS.) As part of the investigation, Dr. DeCresce was informed of the specific allegations in Melgoza's complaint. *(Id.)* Dr. Peter Jokich was also interviewed, and he confirmed that Melgoza disclosed to him that Dr. DeCresce wore a Trump Mask on the same day as the interview. *(Id.;* Exhibit O 195:8-18.)

**RESPONSE:**

Rush admits this paragraph, except that the documents cited do not support that Dr.

Jokich confirmed that Melgoza disclosed to him that Dr. DeCresce wore a Trump mask "on the

same day as the interview." *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly

supported by citation to the record are nullities.").

86.     The Report, dated December 28, 2017, refers to the Administrator of the Cancer Service Line position as the CAO Cancer Center position. (Exhibit SSSS.)

**RESPONSE:**

Rush admits that the Report, dated December 28, 2017, refers to the CAO Cancer Center

position. Further, however, the documents cited do not support the remainder of this paragraph.

*Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record

are nullities.")

87.     Melgoza recalls that on December 26, 2017, Schopp informed her that the Administrator of the Cancer Service Line position was being put on hold, revamped and outsourced to a national search firm. (Exhibit HHH; Group Exhibit MMM, P00001231-P00001233.)

**RESPONSE:**

Plaintiff misrepresents the record evidence related to this statement, as the cancer service

line position was not filled in 2017 because none of the internal candidates were qualified.

(Exhibit O 187:19-188:3) As a result, in May 2018, Rush retained Korn Ferry to search for an

executive to fill the CAO, oncology service line position at Rush. (Exhibit O 188:3-4, 206:5-13;

Exhibit DD 23:5-8.) Further, Plaintiff has failed to support this paragraph with admissible

evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to

the record are nullities."). Plaintiff failed to authenticate Exhibit HHH and Group Exhibit MMM

because she failed to submit evidence "sufficient to support a finding that the item is what the

proponent claims it is" in accordance with Federal Rule of Evidence 901. Further, Plaintiff failed

to lay any foundation for the admission of Exhibit HHH and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

### C. Rush Retitles the Administrator of the Cancer Service Line Position and Outsources the Job Search to Korn Ferry.

88. On April 28, 2018, Melgoza applied for the System Chief Administrator Officer, Oncology Service Line position. (Exhibit UU; Exhibit HHHH; Group Exhibit MMM, P00001173.) The job description for the position is nearly identical to the job description for the "Administrator of the Cancer Service Line" position. (Exhibit TTTT; Exhibit UUUU.)

**RESPONSE:**

Rush admits the first sentence of this paragraph, except that the documents cited do not support that Melgoza applied for the "System Chief Administrator Officer, Oncology Service Line" position. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.") Further, the documents cited do not support the second sentence in this paragraph. Moreover, Plaintiff failed to authenticate Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also failed to lay any foundation for the admission of Group Exhibit MMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

89. On May 3, 2018, Wallace informed Melgoza that the System Chief Administrator Officer, Oncology Service Line position had been referred to the executive search firm Korn Ferry. (Exhibit HHH; Group Exhibit MMM, P00001241.)

**RESPONSE:**

Plaintiff has failed to support this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Specifically, Plaintiff failed to authenticate Exhibit HHH and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Further, Plaintiff failed to lay any foundation for the admission of Exhibit HHH and Group Exhibit MMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

90.     Korn Ferry met with Dandorph and other Rush Executives to discuss the role description and criteria. (Exhibit DD 24:22-30:19.) Dandorph opted not to consider Melgoza for the position. (Exhibit DD 24:22-30:19.)

**RESPONSE:**

Rush admits the first sentence in this paragraph. The documents cited do not support the second sentence in this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

91.     Dennis Basara ("Basara") confirmed that he thought Melgoza had potential for leadership, or otherwise she would not have been on the list of candidates submitted to Rush. (Exhibit DD 50:9-21.) Basara "was impressed" with Melgoza's background and experience. *(Id.)*

**RESPONSE:**

This statement is entirely immaterial to Plaintiff's claims. *De*, 912 F. Supp. 2d at 712 (A statement of additional facts must be limited to material facts.).

**XI.     Rush Continues to Promote Less Qualified Men and/or Non-Mexicans.**

92.     Since her demotion, Melgoza has applied for several AVP and Vice President positions that were filled by men and/or non-Mexican Americans. (Exhibit UU; Exhibit HHH; Group Exhibit MMM, P00001172, P00002053.)

**RESPONSE:**

Rush admits that Melgoza has applied for other AVP and VP positions.

As for the remainder of this paragraph, The documents cited do not support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Further, whether Melgoza was "demoted" is conclusory. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Moreover, Plaintiff failed to authenticate Exhibit HHH and Group Exhibit MMM because she failed to submit evidence "sufficient to support a finding that the item is what the proponent claims it is" in accordance with Federal Rule of Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Exhibit HHH and Group Exhibit MMM which constitute inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3 (plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

93.     Many of Rush's current female Vice Presidents or Chief Administrative Officers were hired or promoted to the position after Melgoza filed her lawsuit, including Richa Gupta and Vanessa Stacks. (Group Exhibit MMM, P00002220; Exhibit VVVV.)

**RESPONSE:**

Rush admits that Vanessa Stacks was promoted to a VP position after Melgoza filed her lawsuit.

The remainder of this paragraph, constitutes Plaintiff's legal argument.. *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); *De*, 912 F. Supp. 2d at 713 (A statement of additional facts is not the proper province of conclusory allegations). Further, the documents cited do not

support the remainder of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not

properly supported by citation to the record are nullities.") Moreover, Plaintiff has failed to

support this paragraph with admissible evidence. *Malec*, 191 F.R.D. at 583 ("Factual allegations

not properly supported by citation to the record are nullities."). Specifically, Plaintiff failed to

authenticate Group Exhibit MMM because she failed to submit evidence "sufficient to support a

finding that the item is what the proponent claims it is" in accordance with Federal Rule of

Evidence 901. Plaintiff also has failed to lay any foundation for the admission of Group Exhibit

MMM which constitutes inadmissible hearsay. *See Alexander*, 217 F. Supp. 2d at 882-3

(plaintiff's notes excluded as hearsay); *Lupescu*, 700 F. Supp. 2d at 967 ("[A] court may consider

only admissible evidence in assessing a motion for summary judgment.").

94.     In 2019, Katie Struck ("Struck") was appointed as Acting Vice President and
Chief Administrative Officer, Oncology Service Line. (Exhibit YY.) Struck joined Rush in 2008
as an assistant general counsel in the Office of Legal Affairs. (Exhibit II; Exhibit YY.) She was
not recommended by Korn Ferry as part of the national search for a cancer executive. (Exhibit
DD 38:19-39:1.)

**RESPONSE:**

Rush admits this paragraph, except that Exhibit II does not support the second sentence

of this paragraph. *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by

citation to the record are nullities."). In addition, for purposes of completeness, Struck was

"promoted a number of times, most recently from deputy general counsel to vice president,

integrated solutions and optimization, in July 2017." (Exhibit YY, P00002261.) She earned her

law degree from Michigan State University. (Exhibit YY, P00002261.)

**XII.    Defendant's Waiver.**

95.     On August 7, 2018, Defendant filed its Answer to Plaintiff's Amended
Complaint. (Dkt. 45, Exhibit AAA.) Defendant's Answer did not raise failure to exhaust
administrative remedies as an affirmative defense. *(Id.)*

**RESPONSE:**

Rush admits that it filed its answer on August 7, 2018. Rush states that the remainder of this paragraph constitutes Plaintiff's legal argument and thus is not proper in a Rule 56.1 statement of facts; *Siegel v. Shell Oil Co*., 656 F. Supp. 2d 825, 830 (N.D. Ill. 2009) ("The purpose of Rule 56.1 statements is…not to make factual or legal arguments."); and Rush's affirmative defenses included that "Plaintiff's claims are barred to the extent relief is sought for actions outside the scope of her EEOC charge."

**DATED: February 5, 2020**　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　RUSH UNIVERSITY MEDICAL CENTER,

　　　　　　　　　　　　　　　　　　　　By: */s/ James C. Goodfellow, Jr.*　　　　
　　　　　　　　　　　　　　　　　　　　　　　One of its Attorneys

Amanda A. Sonneborn
James C. Goodfellow, Jr.
Thomas Horan
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
E-mail: asonneborn@seyfarth.com
jgoodfellow@seyfarth.com
thoran@seyfarth.com

*Attorneys for Rush University Medical Center*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, does hereby certify that he served the foregoing document

with the Clerk of the Court for filing and uploading to the CM/ECF system, which will send

notification of such filing to the following at their e-mail addresses on file with the Court:

Ashley Lauren Orler
Rebekah Susan Mintzer
Melanie Elysia Baker
Golan Christie Taglia LLP
70 W. Madison Street
Suite 1500
Chicago, IL 60602
312-263-2300
alorler@gct.law
rsmintzer@gct.law
mebaker@gct.law

*Counsel for Plaintiff*
*Norma Melgoza*

 *_/s/ James C. Goodfellow, Jr._*
James C. Goodfellow, Jr.