IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORMA MELGOZA,

Plaintiff,

v.

RUSH UNIVERSITY MEDICAL
CENTER,

Defendant.

Case No. 17-cv-6819

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Norma Melgoza brings this employment discrimination action against Rush University Medical Center. Rush has moved for summary judgment on all of Melgoza's claims. For the reasons stated below, Rush's motion for summary judgment [150] is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

1

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND[1]

### I. Melgoza's Career at Rush

Melgoza is a Mexican-American female. (DSOF ¶ 1). She is currently employed as a Director at Rush. (*Id.*). Rush is an Illinois not-for-profit corporation that is part of a multifaceted non-profit health care organization. (*Id.* ¶¶ 2, 20). Melgoza began her employment at Rush in 2006 as Assistant Vice President. (*Id.* ¶ 33). That year she was appointed cancer conference coordinator for Rush's Cancer Committee. (PSOF ¶

---

[1] The facts in this Background section are undisputed unless otherwise noted. Rush's Rule 56.1 Statement of Facts (Dkt. 152) is abbreviated as "DSOF". Melgoza's Rule 56.1 Statement of Facts (Dkt. 168) is abbreviated as "PSOF". Melgoza responded to Rush's Statement of Facts at Dkt. 167 and Rush responded to Melgoza's Statement of Facts at Dkt. 193.

10). According to Melgoza's former supervisor, she was the first woman executive leader since Rush's founding in 1837. (*Id*. ¶ 14).

In November 2010, Melgoza was promoted to Associate Vice President ("AVP"). (DSOF ¶ 33). As an AVP, Melgoza had various managerial duties and was responsible for various departments. (*Id*.). Melgoza reported to Robert Clapp from 2006 to 2012. (*Id*. ¶ 34). She then reported to Michael Mulroe, who was a Vice President. (*Id*. ¶¶ 25, 34). As an AVP, in addition to benefits, Melgoza had a base salary as well as management incentive compensation ("MICP"). (*Id*. ¶ 40). The MICP was 15% of base salary at target, and 22.5% at max of base salary. (*Id*.). Since 2006, Melgoza has expressed her interest in advancing her career at Rush. (PSOF ¶ 25).

## II. Elimination of Melgoza's Position

On or about July 14, 2016, Rush eliminated Melgoza's position as Associate Vice President. (DSOF ¶ 35). Rush explained the decision as a result of a restructuring of cancer services under a "cancer service line" (although Melgoza disputes both the existence of a cancer service line and the reason for her position elimination). (*Id*. ¶ 36; Dkt. 167 at 18). Melgoza thereafter became a Director, reporting to Leo Correa until January 2017. (DSOF ¶¶ 38, 39). She continued her oversight of cancer-related services as a Director under Correa. (PSOF ¶ 38). As Director, Melgoza was no longer eligible for the MICP but Rush provided her with a different type of incentive pay, although she disputes that incentive was comparable to the MICP. (DSOF ¶ 44; Dkt. 167 at 23). As AVP, Melgoza was "grade 28" and as Director she was given the highest grade for that position, "grade 9." (PSOF ¶ 69).

3

### III. Melgoza's Claims

On May 8, 2017, Melgoza filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (DSOF ¶ 96). She received an EEOC "right to sue" letter on August 24, 2017. (*Id.* ¶ 97). She filed this lawsuit on September 21, 2017. (Dkt. 1). In her Amended Complaint (or "complaint") (Dkt. 43), Melgoza brings claims against Rush for violation of the Equal Pay Act of 1963 (EPA) (Count I), retaliation for exercising her rights under the EPA (Count II), violation of Title VII of the Civil Rights Act of 1964 (Title VII) (Counts III and IV), retaliation for exercising her rights under Title VII (Count V), and violation of the Illinois Human Rights Act (IHRA) (Count VI).

## ANALYSIS

### I. Local Rule 56.1 and Melgoza's Affidavit

The purpose of Local Rule 56.1 statements is to "streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.,* 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019) (citation omitted). Here neither party fully complied with Local Rule 56.1, unfortunately making the Court's task more difficult. For example, while the Court agrees with Rush that Melgoza at times misrepresented the evidence, Rush also sometimes responded to Melgoza's statement of facts by arguing that the documents did not support the statement when in fact they did. While the Court can require strict compliance with Local Rule 56.1, it has discretion in that regard. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414

(7th Cir. 2019). Accordingly particular evidence is addressed in the opinion as is necessary.

Melgoza has filed a motion for leave to file her affidavit [198]. She seeks to authenticate certain exhibits including her "handwritten notes, summaries and timelines of events authored and complied by [her], and her description of her job duties and claims." (*Id*. at 6). Some of these documents the Court did not need to rely on either because they lacked relevance or because the facts were supported by evidence elsewhere in the record. However, the Court will not permit Melgoza to rely on her own handwritten notes and her timelines if these notes are being offered to prove the truth of the matter asserted in them. *See Alexander v. Cit Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 883 (N.D. Ill. 2002). She does not argue that these are present sense impressions that constitute an exception to the hearsay rule. *See id*. Instead these notes appear to have been created at a variety of times, as recently as 2019, and she sometimes broadly states that they were created from her "memory."

Moreover, Melgoza's reliance on these documents contravenes the purpose of Local Rule 56.1. For example she relies on "Group Exhibit MMM" throughout her statement of facts sometimes without citation to any particular page number. Group Exhibit MMM is a nearly 300 page document. This is not appropriate on summary judgment. The Court is not obligated "to scour the record looking for factual disputes." *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) (citation and quotations omitted); *see also Malec v. Sanford,* 191 F.R.D. 581, 583-84 (N.D. Ill. 2000) (parties' Rule 56.1 statements must cite specific references to the record); *Gray v. Ghosh,* 2013 WL

5497250, at *5 (N.D. Ill. Oct. 3, 2013) ("facts may be considered on summary judgment only if they are presented in a compliant Local Rule 56.1 statement or response."). Melgoza's motion [198] is denied.

## II. Equal Pay Act

Melgoza claims that Rush paid her less than male employees for substantially equal work and retaliated against her for exercising her rights under the EPA.[2] "The Equal Pay Act prohibits employers from discriminating between its employees by paying an employee lower wages than the employer pays an employee of the opposite sex." *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018) (citing 29 U.S.C. § 206(d)(1)). "Because a plaintiff's burden of proof is different for Equal Pay Act claims than it is for Title VII and § 1983 claims, we review [plaintiff's] Equal Pay Act claim first, then address her claims brought under Title VII." *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017).

### A. Relevant Time Period

Rush seeks to limit the relevant time period for Melgoza's EPA claim based on the allegations in her complaint and the statute of limitations. Rush argues that Melgoza's EPA claim is limited to her time as AVP from September 2014 to July 2016

---

[2] Melgoza argues that "added rigor" should be applied in this case (Dkt. 166 at 13). While courts should be cautious because employment discrimination cases often will turn on issues of intent and credibility (*Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000)), the Seventh Circuit has clarified on several occasions that "there is not a separate rule of civil procedure governing summary judgment in employment discrimination cases." *Bagley v. Blagojevich*, 646 F.3d 378, 389 (7th Cir. 2011) (internal citation and quotations omitted). "[T]he ultimate question...is whether a reasonable jury could find prohibited discrimination." *Lauderdale*, 876 F.3d at 907 (citation and internal quotations omitted).

(Dkt. 194 at 6, 9) (although as discussed below Rush argues it should be even more narrow because of the statute of limitations). The Court agrees with Rush that Melgoza's EPA claim should be limited to her time as AVP but does not agree that the two year statute of limitations applies as a matter of law.

Melgoza alleged in her complaint that "[t]hroughout [her] tenure *as an Associate Vice President*" she was paid "$100,000.00 to $250,000.00 less per year than her male and/or non-Mexican-American colleagues performing substantially equal work." (Am. Compl. ¶32) (emphasis added). However, in responding to summary judgment Melgoza relies on her position as Director to support her EPA claim. "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (citation omitted). *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) ("although a plaintiff generally can alter the legal theories asserted in its complaint, it cannot alter the factual basis of [its] complaint at summary judgment.") (citation omitted). Because of the specificity required regarding EPA comparators, the Court will not permit Melgoza to rely on a different position she held during a different time frame, effectively amending her complaint on summary judgment. *See Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 698–99 (7th Cir. 2003) (describing the elements of a prima facie EPA claim); *see also Kent v. City of Chicago*, 814 F. Supp. 2d 808, 815-16 (N.D. Ill. 2011) (barring EPA plaintiff from relying on a new comparator identified for the first time in response to defendant's summary judgment motion).

Turning to the Associate Vice President position, Rush argues that the EPA's two year, as opposed to three year statute of limitations (*see* 29 U.S.C. § 255(a)) applies because Melgoza has not presented any evidence that Rush's alleged EPA violation was willful. As a result, Rush argues, Melgoza cannot recover for any alleged EPA violations before September 21, 2015 (since she filed her original complaint on September 21, 2017). Melgoza responds that a jury should decide if the two or three year statute of limitations applies.

"A violation is 'willful' under the [EPA] if the defendant either knew he was violating the [EPA] or was indifferent to whether he was violating it or not (and therefore 'reckless')." *E.E.O.C. v. Madison Cmty. Unit Sch. Dist. No. 12*, 818 F.2d 577, 585 (7th Cir. 1987) (citations omitted). Melgoza has provided enough evidence to create a jury question whether Rush was indifferent about violating the EPA. In 2013, Melgoza complained to a senior vice president, Dr. David Ansell, that her requests for equal pay were being ignored, and Dr. Ansell responded that if she complained to HR, her days would be numbered. (PSOF ¶29).[3] In 2015, she formally requested a pay equity review and discussed that request with her supervisor, who she says dismissed the request. (*Id.* ¶30). And in 2016, at a Women's Leadership Council focus group meeting where the then-head of Human Resources (HR) Mary Ellen Schopp was present, Melgoza publicly stated that Mulroe failed to address her wage complaints that she was not being paid equitably. (*Id.* ¶32; see also DSOF ¶24). The

---

[3] Rush objects to Melgoza's reliance on complaints that pre-date 2014 (Dkt. 193 at 20), but to decide if a jury question exists whether Rush was indifferent to violating the EPA for purposes of the statute of limitations, Rush has not cited authority requiring the Court to limit its analysis to September 2014 through July 2016.

statute of limitations question will be left to a jury. *See White v. Zema Sys. Corp.,* 1996 WL 666683, at *2 (N.D. Ill. Nov. 14, 1996) (whether defendant willfully violated EPA giving rise to three year statute of limitations was question of fact to be decided by the trier of fact) (citing *Bankston v. State of Illinois,* 60 F.3d 1249, 1253 (7th Cir. 1995)); *see also Bum Hoon Lee v. BK Schaumburg Inc.,* 2020 WL 3577994, at *6 (N.D. Ill. July 1, 2020).

For these reasons, for purposes of summary judgment, Melgoza's EPA claim is limited to the time period of September 21, 2014 through July 14, 2016.

### B. Comparators

Rush argues that Melgoza fails to identify any proper comparators for her EPA claim. To establish a prima facie claim under the EPA, an employee must demonstrate "a difference in pay despite having a job that requires 'equal skill, effort, and responsibility' as the comparator and a job that is performed under similar working conditions to the comparator…If the employee makes this showing, the burden of proof shifts to the employer to prove some neutral factor that explains the difference in pay." *Terry,* 910 F.3d at 1008 (citations and quotations omitted). A prima facie case of wage discrimination requires a plaintiff to show "by a preponderance of the evidence, that: (1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions. No proof of discriminatory intent is required." *Warren v. Solo Cup Co.,* 516 F.3d 627, 629 (7th Cir. 2008) (internal citations and quotations omitted). Melgoza identifies the following comparators: (1)

Mike Mulroe; (2) Scott Sonnenchein; (3) Shaun Cooper; (4) Leo Correa; (5) Josh Ellis; and (6) Jeremy Strong. (Dkt. 166 at 14).

*Mike Mulroe*: Melgoza argues that her position as AVP was substantially equal to that of Mulroe, Vice President of Hospital Operations. (PSOF ¶ 44). Melgoza's response brief does not specify whether she is comparing her responsibilities in 2014-16 as AVP to Mulroe's responsibilities in 2014-16 or to Mulroe's responsibilities in 2018. As Rush points out, Melgoza identifies Mulroe's total compensation only for 2018. (PSOF ¶ 44; Dkt. 194 at 9). Having identified Mulroe's 2018 compensation only and having failed to articulate the comparison she is asking the Court to make, the Court cannot determine whether the work Melgoza and Mulroe performed required substantially similar skill, effort and responsibility, was done under similar working conditions, and whether Mulroe received higher wages for that work. *See Cullen*, 338 F.3d at 698–99 ("The EPA specifies three separate elements that are to be considered in comparing job duties: skill, effort and responsibility. Each of these elements must be met individually to establish a prima facie case. Moreover, the jobs must be performed under similar working conditions.") (citations omitted); *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 985 (N.D. Ill. 2014) (it is not the court's responsibility to parse plaintiff's argument about comparators); *see also Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) ("It is not the obligation of th[e] court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (internal citations and quotations omitted).

*Scott Sonnenchein*: As a Vice President of Hospital Operations, Sonnenchein was responsible for surgical care, interventional services, endoscopy, and all of nursing that fell under those groups. (PSOF ¶ 47). His responsibilities also included scheduling, the ear nose and throat clinic, interventional radiology, EP labs, cath labs, neuroendovascular, and procedure rooms. (*Id*.) He had budgeting responsibilities to review all expenses and revenue projections, full time employees, and all expense lines. (*Id*.) He oversaw approximately 500 to 600 full time employees. (Sonnenchein Dep. Dkt. 171-11, Exh. R, at p. 42).

As AVP, Melgoza's responsibilities covered complex clinical areas and support functions. (PSOF ¶ 16). She was responsible for breast imaging, radiation oncology, medical physics, dialysis, plasmapheresis, and emergency management. (*Id*. ¶ 18). Her portfolio also included guest relations, interpreter services, volunteer services, the security department, linen services, and environmental services. (*Id*. ¶ 17). As AVP, Melgoza was responsible for budgets exceeding $200 million in revenue, a budget of $80 million, over 700 full time employees, 3.1 million cleanable clinical square feet, and between nine and eleven clinical support departments at one time, and had level four purchasing authority which permits spending up to $1,000,000. (*Id*. ¶ 19).[4]

---

[4] In support of these statements, Melgoza relies on a number of documents. The Court agrees with Rush that not all of documents support all of Melgoza's statements as it relates to her duties in 2014-2016. For example although she lists "services leader for cancer, dermatology, research", she did not mention dermatology at her deposition or on her resume, and she testified that she lost oversight of cancer and research in 2012. (Melgoza Dep. p. 380). However, the Court has relied on statements supported by Melgoza's deposition testimony (Exhibit B) and her resume (Exhibit BBB). Rush does not object to Melgoza's reliance on her

11

Comparing Sonnenchien's and Melgoza's positions as to skill, effort and responsibility shows they are proper comparators. First as to skill, which "includes consideration of such factors as experience, training, education, and ability" (29 C.F.R. § 1620.15(a)), both Sonnenchien and Melgoza had Bachelor's and Master's degrees. (PSOF ¶¶ 1, 46). Both had been in the healthcare industry since the 1990s. (*Id.* ¶¶ 4, 46). As to effort, Melgoza was responsible for more than 700 full time employees and Sonnenchein for approximately 500 to 600 full time employees. As to responsibility, Melgoza and Sonnenchein had a common core of tasks—responsibility for multiple clinical areas and for support or administrative areas. Sonnenchein's estimated budget size for all departments was in the hundreds of millions of dollars and Melgoza's exceeded $200 million (*Id.* ¶¶ 19, 47). Finally Rush does not dispute that Melgoza and Sonnenchein worked under similar working conditions.

Other than taking issue with some of the documents Melgoza relies on as evidence[5], Rush's only response to Melgoza's reliance on Sonnenchein as a comparator is that Sonnenchein was a Vice President and generally Vice Presidents have greater responsibilities than AVPs. (Dkt. 194 at 10). But "[a]ctual job performance and content, not job titles, are key." *Soto v. Adams Elevator Equip. Co.*,

---

resume, and it is well-settled that she can rely on her deposition testimony. *See Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

[5] Rush is correct that Melgoza miscites Sonnenchein's deposition testimony about how many full time employees he oversees (Dkt. 193 at 32), and the Court has cited the correct testimony: 500 to 600 employees. (Sonnenchein Dep. at p. 42). However, it is unclear to the Court why Rush objects to the documents Melgoza relies on showing the compensation of Sonnenchein (or the other comparators) since Melgoza relies on Sonnenchein's W-2's issued by Rush. (Exh. WWW). Rush provides no basis for objecting to the W-2's as evidence of compensation.

941 F.2d 543, 548 (7th Cir. 1991); *Markel v. Bd. of Regents of Univ. of Wisconsin Sys.*, 276 F.3d 906, 913 (7th Cir. 2002) (the jobs compared should be "substantially equal, based upon actual job performance and content—not job titles, classifications or descriptions.") (citations and quotations omitted); *see also Fallon v. State of Ill.*, 882 F.2d 1206, 1209 (7th Cir. 1989) ('The crucial finding on the equal work issue is whether the jobs to be compared have a common core of tasks, i.e., whether a significant portion of the two jobs is identical.) (citations and quotations omitted).

Having found a common core of tasks between Melgoza's and Sonnenchein's positions, the Court "ask[s] whether any additional tasks make the jobs 'substantially different.'" *Cullen*, 338 F.3d at 698. Rush has not provided any evidence that Sonnenchein had additional tasks making his job substantially different from Melgoza's. Based on the record, Melgoza was responsible for approximately 100 more full time employees than Sonnenchein. In addition, "in determining whether equal pay is being paid for equal work, the size of the pay differential, though not determinative…is highly relevant…[meaning that a smaller differential is] more likely [] to be justified by a small difference in the work." *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007) (citation omitted). In 2015, Melgoza's approximate compensation was $172,540 and Sonnenchein's was more than double that, $367,663. (DSOF ¶ 47; PSOF ¶ 47, Exh. WWW). In 2016, the difference was similar ($182,319.44 for Melgoza and $377,668.52 for Sonnenchein). (DSOF ¶ 48;

Exh. WWW).[6] Melgoza has established that Sonnenchein is an appropriate comparator for her EPA claim.

**Shaun Cooper**: In March 2015, Cooper was promoted to AVP, Rush Children's Hospital at a base salary of $159,500. (PSOF ¶ 53). This was less than Melgoza's salary at the time (approximately $172,540). Melgoza refers to Cooper's salary when he became Chief Administrative Officer in 2018 but this outside of the relevant time frame for her EPA claim. Melgoza fails to establish that Cooper is a proper comparator.

**Josh Ellis**: Melgoza identifies Ellis's 2016 salary, which was less than hers. (PSOF ¶ 54). She points to his 2018 salary (*id.* ¶ 55), but that is outside of the relevant time frame. Thus Melgoza cannot rely on Ellis as a comparator.

**Jeremy Strong:** Melgoza compares her AVP position to Strong's AVP position. (Dkt. 166 at 17). Both were AVPs in 2015 and 2016. (PSOF ¶ 49). Strong had responsibility for the operating room, perioperative space, recovery, interventional radiology, cardiac cath, neuroendovascular, electrophysiology, therapies, inpatient rehab facility, and JRB apartments. (*Id.*) In 2015, his salary was $191,901 compared to $172,540 for Melgoza, and his salary in 2016 was $196,153 compared to Melgoza's $182,319. (*Id.*; Exh. XXX). *See King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 473 (7th Cir. 2012) ("Even a dollar's difference based on sex violates both Title VII and the Equal Pay Act."). Both Strong and Melgoza have master's degrees. (PSOF ¶¶ 1, 48). Strong was responsible for 500-700 full time employees and Melgoza for 700 full

---

[6] These numbers represent "wages, tips and other compensation", not "Medicare wages."

time employees. (*Id*. ¶¶ 19, 49; (Strong Dep., Dkt. 173-15, Ex. YYY, p. 24)). They had a common core of tasks—responsibility for multiple clinical areas and for support of administrative areas. (PSOF ¶¶17-19, 49). Rush points to Strong's testimony that (1) he could have been responsible for approximately $100 million more than Melgoza in his budgets and (2) he managed an independent living facility in addition to overseeing his departments. But Rush does not explain how this makes their jobs "*substantially* different." *Cullen*, 338 F.3d at 698 (emphasis added). For example, in addition to other responsibilities, Melgoza was the cancer conference coordinator. (PSOF ¶10). The Court finds Strong is a proper comparator for Melgoza's EPA claim.

**Leo Correa**: Correa was hired by Rush in 2005 and became AVP in 2013. (PSOF ¶¶50-51). As to skill, effort, and responsibility, Melgoza has shown that her job was comparable to Correa's. Both individuals had bachelor's and master's degrees. (*Id*. ¶¶1, 50). Both had responsibility for substantive medical areas and administrative duties. Rush stresses that Correa was responsible for an "entire service line" made up of 500 employees, but Melgoza was responsible for 700 employees, and Rush does not explain how Correa's responsibility made his job substantially different from Melgoza's. In 2015, Melgoza's approximate compensation was $172,540 and Correa's was $206,483. (PSOF ¶ 51; Exh. ZZZ). Correa's 2016 salary was $227,517 and Melgoza's was $182,319. (*Id*.). As with Strong and Sonnenchein, Rush does not dispute that Melgoza and Correa worked under similar working conditions. Correa is a proper comparator for Melgoza's EPA claim.

15

In sum, Melgoza has made a prima facie EPA case based on the following comparators: Sonnenchein, Strong, and Correa.

### C. Bona Fide Business Reason

Rush contends that even if Melgoza can make out a prima facie case under the EPA, bona fide business-related reasons justify any wage discrepancies. "Once a plaintiff establishes a prima facie case under the Equal Pay Act, the burden of proof shifts to the employer to show that the pay disparity is due to: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex. These are affirmative defenses on which the employer bears the burden of proof (persuasion)." *Fallon*, 882 F.2d at 1211 (citations omitted). Rush argues that the fourth affirmative defense—the "catch-all"—applies. *See id*. This exception "embraces an almost limitless number of factors, so long as they do not involve sex" and "we ask only whether the factor is discriminatorily applied or if it causes a discriminatory effect." *Id.* (citations omitted).

Rush contends that it had a bona fide, gender neutral rationale for any discrepancy in pay: a grade system for AVPs where grades are determined based on job description, responsibilities, skills and education, and market data is used to develop a salary range for each grade level. (Dkt. 151 at 15). First, this does not apply to Melgoza's comparator, Sonnenchein, since he was a VP while she was an AVP, and Rush's Sylvia Chen testified that VP positions "were never graded." (Chen Dep. (Dkt. 155-20), p. 66). Rush does not explain how its alleged business reason applies to the difference between his pay and Melgoza's, and Rush does not offer any other reason

for the difference. (Dkt. 151 at 15; Dkt. 194 at 12-13). As Melgoza points out, in addition to VP positions, some AVP positions were not graded. (Dkt. 167 at 21). Indeed, Chen explained that some AVP positions were not graded and the identifier "admin/tech manager 28" was entered into the system, even though a grade was not actually associated with the position, and "admin/tech manager 28" does not have any minimum or maximum salary associated with it. (Chen Dep. p. 67). Chen testified that there were a "handful of AVP-level jobs that were nongraded *including [Melgoza's*]." (*Id*. p. 68, emphasis added). Thus Chen's testimony contradicts Rush's rationale that a grading system explains the difference in Melgoza's salary compared to men.

As to Strong and Correa, who were AVPs at the same time as Melgoza, in 2015 and 2016, Melgoza, Strong, and Correa were all "admin/tech manager 28". (PSOF ¶ 69; Exh. LL). Even assuming for the sake of argument that Rush's grading system applied to all AVPs, Rush does not explain how that system resulted in the actual salary differentials. *See King*, 678 F.3d at 474 (where defendant articulated potentially explanatory variables without proving that they actually accounted for the difference, district court erred in granting summary judgment to defendant on EPA claim); *Leong*, 67 F. Supp. 3d at 984 (employer "must prove that the explanatory variable *actually* accounts for the difference; it is an affirmative defense as to which the defendant bears the burdens of production and persuasion…Under the [EPA], it is not up to the plaintiff to establish that the employer's neutral reasoning is pretextual; the employer must prove its reasons outright once the plaintiff has shown

a prima facie case of pay disparity.") (emphasis in original) (citations omitted). *Cf. Warren*, 516 F.3d at 630 (specifically evaluating two employees in terms of whether differential was bona fide).

Rush has failed to meet its burden to prove a gender neutral rationale for the discrepancy in pay between Sonnenchein, Strong and Correa on one hand and Melgoza on the other. Melgoza's EPA unequal pay claim withstands summary judgment.

### D. Retaliation under the EPA

Melgoza claims that Rush discriminated against her for exercising her rights under the EPA. Melgoza must establish that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." *Leong*, 67 F. Supp. 3d at 985. As for her protected expression, Melgoza points to her statement in 2006 to her supervisor Clapp that she was underpaid, her April 14, 2015 formal request to her supervisor Mulroe for an equitable salary review, and her statement in a 2016 WLC meeting that her wage inequality had not been addressed. (Dkt. 166 at 27).

Melgoza's complaint in 2006 was ten years before any alleged adverse action. She does not provide any evidence to connect her complaint in 2006 with her demotion in 2016. Moreover, she testified that after complaining to Clapp in 2006, he worked with HR (albeit not as quickly as she would have liked), HR performed a market review for her salary as an Assistant Vice President, and as a result Rush increased her salary by 6% or 8%, and then later in 2010 she was promoted to Associate Vice President.

(Melgoza Dep., Exh. B, pp. 67-68). Melgoza does not claim that Clapp, who passed away in 2012 (DSOF ¶ 34), was involved in any retaliation against her. Melgoza's 2006 complaint cannot form the basis of a retaliation claim.

Melgoza's April 2015 request for review of her salary did not mention that she believed she was paid less because of her gender. (PSOF ¶ 30, Exh. OOO). In that request, she asked Mulroe to "please review my salary based on the dynamic span of my portfolio, education and experience. I want to be treated and compensated equitably for my effort based on the market." (*Id*.). At her deposition she also did not testify that she told Mulroe that she believed the wage inequity was based on her gender. (PSOF ¶ 30, Melgoza Dep., pp. 528-535). Similarly, her statement in the January 2016 WLC meeting was that Mulroe had failed to address her wage complaints and she was not being paid equitably, but again did not state that she was being paid inequitably *because of her gender*.[7]

"A complaint about dissatisfaction with one's compensation in general does not trigger protection of the statute." *Leong*, 67 F. Supp. 3d at 986. The evidence does not show that Melgoza's complaints in 2015 and 2016 referenced gender-based pay discrepancies. In *Jaburek v. Foxx*, 813 F.3d 626, 634 (7th Cir. 2016)[8] for example, plaintiff requested an audit to determine whether her compensation correlated to her

---

[7] As discussed, Melgoza cannot rely on Exhibits M or HHH. Moreover, Exhibit M provides the incorrect date for the April 2015 memo to Mulroe (instead giving a date of June 24, 2016) and still does not show she complained of inequitable pay because of her gender. (Exh. M, Dkt. 169-9 at 4).

[8] *Jaburek* involved a Title VII retaliation claim. Retaliation under Title VII and the Equal Pay Act are evaluated under a similar standard. *See Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001).

work. However, "none of [plaintiff's] documents or statements contain[ed] oppositional language or complaints or refer to any discrimination towards [plaintiff]." *Id. Cf. Betts v. Option Care Enterprises, Inc.*, 2019 WL 193914, at *10 (N.D. Ill. Jan. 15, 2019) (plaintiff alleged that in her complaint to her supervisor "she asked for a raise 'so her earnings would be comparable to those of similarly situated men, particularly Hess.' Her complaint therefore was directed specifically at gender-based pay discrepancies, rather than general dissatisfaction about pay."). Rush's summary judgment motion on Melgoza's claim for retaliation under the EPA is therefore granted.

In sum, Melgoza can proceed on her EPA wage inequity claim (Count I) based only on the three comparators identified. Summary judgment is granted in favor of Rush on her EPA retaliation claim (Count II).

### III. Title VII – Discrimination

Melgoza alleges that Rush discriminated against her in violation of Title VII based on her gender and national origin. She claims Title VII violations based on (1) unequal pay; (2) her demotion; (3) Rush's failure to allow her to prepare for interviews; and (4) Rush's failure to promote her to more advanced positions.

Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The critical question on summary judgment is whether [plaintiff] presented evidence that would permit a reasonable fact-finder to conclude that the [defendant] took a materially adverse

employment action against [plaintiff] because of her sex." *Terry*, 910 F.3d at 1004 (citations omitted). "Discrimination claims may survive summary judgment when a plaintiff presents evidence that permits a reasonable factfinder to conclude that the employer took an adverse action against the employee because of the employee's race or national origin. In deciding motions for summary judgment, courts must consider the evidence as a whole." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

### A. Interviews and failure to promote

Rush argues that Melgoza failed to respond to its argument that her discrimination claims failed based on the theories that Rush did not allow her to prepare for interviews and did not promote her to more advanced positions. (Dkt. 194 at 18). The Court agrees. Melgoza has abandoned her Title VII discrimination claim based on those two theories. *See Maclin v. SBC Ameritech,* 520 F.3d 781, 788 (7th Cir. 2008) (where plaintiff failed to defend her claim against defendant's arguments on summary judgment, she abandoned that claim); *Palmer v. Marion Cty.,* 327 F.3d 588, 597-98 (7th Cir. 2003); *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016) (plaintiff's failure to respond to defendant's argument that it was entitled to summary judgment on claim meant that plaintiff conceded that summary judgment on that claim was warranted).

### B. Unequal Pay

Melgoza claims that Rush violated Title VII by failing to pay her the same as men and/or non-Mexican American individuals. Melgoza "must present sufficient evidence

21

that she was a member of a protected class, she performed reasonably on the job in line with the employer's legitimate expectations, she was subjected to an adverse employment action, and similarly situated employees of the opposite sex were treated more favorably." *Lauderdale*, 876 F.3d at 910. Unlike the EPA, Title VII requires plaintiff to show defendant's intent to discriminate. *See Fallon*, 882 F.2d at 1213.

Similar to her EPA claim, Melgoza relies on comparators to show discrimination. Under Title VII, "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, yet this is a flexible inquiry with no magic formula. Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (citations and quotations omitted). "The purpose of the inquiry is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Skiba*, 884 F.3d at 723 (citations and quotations omitted).

The male comparators Melgoza relies on are Mulroe, Sonnenschein, Strong, Cooper, Correa, and Ellis (Dkt. 166 at 21). The Court's analysis, *supra*, shows that Melgoza has provided enough evidence that Sonnenschein, Strong and Correa are directly comparable to Melgoza in all material respects. However, a reasonable fact-finder could not find that Melgoza met her burden as to Mulroe, Cooper, and Ellis

because she has not provided sufficient evidence to compare their jobs and compensation while she was AVP.[9]

If Rush articulates a nondiscriminatory reason for the pay discrepancy, the burden shifts to Melgoza to "prove that the employer's justification was pretext for a decision made on prohibited criteria." *Lauderdale*, 876 F.3d at 910.[10] Rush's justification for the pay discrepancies is a difference in responsibilities, educational requirements, and skills and the grading system for AVP's. (Dkt. 151 at 23). For Melgoza's EPA claim, the Court found that Rush failed to meet its burden to prove a gender neutral rationale for the pay discrepancy because of contradictions in the record and because Rush did not show how the grading system actually applied to Melgoza and her comparators. But for her Title VII claim, Melgoza has the burden to show pretext to rebut Rush's justification. She "must show that her employer did not honestly believe in the reasons it gave for setting salaries." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012). "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Everroad,* 604 F.3d at 479 (citations and quotations omitted). Melgoza does not discuss pretext in the context of her Title VII unequal pay claim, and only argues that her requests for an equity review were

---

[9] As discussed earlier regarding her EPA claim, Melgoza provides no basis to extend her Title VII equal pay claim to her position as Director starting in July 2016.

[10] As to Melgoza's six female (non-Mexican American) comparators (Dkt. 166 at 21), the Court agrees with Rush that Melgoza has not provided enough evidence about these comparators for the Court to find "enough common factors...to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Skiba*, 884 F.3d at 723. However the Court need not address the issue in detail because Melgoza has failed to carry her burden on the issue of pretext. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010) (some cases warrant skipping initial burden-shifting to focus on question of pretext).

ignored and Rush did not follow its own salary review procedures. (Dkt. 166 at 21). This is not "'significantly probative admissible evidence' from which it could be inferred that the employer's reason was false *and* that the actual reason was discriminatory." *Giwa v. City of Peoria*, 917 F. Supp. 2d 850, 857 (C.D. Ill. 2013) (emphasis added) (citing *Jones v. Union Pac. R.R.*, 302 F.3d 735 (7th Cir. 2002)). Therefore a reasonable juror could not infer both that Rush's reason for the pay discrepancy was false and that the actual reason was discriminatory.

Rush's summary judgment motion on Melgoza's Title VII claim based on unequal pay is granted.

### C. Mini-RIF

Melgoza argues that when Rush restructured its cancer services line in July 2016, hers was the only position eliminated in a "mini-RIF" (reduction in force). (Dkt. 166 at 11, 25). "The point of the mini-RIF, unlike a true RIF, is that the job really was not eliminated at all; because the fired employee's duties were absorbed by others, they were effectively 'replaced,' not eliminated." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). "Because of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, we have dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably. Instead, because the fired employee's duties are absorbed by other workers and the employee was 'replaced, not eliminated,' we only require that a plaintiff demonstrate that his duties were absorbed by employees who were not members of

the protected class." *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) (citations omitted).

To survive summary judgment on her mini-RIF discrimination theory, Melgoza must show (1) she is a member of a protected class, (2) she reasonably performed to Rush's expectations, (3) she was subject to an adverse employment action and (4) her duties were absorbed by employees who were not members of the protected class. *See Michas,* 209 F.3d at 693. Rush does not dispute any of these elements of Melgoza's prima facie case. (Dkt. 151 at 22-23).[11]

Although Rush argues that Melgoza's characterization of her transition to Director as a "demotion" is a "legal conclusion" (Dkt. 193 at 23), Rush does not dispute that her position was eliminated or that the elimination was an adverse employment action. Moreover, Senior Vice President and Chief Operating Officer Cynthia Barginere (the supervisor of Melgoza's supervisor) referred to it as a "demotion." (Barginere Dep. (Dkt. 171-13) p. 100); see also DSOF ¶ 23). As to the fourth prong, Melgoza's non-cancer related portfolio of departments became the responsibility of Mulroe (a white male). (Dkt. 166 at 25-26; Dkt. 151 at 17-18; DSOF ¶ 37). The three cancer-related departments Melgoza was responsible for were moved to the cancer service line under Correa (a Mexican American male). (*Id.*). Rush does not dispute

---

[11] Rush asserts that Melgoza has not identified a similarly situated employee who was treated more favorably. (Dkt. 151 at 23). But for purposes of her mini-RIF discrimination theory, she does not need to make that showing. *Bellaver*, 200 F.3d 485 at 495 ("The plaintiff in a single-discharge case does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 'replaced' by workers outside of the protected class.").

that Melgoza continued her oversight of these cancer-related services as a Director under Correa. (PSOF ¶ 38).

Melgoza has created a presumption of discrimination so the burden shifts to Rush "to present a legitimate non-discriminatory motive for the adverse employment action." *Michas,* 209 F.3d at 694. Rush contends that it eliminated Melgoza's position in a legitimate restructuring decision "to operationalize the cancer service line" to better serve its cancer patients. (Dkt. 151 at 17, 23). Because Melgoza was responsible for three departments to be moved under the cancer service line, Rush argues that the portfolio of departments remaining under Melgoza's purview did not warrant an AVP position. (*Id.*). There are two problems with Rush's explanation. First, Rush's reason for restructuring departments does not provide a legitimate non-discriminatory motive *for the adverse employment action* against Melgoza. Second, even accepting Rush's explanation that after the restructuring, an AVP position was not warranted given Melgoza's remaining responsibilities under Mulroe's supervision, Rush does not explain why Melgoza could not have kept her AVP title when she transitioned to her position in the cancer service line.

Rush does not argue that Melgoza had any performance issues or that eliminating her AVP position was financially necessary. To the contrary, Rush argues that Melgoza's base pay did not decrease as a result of her transition to Director and Rush even provided her a unique incentive program not generally available to other Directors. (DSOF ¶¶ 44, 51). Thus Rush has failed to set forth a legitimate non-discriminatory motive for the adverse employment action to rebut Melgoza's prima

facie case of discrimination. *Cf. Michas,* 209 F.3d at 694-95 (deposition testimony supported company's financial rationale that employee's discharge was economically motivated); *Bagwe v. Sedgwick Claims Mgmt. Servs.,* 811 F.3d 866, 881 (7th Cir. 2016) (company's reason for termination—plaintiff's poor leadership skills—was supported by evidence that plaintiff was on performance improvement plan and employer had received multiple complaints about plaintiff's inability to work with others). Even if Rush had set forth a legitimate reason, considering the evidence as a whole, Melgoza has identified weaknesses and inconsistencies in Rush's explanation for her demotion such that a reasonable juror could find the explanation unworthy of credence.[12]

Melgoza's Title VII discrimination claim based on her mini-RIF theory survives summary judgment.

### D. Hostile Work Environment

Melgoza claims that she was subjected to a hostile work environment at Rush. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

---

[12] Megloza has provided evidence of pretext. (Dkt. 166 at 26; PSOF ¶ 36; Dkt. 167 at 16). Pretext requires evidence from which it can be inferred that Rush did not, at the time of Melgoza's demotion, honestly believe the reason it gave for demoting her. *See Michas,* 209 F.3d at 695; *Coleman v. Donahoe,* 667 F.3d 835, 852 (7th Cir. 2012). Melgoza points to Barginere's testimony stating that Rush could have kept Melgoza as an AVP. (Barginere Dep. pp. 96-100). Further supporting Melgoza's contention that she could have been kept her AVP title is an organizational chart created by Mulroe in May 2016. (PSOF ¶ 36, Exh. QQQQ). At his deposition, Mulroe explained that the chart shows three options for the transition in 2016, in the first of which, Melgoza is an AVP along with another AVP. In addition, Rush does not dispute that non-Mexican American male employees had their duties changed during the restructuring but none were demoted. (Dkt. 166 at 26; Dkt. 194 at 16-18).

employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal citations and quotations omitted). "This is a demanding standard; a plaintiff's evidence must go well beyond showing rudeness or incivility…, even if it need not reach the point of 'hellishness.'" *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 973 F.3d 718, 728 (7th Cir. 2020) (citations omitted).

Melgoza argues that three events, taken together, create a jury question about whether she endured a hostile work environment: (1) in early 2013, during a meeting with Melgoza, executive vice president Michael Dandorph mentioned his Cuban girlfriend and his boat; (2) in February 2017, Bianco, during an interview with Melgoza, called her a snob because she went to Smith College; and (3) in November 2017, Dr. DeCresce began Melgoza's interview by putting on a Donald Trump mask. (Dkt. 166 at 22). Melgoza is correct that in hostile work environment cases, courts analyze the totality of the circumstances (*see Hall v. City of Chicago,* 713 F.3d 325, 331 (7th Cir. 2013)) and statements by supervisors are taken more seriously than co-workers' statements. (*Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 638 (7th Cir. 2019)).

However, "employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018*); see also Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012) ("[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment."). Here, the incidents were infrequent—

Melgoza identifies three incidents that occurred over the course of more than four years. They also lacked the severity of comments and conduct in other cases where the Seventh Circuit has held that the hostile work environment question should be decided by a jury. For example Melgoza relies on *Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018), reh'g denied (July 24, 2018), in which an employee's supervisor used a particular racial epithet toward him on multiple occasions. The Seventh Circuit held that "Perales's multiple uses of the word n- - - -r in combination with his heightened scrutiny of Robinson and his call to others to take action against Robinson are sufficient to create a triable issue for a jury on whether the harassment was severe or pervasive enough to constitute a hostile work environment." *Id*. at 828. In *Hall,* 713 F.3d 325, also cited by Melgoza, plaintiff's supervisor assigned her unnecessary menial work, forbade her coworkers from speaking to her, prohibited her from division meetings, stopped her efforts to take on more work, and subjected her to occasional verbal outbursts and a minor physical altercation. *Id*. at 330-31. The incidents Melgoza describes do not rise to the level of the comments and conduct in *Robinson* or *Hall*. Melgoza also does not explain how the three incidents altered the conditions of her employment.

While the Court understands Melgoza's distress in response to these alleged incidents, when considered on their own or in combination, a reasonable juror could not find them to have created a hostile work environment. Accordingly Rush's motion for summary judgment on the hostile work environment claim is granted.

### IV. Title VII Retaliation

A prima facie case of retaliation under Title VII requires a plaintiff to show: "(1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield,* 926 F.3d 894, 896 (7th Cir. 2019). Melgoza has put forth several theories of retaliation, one of which survives summary judgment.

First, for the same reasons that Melgoza's EPA retaliation claim fails, discussed *supra*, her Title VII retaliation claim based on her alleged complaints of unequal pay also fail. Second, Melgoza argues that her demotion was retaliation for her complaints of discrimination against Mexican-Americans. (Dkt. 166 at 30). For support, Melgoza points to the facts that she was a founding member of Rush's Diversity Leadership Council and "vocal in promoting opportunities for diverse leaders in healthcare, particularly those of Mexican-American and Latino descent." (PSOF ¶ 12). However Melgoza has not "produce[d] evidence of an adverse employment action that was instigated *by her 'complaining about prohibited discrimination.'" Jaburek*, 813 F.3d at 626 (emphasis added). "A retaliation claimant must produce evidence that she gave 'a cognizable expression of opposition' to discriminatory practices." *Id*. Moreover, this argument is undeveloped and therefore waived. *See Riley*, 909 F.3d at 190.

Melgoza's final theory of retaliation is that Rush denied her promotion in 2017 in retaliation for her complaints of discrimination after her demotion and her filing of the EEOC charge and this litigation. (Dkt. 166 at 31-33). Here Rush again does not

dispute that there was a materially adverse action. *See Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (failure to promote can be adverse action). And Rush does not dispute that the EEOC charge, her complaint in this case, and 2017 complaint to HR are protected activity.[13] Rush argues, however, that Melgoza cannot show any casual link between her protected activity and the adverse action.

Melgoza relies on circumstantial evidence including "suspicious timing" to show the causal link.[14] "Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015). Melgoza claims that following her May 2017 EEOC charge and September 21, 2017 complaint, she failed to get the cancer administrator position in December 2017. (PSOF ¶ 87).[15] While this

---

[13] In terms of protected activities, the Court focuses on Melgoza's May 2017 EEOC Charge, September 2017 complaint and November 2017 HR complaint. Melgoza makes general references to complaints of discrimination after her 2016 demotion and before her EEOC Charge, but she fails to produce evidence that she complained that she was demoted because she was a Latina woman. For example she argues that she had a conversation with Dr. Ansell in March 2017 (PSOF ¶ 74), but she did not actually testify about any details of that conversation at her deposition (Exhibit B), nor does Exhibit PPPP, an email amongst some Rush executives in 2017 about President Obama's "hopeful and inspiring message", show that she made complaints about prohibited discrimination.

[14] Circumstantial evidence to support causation can include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (citation omitted).

[15] As to the other promotion she did not get, the interim cancer position in early 2017, that came *before* the May 2017 EEOC charge and September 2017 complaint.

approximate three month period between filing her complaint and being denied the promotion would not alone establish causation, additional record evidence supports an inference of causation, creating a jury question about whether Rush retaliated against Melgoza for filing this litigation and for her HR complaint.

Melgoza had multiple interviews for the cancer administrator position including with DeCresce and Dandorph. (PSOF ¶ 84; DSOF ¶ 83). On November 1, 2017, at her interview with DeCresce, she says DeCresce wore a Trump mask. (PSOF ¶ 85; Exh. SSSS). On November 30, 2017, she reported to HR and Dandorph and Ranga Krishman that DeCresce wore a Trump mask during her interview. (Exh. SSSS). HR conducted an investigation, interviewing Melgoza and DeCresce each on December 4 and 5, 2017. (*Id.*) HR also interviewed Peter Jokich on December 7; Jokich reported that Melgoza told him about DeCresce wearing the Trump mask on the same day as her interview. (*Id.*) On December 20, 2017, HR informed Melgoza that they closed the investigation because they were "not able to substantiate the version of the incident as reported." (*Id.*). (HR did instruct DeCresce to remove the mask from Rush property. (DSOF ¶ 86)). Six days later, on December 26, HR informed Melgoza that she did not get the cancer administrator position. (PSOF ¶ 87). Rush says it determined none of the internal candidates were qualified for the job. (DSOF ¶ 87). In May 2018, Rush retained an outside search firm to conduct a nationwide search to fill the position. (*Id.*) The outside search firm presented twelve candidates to Rush, one of whom was Melgoza, the only Rush employee. (Basara Dep., Exh. DD, pp. 35-39). Rush decided not to move forward with Melgoza's candidacy. (DSOF ¶ 89).

A reasonable juror could infer causation from this evidence. *See Coleman*, 667 F.3d at 861 (reasonable juror could infer retaliation from sequence of protected activities and subsequent retaliatory action). After filing her complaint in September 2017, Melgoza complained to HR and her superiors in November 2017 about experiencing conduct during an interview for a promotion which she felt was offensive to her as a woman of Mexican heritage. (Exh. SSSS). One of the individuals she complained to, Dandorph, was both President of Rush and also a hiring manager for the promotion she was seeking. (Dkt. 167 at 34; PSOF ¶13; Schopp Dep. pp. 187-88). Dandorph additionally testified that he was offended by her EEOC charges against him. (Dandorph Dep. pp. 97-98).

In addition, Rush claimed Melgoza was not qualified for the position, but several months later, an outside search firm reviewing candidates nationwide for the position recommended Melgoza as a final candidate. The search firm's presentation of Melgoza as an objectively qualified candidate supports Melgoza's theory that Rush's reason for not promoting her was pretextual. *See Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015) (plaintiff provided evidence of both suspicious timing and animus, including an email as showing defendant's disdain for the EEOC process and animus against plaintiff for filing her complaint); *Rowlands*, 901 F.3d at 803 (suspicious timing combined with evidence that decision for adverse employment action was pretextual raised jury question as to retaliation).

Viewing the facts in the light most favorable to Melgoza and considering the evidence as a whole, she has provided sufficient evidence warranting a trial on the

33

question of whether her September 2017 lawsuit and November 2017 HR complaint were tied to Rush's decision not to promote her.

### V. Illinois Human Rights Act Claim

Finally, Rush contends that Melgoza cannot bring an IHRA claim because she failed to exhaust her administrative remedies. Melgoza counters that Rush waived that affirmative defense by waiting until summary judgment to raise it. "A defendant's failure to plead an affirmative defense may result in a waiver of the defense if the defendant has relinquished it knowingly and intelligently, or forfeiture if the defendant merely failed to preserve the defense by pleading it." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019). However the Seventh Circuit has made clear the rule is "not to be applied rigidly." *Id.*

First, in Rush's answer to Melgoza's amended complaint, it answered her allegation that she had "fully exhausted all of her administrative remedies" by admitting she had "exhausted her administrative remedies *with the EEOC*" (Dkt. 45 at 24, emphasis added) but denying the remaining allegations of that paragraph. (*Id.*) Rush also asserted the affirmative dense that she was barred from relief "sought for actions outside the scope of her EEOC charge." (*Id.* at 37). While neither of these statements explicitly raised the affirmative defense that Melgoza failed to exhaust her administrative remedies under the IHRA, Rush did at least provide some notice of that defense.

Furthermore, Melgoza does not articulate any harm arising from Rush's delay in asserting the defense. "We will generally find that the failure to plead an affirmative

defense in the answer works a forfeiture 'only if the plaintiff is harmed by the defendant's delay in asserting it.'" *Reed*, 915 F.3d at 478 (citation omitted). Melgoza does not point to any evidence in the record that would show she exhausted her remedies under the IHRA nor does she argue that she has any such documentation but did not have the opportunity to produce it because of Rush's delay in raising the defense. To the contrary, attached to the amended complaint is a letter from the Illinois Department of Human Rights explaining the procedure before the EEOC and the Commission, but not otherwise attaching any documentation from the Commission. (Dkt. 43-1). *See Perez v. Cook Cty. Sheriff's Office*, 2020 WL 777288, at *3 (N.D. Ill. Feb. 18, 2020) (explaining that even with the EEOC-IHRA workshare agreement, an EEOC right to sue letter is not a substitute for a final order from the Illinois Human Rights Commission); *see also Principe v. Vill. of Melrose Park*, 2020 WL 4815908, at *4 (N.D. Ill. Aug. 18, 2020) (explaining EEOC and IHRA procedures and dismissing IHRA claim for failure to exhaust).

Rush's summary judgment on Melgoza's IHRA claim is granted.[16]

## CONCLUSION

For the stated reasons, Defendant Rush's motion for summary judgment [150] is granted in part and denied in part. Melgoza's motion for leave to file her affidavit [198] is denied. The following claims remain for trial: Count I (Equal Pay Act) based on three comparators, Counts III and IV (Title VII) based on Melgoza's mini-RIF

---

[16] Finally, as to the EPA and Title VII claims, for similar reasons discussed *supra* related to the EPA statute of limitations issue, the issues of damages, willfulness and good faith will be decided by a jury. The Court declines Rush's invitation to decide those issues as a matter of law at this stage.

theory, and Count V (Title VII retaliation) based on Melgoza's theory that Rush did not promote her in retaliation for filing her complaint in this case and complaint to HR in November of 2017.

E N T E R:

Dated: November 9, 2020

_____
MARY M. ROWLAND
United States District Judge