**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NORMA MELGOZA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 17-cv-6819** |
| | ) | |
| **v.** | ) | **Honorable Mary M. Rowland** |
| | ) | |
| **RUSH UNIVERSITY MEDICAL CENTER,** | ) | |
| | ) | **Jury Trial Demanded** |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR STAY OF PROCEEDINGS OR, ALTERNATIVELY, FOR LEAVE TO FILE COUNTERCLAIM

Defendant Rush University Medical Center ("Defendant" or "Rush"), through its attorneys, Jane M. McFetridge and Audrey Olson Gardner of Jackson Lewis P.C., hereby moves  the Court for a stay of proceedings until 90 days after Plaintiff Norma Melgoza ("Plaintiff" or "Melgoza") obtains a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") in connection with her pending EEOC charge.  Alternatively, Defendant respectfully requests leave to file a counterclaim for declaratory relief.

## INTRODUCTION

Plaintiff's purported interest in having this matter expeditiously set for trial is nothing more than a ruse.  Her real goal is blatant forum shopping through the vehicle of impermissible claims splitting.  After Plaintiff's employment was terminated in a July 2020 COVID-related reduction in force, she asked this Court for permission to amend her Complaint to add allegations about her termination in further support of her claims.  In her motion for leave to amend, which attached a proposed second amended Complaint, Plaintiff expressly stated that the allegations about her termination were "an extension of" the facts previously alleged in her Complaint and stemmed from the "same underlying facts."

However, a week later, Plaintiff withdrew her motion, claiming that she wanted "to move forward with the claims in her First Amended Complaint as expeditiously as possible." Since that time, Plaintiff has played coy about her true intentions, repeatedly asserting to both this Court and Defendant's counsel that she wasn't sure what she was going to do about the claims associated with her termination. Immediately after the Court's November 2020 ruling on the motion for summary judgment,[1] Defendant began raising and has continued to raise concerns about the possibility, indeed likelihood, that Plaintiff's true intention was to pursue two separate causes of action. (*See* Dkt. No. 226). Plaintiff maintained her fiction through three status hearings and two settlement conferences and only ultimately came clean on April 6, 2021, after being ordered to do so by this Court. (*See* Dkt. No. 234).

Plaintiff's motivation is obvious: by stretching out the clock on assertion of her termination claims, she seeks to bolster an argument that it is too late to incorporate those claims into the extant case, thereby paving the way to impermissible claims splitting. She is hedging her bets. If she doesn't prevail in this case – either at all or sufficiently in her estimation – she has her "back-up" cause of action which she can pursue with a different judge and jury who might be more favorably disposed to her position. And she would have the added benefit of inflicting "maximum pain" on her former employer – a not-for-profit healthcare institution suffering through an international pandemic and its aftermath.

Plaintiff will no doubt characterize the foregoing as speculative. Common sense is not speculative. Notwithstanding, what is clearly ***not*** speculative is the fact that Plaintiff has had ample opportunity to pursue her termination claims in the context of this litigation, without any prejudice or delay to the setting of a trial date. Had Plaintiff amended her pleadings last summer when she

---

[1] At this time, Defendant's current counsel, Jackson Lewis P.C., became actively involved in this litigation.

originally sought leave to do so (or even just filed an administrative charge at that time), any limited discovery and motion practice associated with her termination claims would have been conducted during the time period the courts were not trying cases due to COVID-19 and completed by now. The parties and the Court would now be in position to set this matter for trial. Instead, Plaintiff has engaged in not-so-subtle gamesmanship resulting in unnecessary delay and costs. She should not be rewarded for her actions.

Accordingly, Rush respectfully moves the Court for a stay of proceedings until 90 days after Plaintiff obtains a Notice of Right to Sue from the EEOC. At that time, Plaintiff will be forced to either assert her claims in this action, initiate a separate lawsuit, or forgo her termination allegations altogether. If Plaintiff chooses to file a separate proceeding, Rush will move to consolidate that action with this case. Thus, staying the case will pave a way for all of Plaintiff's claims to be brought before this Court, easing the burden of litigation on both parties and the Court, simplifying and streamlining the issues, and preventing Plaintiff's claims from a later dismissal on res judicata grounds. Alternatively, Rush requests leave to file a counterclaim for a declaratory judgment barring Plaintiff from asserting her termination claims in a separate action.

## RELEVANT PROCEDURAL BACKGROUND

Plaintiff's First Amended Complaint ("FAC" or "Complaint") includes six counts under the Equal Pay Act of 1963; Title VII of the Civil Rights Act of 1964 ("Title VII"); and the Illinois Human Rights Act. (FAC, Dkt. No. 43, ¶¶ 94-135). In support of these claims, Plaintiff alleges that Rush discriminated against her based on sex and national origin by paying her less than coworkers outside of her protected categories, failing to promote her, and harassing her. (*Id.*) She also alleges that she reported concerns about the discrimination and was retaliated against for doing so. (*Id.*) Notably, Plaintiff's Complaint alleges "Rush's discrimination and retaliation continues." (*Id.* at ¶ 93).

On July 14, 2020, Rush advised Plaintiff that her position was being eliminated effective July 19, 2020 in a reduction in force ("RIF") impacting more than 230 employees. At that time, Defendant's motion for summary judgment was pending. (*See* Dkt. No. 151). Immediately after learning of her termination, on July 15, 2020, Plaintiff filed a motion to amend her Complaint ("Motion to Amend") and attached a draft Second Amended Complaint ("SAC") including new allegations based on her termination. (*See* Ex. A, Dkt. No. 213). In her Motion to Amend, Plaintiff acknowledged that her termination allegations inherently relate to the claims in her Complaint:

> [T]hough Plaintiff's Second Amended Complaint incorporates new *allegations*, it does not raise new *claims*…her July 14, 2020 termination is the culmination of Rush's years' long continuing campaign of retaliation against Plaintiff for the protected activity alleged in her prior pleadings as well as the instant litigation. Plaintiff does not seek to add additional counts to her Amended Complaint as her recent termination is an extension of the same underlying facts previously alleged and violative of the same laws[.]

(*Id.* at ¶ 24). The SAC added roughly four full pages of allegations related to her termination and asserted that her inclusion in the RIF was further indicia of Rush's discriminatory and retaliatory animus toward her. It did not contain any new allegations of discriminatory or retaliatory motives or animus. Nor did it assert that Plaintiff engaged in new protected activity. To the contrary, Plaintiff simply alleged that "[s]ince 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment[.]" (SAC, Ex. A, p. 10, at ¶¶ 130, 150, 161).

On July 23, 2020, Plaintiff submitted a letter requesting withdrawal of her Motion to Amend in order "to move forward with the claims in her First Amended Complaint as expeditiously as possible." (Dkt. No. 215). The Court granted Plaintiff's request to withdraw her motion. (Dkt. No. 216).

On November 9, 2020, the Court issued its opinion on the motion for summary judgment, granting it in part and denying it in part. (Dkt. No. 225). After the Court's ruling, the parties submitted a joint status report wherein Plaintiff requested that a trial date be scheduled "as soon as practical." (Dkt. No. 226). Defendant stated its belief that "the matter should be stayed until Plaintiff makes clear her intentions relative to any action she intends to take regarding the termination of her employment with Defendant." (*Id.*) Defendant further articulated in detail its consistent position that allowing Plaintiff to pursue her termination claims separately would constitute impermissible claims splitting. (*Id.*)

The Court ordered the parties to discuss settlement (Dkt. No. 228). Thus, on February 24, 2021 and March 10, 2021, the parties attended a virtual telephonic settlement conference with the Court but were unable to resolve their dispute. (Dkt. No. 234). During and after the settlement conference, Plaintiff made clear to Rush and the Court that the damages she is claiming in ***this*** action include those allegedly resulting from her 2020 termination, but refused to state whether she would also be pursuing a separate cause of action for the termination

In light of Plaintiff's ongoing obfuscation of her intentions relative to the termination claims, Rush sent Plaintiff a letter on April 2, 2021 asking her to confirm her intended course of action relative to those claims. (*See* Ex. B.) On April 9, 2021, the parties submitted a joint status report wherein Plaintiff confirmed she intended to file an administrative charge on or before May 7, 2021. (Dkt. No. 237, ¶ 9). On April 12, 2021, the Court entered an order requiring Plaintiff to file her charge by that date. (Dkt. No. 238). The Court further adopted the parties' proposed briefing schedule whereby Rush would file a motion seeking to consolidate Plaintiff's termination allegations with the present case by May 7, 2021. (*Id.*)

Despite her purported "concerns" about delay, weeks passed without Plaintiff filing her EEOC charge. Accordingly, on April 28, 2021, Rush contacted Plaintiff and inquired about the

status of Plaintiff's EEOC charge, as Rush would need sufficient time to review it before filing its Motion on May 7th.  Plaintiff confirmed the EEOC charge would be forthcoming, and then, only about two weeks before her administrative deadline,[2] filed her EEOC charge on April 30, 2021. (*See* Exs. C-D.)  Notably, Plaintiff's EEOC charge sets forth many of the same allegations already asserted in her Complaint and her withdrawn SAC.  (Ex. D). For example, Plaintiff's EEOC includes the following allegations:

- Rush "paid [Melgoza] less per year than [her] male and/or non-Mexican-American colleagues performing substantially equal work."  (Ex. D, ¶ 3; *compare* FAC, ¶¶ 33-44 (same allegations.))

- Melgoza "raised complaints about…equal pay as a woman and requested equity in Rush's payment of [her] compensation."  (Ex. D, ¶ 3; *compare* FAC, ¶¶ 33-44 (same allegations.))

- Melgoza "complained of discriminatory treatment and systematic discriminatory practices by Rush[.]" (Ex. D, p. 1, ¶ 3; *compare* FAC, ¶¶ 33-44 (same allegations.))

- "On July 14, 2016, Rush demoted [Melgoza] two levels down to a position of "Director" at Rush[.]"  (Ex. D, ¶ 4; *compare* FAC,, ¶¶ 33-44 (same allegations.))

- "On May 8, 2017, [Melgoza] filed a Charge of Charge of Discrimination…. with the [EEOC]…alleging retaliation and discrimination on the basis of gender and national origin."  (Ex. D, ¶ 4; *compare* FAC, ¶¶ 33-44 (same allegations.))

---

[2] Because a charge of discrimination must be filed within 300 days of the alleged adverse action, Plaintiff's deadline to file a charge based on her July 14, 2020 termination (effective July 19, 2020) would have, at the latest, been May 17, 2021 (300 days after July 19, 2020).

- In 2019, Rush added positions in the cancer center, including Katie Struck, who "was appointed CAO of Cancer in May 2019." (Ex. D, ¶ 6; *compare* SAC, ¶¶ 112 (same allegation.))

- Melgoza was "instrumental during the COVID-19 pandemic in assisting Rush in implementing cost containment initiatives and other patient care solutions across the system." (Ex. D, ¶ 12; *compare* SAC, ¶ 95 (same allegation.))

- On July 10, 2020, Melgoza's supervisor, Josh Ellis, "informed [Melgoza] that Rush would be laying off [her] immediate direct report, [Sharon D.] Brown-Elms, purportedly as part of a reduction in force due to the COVID-19 pandemic. Rush had previously attempted to eliminate Brown-Elm's position, but Ellis paused the elimination." (Ex. D, ¶ 13; *compare* SAC, ¶¶ 97-100 (also alleging, like in her EEOC charge, that Brown-Elms is an African American female and Rush was discriminating against her too.))

- "By sharing the information with [Melgoza] about Rush's decision to terminate the employment of [her] immediate direct report [,] Rush implied to [Melgoza] that her employment at Rush would not be impacted by the purported reduction in force." (Ex. D, ¶ 13; *compare* SAC ¶ 101 (same allegation.))

- "Ellis sent [Melgoza] an electronic calendar invitation for a meeting between Ellis and [her] at 9:45 a.m. on July 14, 2020…[Melgoza] asked Ellis to explain the topic of the meeting and whether [she] needed to prepare anything for the meeting." (Ex. D, ¶ 13; *compare* SAC ¶¶ 102-103 (same allegations.))

- Melgoza contacted Dr. Lisa Stempel, Chief of Breast Imaging, regarding the meeting and also had her attorney contact counsel for Rush to confirm the basis for the July 14, 2020 meeting. (Ex. D, ¶¶ 13-14; *compare* SAC ¶¶ 104-105 (same allegations.))

- At a July 10, 2020, Cancer Center Town Hall meeting, Rush stated the RIF in the cancer center would be minimal.  (Ex. D, ¶ 15; *compare* SAC ¶ 107 (same allegation.))

- Ellis informed Melgoza on July 10, 2020, that there was no need to prepare anything for the July 14, 2020 meeting.  (Ex. D, ¶ 15; *compare* SAC ¶ 108 (same allegation.))

- On July 14, 2020, Ellis met with Melgoza in a virtual video conference, with Javette Simmons, HR Generalist, and terminated her employment effective July 19, 2020 due to Rush's restructuring.  (Ex. D, ¶ 16; *compare* SAC ¶¶ 109-111 (same allegations.))

- Melgoza expressed that she believed the elimination of her role was retaliatory.  (Ex. D, ¶ 17; *compare* SAC ¶ 114 (same allegations.))

- Rush offered Melgoza a severance package which would include a release of her claims against Rush.  (Ex. D, ¶ 18; *compare* SAC ¶¶ 115-116 (same allegations.))

As illustrated above, nearly all of Melgoza's allegations in her EEOC charge mirror those found in pleadings that she has filed in this case.  Some of the allegations are even completely identical.  It cannot be reasonably disputed that her EEOC charge is based on the same operative facts as the claims in this case.  Accordingly, and as discussed below, Rush requests that the Court stay this matter until 90 days after Plaintiff receives a Notice of Right to Sue in connection with her EEOC charge so that her allegations regarding her July 2020 termination may be asserted in this case, or, in the alternative, grant Defendant leave to file a declaratory judgment counterclaim addressing her allegations concerning the termination.

## **ARGUMENT**

I.    **The Court is Authorized to Stay the Proceedings Pending Resolution of Plaintiff's EEOC Charge.**

"[T]he Court has 'broad discretion' in deciding whether to stay proceedings as an incident to its power to control its own docket consistent with equity, judicial economy, and the parties'

interests." *United States Securities and Exchange Commission v. Glick*, 2019 U.S. Dist. LEXIS 460 at *5 (N.D. Ill. Jan. 2, 2019) (citing *Clinton v. Jones,* 520 U.S. 681, 706 (1997)); *see also Doe v. City of Chicago,* 360 F.Supp.2d 880, 881 (N.D. Ill 2005) ("The court has the inherent power to stay civil proceedings…when the interests of justice so dictate.")

This discretion includes the ability to stay pending litigation while administrative proceedings are resolved. *See Jefferson v. Ingersoll International Inc.,* 1999 U.S. Dist. LEXIS 7609 at *5-6 (N.D. Ill. May 20, 1999) (staying litigation pending resolution of EEOC proceedings as doing so would potentially simplify matters and spare the parties the expense and burden of duplicative litigation); *Christenson v. John Zink Co., LLC,* 2007 U.S. Dist. LEXIS 57544 at *9 (N.D. Okla. Aug. 6, 2007) (staying litigation under the Age Discrimination in Employment Act for 45 days or completion of EEOC conciliation, reasoning that "[a]bsent a stay, defendant will have to take part in the EEOC conciliation process and defend itself in this Court at the same time, which would result in unnecessary expenditures on the part of the litigants and a waste of judicial resources.")

Ultimately, in deciding whether to stay an action, courts consider three factors: "(1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party, (2) whether a stay will simplify the issues in question and streamline the trial, and (3) whether a stay will reduce the burden of litigation on the parties and on the court." *Markel American Ins. Co. v. Dolan,* 787 F.Supp.3d 776, 779 (N.D. Ill. 2011). Here, application of all three factors strongly favors a stay of this matter.

### A. Plaintiff Will Not Be Prejudiced by a Stay of This Matter.

First, Plaintiff cannot demonstrate that she will be prejudiced by a stay. It is her own delay that now necessitates a stay. Furthermore, a stay would appear to be in Plaintiff's best interest, as

it will enable her to indisputably pursue her termination claims, which could otherwise be barred on res judicata grounds.[3]

Under the theory of res judicata, "a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Rose v. Bd. of Election Comm'rs for the City of Chi.,* 815 F.3d 372, 374 (7th Cir. 2016). "[S]eparate claims are considered the same cause of action for claim-preclusion purposes 'if they arise from a single group of operative facts, regardless of whether they assert different theories of relief.'" *Walczak v. Chicago Board of Education*, 7390 F.3d 1013, 1016-1017 (7th Cir. 2014). "[T]hat separate suits are different in some respects, including the legal theories advanced and some of the facts a claimant intends to use to prove its right to relief, is not enough to defeat a finding that two claims rely on the same fundamental facts." *Digital Dynamics Software, Inc. v. Eclipse Gaming Sys., LLC,* 2018 U.S. Dist. LEXIS 92752 at *21 (N.D. Ill. June 1, 2018) (citing *Ross ex rel. Ross v. Bd. of Educ. Of Twp. High Sch. Dist. 211,* 486 F.3d 279, 283 (7th Cir. 2007).

For example, in employment cases, while "there may be different phases to an employment action, the overlap of the facts behind the entire sequence calls for common treatment." *King v. City of Chicago,* 2004 U.S. Dist. LEXIS 1311 at *14 (N.D. Ill. Feb. 2, 2004) (citing *Davis v. City of Chicago,* 53 F.3d 801, 803 (7th Cir. 1995)). This is because, "[i]t would be silly to break [a] sequence of events into little packages and litigate it twice; once over the interim measures and again over the final decision." *Id.* "Different phases of the same basic dispute are not separate claims." *Id.* Indeed, a party must bring in one lawsuit "all legal theories arising out of the same transaction or series of

---

[3] Rather than having Rush incur additional expense moving to dismiss Plaintiff's second litigation on res judicata grounds, it is most economical and in the best interest of all parties to simply resolve her termination claims in this case.

transactions." *Kim v. Sara Lee Bakery Group, Inc.*, 412 F.Supp. 2d 929, 941 (N.D. Ill. 2006) (discussing claim splitting, a form a res judicata that bars claims before a final judgment is entered).

As detailed above, Plaintiff's EEOC charge and her Complaint rely on the same allegations of discrimination and retaliation. Moreover, her EEOC charge contains the same allegations from Plaintiff's SAC, and Plaintiff already informed the Court that the allegations in her SAC are "an extension of the same underlying facts previously alleged [in the FAC] and violative of the same laws." (Ex. A, Dkt. No. 213, ¶ 24). Thus, Plaintiff herself has recognized that the allegations in her EEOC charge stem from the same operative facts as her Complaint. As a result, under the doctrine of res judicata, her termination claims will likely be barred if not asserted herein, and in any case, such claims filed in another forum will only waste judicial and litigant time and resources.

Plaintiff's assertions that delay will cause prejudice are specious. Despite being terminated in July 2020, Plaintiff waited nearly the full 300 days to file an EEOC charge based on her termination. Had Plaintiff not waited until the last possible second, her EEOC charge could have been resolved by now, as would any discovery and motion practice related to the termination claims. Clearly, Plaintiff has never had any real concerns about delay. And, in any event, any delay has been due to her own actions. As a result, she cannot claim prejudice. *See CE Design, Ltd. v. King Supply Co., LLC,* 2012 U.S. Dist. LEXIS 101310 at *38 (N.D. Ill. July 20, 2012) ("We do not find convincing pleas of prejudice that are the [party's] own making"); *Williams v. CSX Transportation, Inc.,* 2004 U.S. Dist. LEXIS 17949 at *7 (N.D. Ind. Aug. 17, 2004) (plaintiff cannot claim prejudice for "a delay of his own making.") Accordingly, the first factor weighs heavily in favor of a stay.

**B. A Stay Will Reduce the Burden of the Litigation on the Parties and the Court.**

Second, a stay of this matter will help reduce the burden of this litigation on the parties and the Court. If a stay is not imposed to permit Plaintiff to bring her termination claims into this case; it is clear that she will try to assert them in a separate proceeding. The Seventh Circuit has counseled

litigants against such tactics and has recognized that a terminated employee maintaining two suits against her former employer is an "inefficient manner of litigation" and "unduly burdensome to employers." *Hermann v. Cencom Cable Assocs.,* 999 F.2d 223, 225, 1993 U.S. App. LEXIS 17237 at *4-6 (7th Cir. 1993).

Indeed, under Seventh Circuit precedent, where a plaintiff has already commenced a lawsuit and then later discovers a claim which must first go through an administrative process, the plaintiff should "request[] that the court postpone or stay the first case. What [s]he cannot do…is split causes of action and use different theories of recovery as separate bases for multiple suits." *Brzostowski v. Laidlaw Waste Sys.,* 49 F.3d 337, 339 (7th Cir. 1995); *see also Walczak v. Chi. Bd. of Educ.,* 739 F.3d 1013, 1019 (7th Cir. 2014) (stating that plaintiff waiting on a Notice of Right to Sue from the EEOC "could have requested that the court postpone or stay the proceedings until such time as her EEOC charge was resolved…[or] could have asked the EEOC…to accelerate the administrative process."); *Hermann.,* 999 F.2d at 225 (noting that the plaintiff "would have a very strong case" for asking the court to stay litigation while the Title VII administrative process resolves). Moreover, where two cases "rely on similar witnesses" and the nature of the facts at issue are duplicative, a stay of one of the actions is especially warranted to "preserve judicial resources and reduce the litigation of the parties and the court." *See In re Groupon Derivative Litig.,* 882 F.Supp.2d 1043, 1050-1051 (N.D. Ill. 2012).

Thus, rather than beginning a new in a second proceeding, the most efficient manner to resolve Plaintiff's termination allegations is to include them in this case. As described above, Plaintiff's Complaint and her EEOC charge both rely on the same allegations, and both cases will involve the same witnesses. Requiring Rush to duplicate its same defenses in another action and requiring the Court adjudicate the same allegations would be entirely burdensome, unnecessary, and

a waste of judicial resources. Accordingly, the second factor also weighs in favor of a stay of this matter pending resolution of Plaintiff's EEOC charge.

### C. A Stay Will Simplify the Issues and Streamline Trial.

Finally, a stay will simplify the issues in this case and streamline any trial of this matter. Without a stay of proceedings and consolidation of Plaintiff's termination claims into this case, there will essentially be two trials regarding overlapping periods of Plaintiff's employment, with the first trial purportedly focused on Plaintiff's demotion and the second on her termination. The parties are certain to dispute the proper scope of Plaintiff's damages in each case and the evidence that may be considered by the jury. For example, in the first trial, Rush will seek to limit Plaintiff's recovery to July 2020 when she was lawfully terminated. Rush will further seek to bar any evidence that would suggest that Plaintiff's termination was unlawful as it would unnecessarily prejudice the jury. Given that Plaintiff's EEOC charge duplicates the allegations from her Complaint, Plaintiff will undoubtedly seek to use repeat evidence in each trial, which Rush will contest.

Further, without a stay, there is a risk of inconsistent findings in the two proceedings given the factual overlap. *See Gu v. Bank of Am.,* 2012 U.S. Dist. LEXIS 15281 (N.D. Ill. Feb. 8, 2012) (permitting parallel proceedings involving substantially similar parties and issues "proceed to judgment…risks inconsistent outcomes"); *Rose v. Hearst Magazines Div., Hearst Corp.,* 814 F.3d 491, 493 (7th Cir. 1987) (noting that "civil juries must return consistent verdicts" and the Seventh Circuit has reversed cases where inconsistencies cannot be resolved.) Rather than having to litigate these complicated issues twice, a stay will permit the parties to discuss all the claims at once and permit the jury to consider all relevant evidence related to her demotion and termination at the same time. This is certain to be the more streamlined and simple approach. Accordingly, because the third factor also favors a stay of this case, Rush respectfully requests that the Court grant its Motion and stay this matter until 90 days after Plaintiff receives a Notice of Right to Sue.

## II.   **Defendant Alternatively Requests Leave to File a Counterclaim.**

In the event the Court does not grant the requested stay, Rush alternatively requests leave to file a counterclaim for declaratory relief.  Specifically, and as reflected in its proposed counterclaim[4] attached in <u>Exhibit E</u>, Defendant's counterclaim will ask this Court for a declaration that Plaintiff's termination claims may not proceed in a separate action, as they will be barred by the doctrine of res judicata and impermissible claim splitting if not asserted herein.

Under Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleadings with leave of court.  "Courts have interpreted [Rule 15] liberally, in furtherance of the goal of the Federal Rules to resolve disputes on the merits and in a single judicial proceeding wherever possible."  *Jupiter Aluminum Corp. v. Home Ins. Co.,* 181 F.R.D. 605, 609 (N.D. Ill. 1998) (citing *Foman v. Davis,* 371 U.S. 178, 181-182 (1962)).  Where a deadline to amend the pleadings has passed, "the Court may modify a case's existing schedule for 'good cause'…Indeed, district courts are vested with broad discretion over case scheduling."  *Travelers Prop. Cas. Co. of Am. V. Dish Network, LLC,* 2016 U.S. Dist. LEXIS 38516 at * 5 (C.D. Ill. Mar. 24, 2016) (citing Fed. R. Civ. P. 16(b)(4) and *Jones v. Coleman Co.,* 39 F.3d 749, 753 (7th Cir. 1994)).  In determining whether good cause exists, "the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2016).

Here, good cause supports permitting Rush to file its counterclaim for declaratory relief. Since the Court rendered its summary judgment decision, Rush has been actively trying to determine whether Melgoza intended to pursue additional claims based on her July 2020 termination.  Rush only recently received confirmation that Melgoza intends to pursue her termination claims in a separate action and received a copy of her EEOC charge for the first time on April 30, 2021 from

---

[4] A redlined version of Rush's proposed Amended Answer and Counterclaim is attached as <u>Exhibit F</u>

her counsel.  *See* Ex. C.  Upon reviewing the allegations therein and confirming that they are the same as those asserted in this case, Rush has now promptly moved to assert its counterclaim for declaratory relief.  Rush's diligence demonstrates good cause to permit the requested amendment.

Moreover, the requested amendment will enable the parties to resolve their ongoing dispute regarding whether Plaintiff may file claims relating to her July 2020 termination separately from this action. *See Klinger v. Conan Doyle Estate, Ltd.,* 988 F.Supp.2d 879, 885 (N.D. Ill. 2013) ("[t]he Declaratory Judgment Act…authorizes a federal court ]i]n a case of actual controversy within its jurisdiction' to 'declare the rights and other legal relations of any interested party seeking such declaration.'") To date, the parties remain on opposite sides of this question.  The requested declaratory relief will therefore enable them to resolve their dispute and then focus on the allegations in this case.  Accordingly, Rush respectfully submits that good cause exists to permit it to file an amended Answer asserting a counterclaim for declaratory relief in the event a stay is not granted.

## **CONCLUSION**

For the foregoing reasons, Defendant Rush University Medical Center respectfully requests that the Court order a stay of the present proceedings until 90 days after Plaintiff receives a copy of a Notice of Right to Sue from the EEOC in connection with her pending EEOC charge. Alternatively, Rush requests that the Court grant it leave to amend to assert a counterclaim for declaratory relief.

Dated: May 7, 2021

Respectfully submitted,

RUSH UNIVERSITY MEDICAL CENTER

/s/ Jane M. McFetridge
One of Its Attorneys

Jane M. McFetridge (ARDC No. 6201580)
Audrey Olson Gardner (ARDC No. 6337084)
JACKSON LEWIS P.C.
150 North Michigan Avenue, Suite 2500

Chicago, Illinois  60601
Tel.: 312.787.4949
Jane.McFetridge@jacksonlewis.com
Audrey.Gardner@jacksonlewis.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on May 7, 2021, she caused a true and correct copy of the foregoing *Defendant's Motion for Stay of Proceedings, or Alternatively, For Leave to File Counterclaim* to be filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record via the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Jane M. McFetridge

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORMA MELGOZA, | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 17-cv-6819** |
| | ) | |
| **v.** | ) | **Honorable Mary M. Rowland** |
| | ) | **Honorable Gabriel A. Fuentes** |
| **RUSH UNIVERSITY MEDICAL CENTER,** | ) | |
| | ) | **Jury Trial Demanded** |
| **Defendant.** | ) | |

## MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiff, Norma Melgoza ("Plaintiff" or "Melgoza"), by and through her attorneys, Ashley L. Orler, Rebekah S. Mintzer, and M. Elysia Baker of Golan Christie Taglia LLP, respectfully moves this Honorable Court, pursuant to Fed. R. Civ. P 15(a)(2), for leave to file her Second Amended Complaint against Defendant Rush University Medical Center ("Defendant" or "Rush"). In support thereof, Plaintiff states as follows:

### PROCEDURAL HISTORY

1. On September 21, 2017, Plaintiff filed her initial Complaint against Rush. [Dkt. No. 1.] Counts I and II of the Complaint allege that Rush, Plaintiff's now-former employer, discriminated and retaliated against Melgoza on the basis of her gender and violated the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq.* ("EPA"), by paying Melgoza wages at a rate less than the rate at which it pays male employees performing substantially equal work. Counts III and IV alleged that Rush discriminated and retaliated against Melgoza on the basis of her gender and national origin, Mexican-American, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Count V alleged a hostile work environment claim under Title VII against Rush.

2. Plaintiff thereafter requested, and this Court granted, leave to file an Amended Complaint, which added one additional count (Count VI) alleging violations of the Illinois Human Rights Act ("IHRA"). [Dkt. Nos. 40-42.]

3. On July 24, 2018, Plaintiff filed her Amended Complaint. [Dkt. No. 43.] On August 7, 2018, Rush filed its Answer and Affirmative Defenses to the Amended Complaint. [Dkt. No. 45.]

4. On November 15, 2019, Rush filed its Motion for Summary Judgment seeking judgment and dismissal of all counts of Plaintiff's Amended Complaint. [*See* Dkt. Nos. 150-152.] The parties have fully briefed Rush's Motion for Summary Judgment and are currently awaiting a ruling from this Court. [*See* Dkt. Nos. 166-168, 193-194, 198, 201, 203.]

## FACTUAL BACKGROUND

5. The precipitating event giving rise to this litigation is Rush's so-called "elimination" of Plaintiff's position as an Associate Vice President in June 2016. (*See* Am. Compl. ¶ 44.) As alleged in Plaintiff's Amended Complaint, Plaintiff was demoted two levels down to a position of "Director" at Rush. (*Id*.)

6. As set forth in Plaintiff's Complaint and her Response to Rush's Motion for Summary Judgment, Rush's proffered reason for its decision to "eliminate" Plaintiff's position is false and pretext for an unlawful discriminatory and retaliatory demotion. (*See, e.g.,* Am. Compl. ¶¶ 44-59.)

7. Throughout this litigation, Plaintiff continued to work for Rush in the lower Director position, and has received overwhelmingly positive performance evaluations during this period.

8. On July 14, 2020, without warning, Rush informed Plaintiff that her Director position had been eliminated, abruptly terminating her employment effective July 19, 2020.

2

9.     The circumstances of Plaintiff's recent termination indicate that, again, Rush's proffered reason for its adverse action is false and pretext for unlawful retaliation.

10.     In 2019 and 2020, Rush added multiple positions to its Cancer Center, including Katharine Struck, Chief Administrative Officer; Joshua Ellis ("Ellis"), Associate Vice President of Operations in Cancer Center; and Elizabeth Cozzi, Director of Cancer Center, which is a similar title as Melgoza's title.

11.     In her position as Director, Melgoza has been instrumental during the COVID-19 pandemic in assisting Rush in implementing cost containment initiatives and other patient care solutions across the system. Melgoza was a member of Rush's COVID-19 Pandemic Mobilization Team and worked multiple shifts during the week and weekends on the inpatient floors to educate staff on the use of personal protective (PPE) gear, transport of patients, handling of lab samples, and implementation of other safety protocols.

12.     During the COVID-19 pandemic, Melgoza also continued to expand and stabilize patient care, implement new technologies in breast imaging, and introduced novel therapies in cellular therapy for patients with complex cancers.

13.     During the COVID-19 pandemic, Melgoza's supervisor, Ellis, informed Melgoza that Rush would be laying off one of Melgoza's direct reports, Sharon D. Brown-Elms ("Bown-Elms"), Administrator of Breast Imaging, as part of a reduction in force due to the COVID-19 pandemic. While there was a previous attempt by Rush to eliminate Brown-Elms prior to the pandemic, Ellis paused moving forward with the termination of Brown-Elms.

14.     On July 10, 2020, Ellis informed Melgoza that Rush would notify Brown-Elms at 9:00 a.m. on July 14, 2020 that her employment at Rush would be terminated. Ellis stated that he did not need Melgoza to attend the meeting and that he would be informing Brown-Elms about the termination.

3

15.     By sharing the information with Melgoza about Rush's decision to terminate the employment of Melgoza's direct report, Brown-Elms, Rush implied to Melgoza that her employment at Rush would not be impacted by the planned termination of Brown-Elms' employment.

16.     On July 10, 2020, after notifying Melgoza of the planned meeting with Brown-Elms at 9:00 a.m. on July 14, 2020, Ellis sent Melgoza an electronic calendar invitation for a meeting between Ellis and Melgoza at 9:45 a.m. on July 14, 2020.

17.     After receiving Ellis' electronic calendar invitation for a meeting on July 14, 2020, on July 10, 2020, Melgoza asked Ellis to explain the topic of and whether she needed to prepare anything for the meeting scheduled by Ellis at 9:45 a.m. on July 14, 2020.

18.     Melgoza also reached out to Dr. Lisa Stempel, Chief of Breast Imaging at Rush, and Dr. Paula Grabler, Breast Imaging Medical Director at Rush Oak Park, and informed them about the meeting with Ellis scheduled for July 14, 2020 and shared her concern that Ellis would be terminating Melgoza's employment at that meeting. Both doctors responded that Melgoza's employment would not be terminated.

19.     After Melgoza received Ellis' electronic calendar invitation for a meeting on July 14, 2020, on July 10, 2020, counsel for Melgoza contacted counsel for Rush and asked Rush to confirm the basis for the meeting scheduled by Ellis with Melgoza at 9:45 a.m. on July 14, 2020.

20.     Counsel for Rush never provided any information regarding the basis for the meeting scheduled by Ellis with Melgoza at 9:45 a.m. on July 14, 2020.

21.     At a July 10, 2020 Cancer Center town hall meeting among certain Rush employees, including Melgoza, Rush Medical Director of the Cancer Center, Dr. Mia Levy, stated that the reduction in force in the Cancer Center positions at Rush "are minimal" and "very small."

4

22.     Later in the day on July 10, 2020, Ellis sent an email to Melgoza stating, in part, "I wanted to touch base after I meet with [Brown-Elms]. There's no need to prepare anything [for the July 14, 2020 meeting]." Ellis' response was untrue and misleading.

23.     On July 14, 2020 at 9:45 a.m., Melgoza met via virtual video conference with Ellis, and Melgoza was surprised to see that Javette Simmons ("Simmons"), Rush HR Generalist, was also at the virtual video conference.

24.     Without warning, Ellis informed Melgoza that Rush was eliminating Melgoza's Director position effective July 19, 2020.

25.     Similar to Rush's "elimination" of Melgoza's Associate Vice President position (demotion) in 2016, Melgoza was told by Ellis that her termination was due to the Company's restructuring of its management positions. Ellis added that Rush was "top heavy."

ARGUMENT

26.     Rush's proffered justification for Melgoza's termination is false and pretext for unlawful retaliation in response to Melgoza's complaints (including the instant litigation) of discrimination, harassment, unequal pay and retaliation.

27.     Given the series of events outlined above, the instant litigation and allegations contained therein, and the fact Rush selected Melgoza for termination among these 13,000 employees – the only Mexican-American woman in a position of leadership at Rush who has been integral to Rush's response to the current pandemic and continuing work in complex and profitable cancer departments – Rush's decision to terminate Melgoza's employment is illegal retaliation.

28.     Accordingly, Plaintiff now seeks leave to amend her Amended Complaint to include allegations regarding her recent termination. Namely, that there is a causal link between

5

Plaintiff engaging in the protected activity alleged in her Amended Complaint and Rush's recent "elimination" of her position.

29.     A copy of Plaintiff's proposed Second Amended Complaint is attached hereto as **Exhibit A**. Exhibit A is in redline format, without exhibits (which remain unchanged), showing the proposed edits to Plaintiff's Amended Complaint.

30.     Leave to amend pleadings prior to trial should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "This liberal policy of granting amendments is based in part on the belief that decisions on the merits should be made whenever possible, absent countervailing considerations." *Gregg Communications Systems, Inc. v. American Tel. and Tel. Co.,* 98 F.R.D. 715, 720 (N.D. Ill. 1983).

31.     As set forth by the U.S. Supreme Court, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the [Federal Rules of Civil Procedure] require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (quotation and citation omitted).

32.     In order to determine whether an amendment would cause undue prejudice to the adverse party, the court balances the interests of the parties. *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, 02 C 3293, 2004 WL 2005808, at *3 (N.D. Ill. Sept. 3, 2004) (granting Plaintiff leave to file a third amended complaint). These interests include "the hardship to the moving party if leave to amend is denied, the reasons for the moving party for its failure to add the new allegations in the initial pleading, and the injustice to the adverse party if leave to amend were granted." *Id*.

33.     This Motion will not cause prejudice to any party. Significantly, the new allegations are not a surprise to Rush, as it is well aware that it chose to "eliminate" Plaintiff's position and knew of its decision before Plaintiff did. There can be no credible argument that the facts surrounding Plaintiff's termination are somehow unknown to Rush or otherwise require additional investigation by the Defendant.

34.     Second, though Plaintiff's Second Amended Complaint incorporates new *allegations*, it does not raise new *claims* that were not addressed in her prior complaints. As alleged in the proposed Second Amended Complaint, her July 14, 2020 termination is the culmination of Rush's years' long continuing campaign of retaliation against Plaintiff for the protected activity alleged in her prior pleadings as well as the instant litigation. Furthermore, Plaintiff does not seek to add additional counts to her Amended Complaint as her recent termination is an extension of the same underlying facts previously alleged and violative of the same laws: the EPA, Title VII, and the IHRA.

35.     This Motion is brought in good faith and not for the purpose of delay.

36.     Counsel for Melgoza contacted counsel for Rush regarding this motion. Rush's counsel will provide its position as to whether it objects to the motion after it has the opportunity to review the proposed Second Amended Complaint.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Honorable Court enter an order:

      (a)     Granting Norma Melgoza leave to file her Second Amended Complaint; and

      (b)     Granting any further relief this Court deems reasonable and just.

Dated: July 15, 2020                Respectfully submitted,

                            Norma Melgoza,
                            Plaintiff,

                            By: */s/ Ashley L. Orler*
                                  One of her Attorneys

Ashley L. Orler, Esq. (#6297339)
Rebekah S. Mintzer, Esq. (#63179231)
M. Elysia Baker Analo, Esq. (#6308530)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
alorler@gct.law
rsmintzer@gct.law
mebanalo@gct.law

## **CERTIFICATE OF SERVICE**

   I, Ashley L. Orler, an attorney, hereby certify that I caused a copy of Motion for Leave to File Second Amended Complaint, to be served upon the following:

      Amanda A. Sonneborn, Esq.
      James C. Goodfellow, Esq.
      Thomas M. Horan, Esq.
      Seyfarth Shaw LLP
      233 S. Wacker Drive, Ste. 8000
      Chicago, Illinois 60606
      asonneborn@seyfarth.com
      jgoodfellow@seyfarth.com
      thoran@seyfarth.com

by causing a copy of the same to be served via CM/ECF, this 15th day of July, 2020.


        By:  */s/ Ashley L. Orler*

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NORMA MELGOZA, | ) |
| | ) |
| Plaintiff, | ) Case No. 17-cv-6819 |
| | ) |
| v. | ) Honorable Mary M. Rowland |
| | ) Honorable Gabriel A. Fuentes |
| RUSH UNIVERSITY MEDICAL CENTER, | ) |
| a not-for-profit corporation, | ) |
| | ) JURY TRIAL DEMANDED |
| Defendant. | ) |

**SECOND AMENDED COMPLAINT**

Plaintiff, Norma Melgoza ("Melgoza" or "Plaintiff"), by her attorneys, ~~Peter M. Katsaros,~~ Ashley L. Orler, ~~and~~ Rebekah S. Mintzer, and M. Elysia Baker Analo of Golan Christie Taglia LLP, complains against Defendant, Rush University Medical Center ("Rush" or "Defendant") as follows:

**Nature of Action**

1.      This lawsuit arises under the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq.* ("EPA"), for Rush's discrimination against Melgoza on the basis of her gender by paying wages to her at a rate less than the rate at which it pays male employees performing substantially equal work, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

2.      This lawsuit also arises under the Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment and systematic discriminatory practices by Rush, including but not limited to failure to post executive leadership positions and fairly evaluate

candidates, and hiring relatives and friends which excludes women, veterans, the disabled, and individuals of Mexican descent.  Rush created a hostile environment for Melgoza and others by promoting systematic discrimination against women, veterans, the disabled and those of Mexican descent.

3.     This lawsuit also arises under the Illinois Human Rights Act, 775 ILCS 5/1-101, for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

### Parties

4.     Melgoza, at all times relevant to this dispute, worked and resided in this judicial district.

5.     Melgoza is a current, at all times relevant to this dispute, was an employee of Rush and worked for Rush in this judicial district.

6.     Rush is an Illinois not-for-profit corporation with its principal place of business at 1653 West Congress Parkway, Chicago, Illinois.

### Jurisdiction and Venue

7.     This Court has jurisdiction over Counts I and II under the express provisions of the EPA, 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, over Counts III, IV and V under the express provisions of Title VII, § 2000e-5(f)(3) and 28 U.S.C. § 1331, and over Count VI under 28 U.S.C. § 1367 as the facts constituting this count are so related to the claims in the other counts that it forms part of the same case or controversy.

8.     Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391, because all the significant events giving rise to the claims occurred in this judicial district.

9. Venue is also proper in the Northern District of Illinois, Eastern Division because Defendant does business and has employees located within this judicial district.

### Factual Allegations

10. Rush University Medical Center Obligated Group is a not-for-profit healthcare, education, and research enterprise, comprising of Defendant, Rush Health, Rush Oak Park Hospital and Rush University. Rush University has an enrollment of 2,500 students. In 2016 Rush's operation was licensed to operate 1,100 beds, handled 184,000 emergency room visits, had 251,000 patient days and listed 10,000 employees. Rush's total operating revenue from U.S. government administrated Medicare and Medicaid was forty-three percent (43%).

11. Melgoza has a Bachelor of Arts Degree from Smith College and a Master's Degree in Public Administration in Health Policy and Management from the Robert F. Wagner Graduate School of Public Service at New York University ("NYU"). Melgoza received academic awards both at Smith College and NYU, and was the recipient of the Robert F. Wagner Public Service award during her years at NYU.

12. Melgoza is a Fellow with the American College of Health Care Executives and is certified in Healthcare management.

13. In October 2013, Melgoza received a Leadership Executive Program Certificate from the American College of Health Care Executives. She was selected by the Latino Forum of Healthcare Executives as a scholarship recipient for her leadership abilities and commitment to patient excellence. The intent of the scholarship was to promote healthcare leaders in the U.S.

14. Melgoza has worked in the healthcare industry for over twenty-five years, and immediately prior to her employment by Rush, was the Assistant President of Services Lines of Cancer, Medicine, Geriatrics, Women & Children, and Surgery for Mount Sinai Hospital.

15.     Melgoza ~~has~~ was been employed by Rush from 2006 through ~~the present~~July 19, 2020.

16.     From November 2006 through October 2010, Melgoza was employed by Rush as an Assistant Vice President, and her responsibilities included, *inter alia*, management of the radiology, non-invasive cardiology, neurodiagnostics, radiation oncology, breast imaging, bone marrow transplant, photopheresis, emergency department, transfer center agreements, transfer center, dialysis, and respiratory therapy departments.

17.     From November 2006 through October 2010, Melgoza was a key executive in the implementation of the hospital-wide EPIC software system and the migration to a new picture archiving system (PACS) for the new, non-invasive platform, and a strategic leader in the opening of Rush's new patient tower.

18.     During her tenure as an Assistant Vice President for Rush, Melgoza served as the Executive of Rush's Cancer Committee.

19.     In 2006, the Rush Cancer Committee appointed Melgoza as the Cancer Conference Coordinator for the organization.  In this role, Melgoza oversaw Rush's multi-disciplinary cancer conferences by ensuring compliance with American College of Surgeons Commission on Cancer standards by monitoring cancer care discussions and multidisciplinary standards required for Rush's Commission on Cancer accreditation.

20.     From November 2010 through July 14, 2016, Melgoza worked as an Associate Vice President for Rush, and her responsibilities included, *inter alia*, management of the non-invasive platform for the opening of the new patient tower, management of the radiation oncology / Women's Cancer Center, breast imaging, bone marrow transplant, inpatient dialysis, photopheresis, plasmapheresis, radiation safety, occupational safety, evening / weekend

4

administrators, environmental services, linen services, guest relations, volunteer services, interpreter services and security departments. She also served as a voting member on the Rush Medical Center Institutional Review Board.

21. Many of the departments that Melgoza capably managed during her tenure as Associate Vice President for Rush involved cancer treatment research, quality management, accreditation and cancer prevention.

22. Melgoza worked diligently on improving patient care and creating a positive environment for Rush employees with a focus on innovation, excellence, empathy and service to its patients and the community at large.

23. During Melgoza's tenure as an Associate Vice President for Rush, she was responsible for budgets exceeding $200 million revenue, over 700 full-time employees, and between nine (9) and eleven (11) clinical and support departments at one time.

24. Melgoza was a founding member of the Rush Diversity Leadership Council in 2006, and a member of the Rush Women's Leadership Council.

25. Throughout her employment by Rush, Melgoza actively promoted diversity in the workplace, including but not limited to the advancement of Hispanics, including Mexican-Americans, and women to positions in management, including the executive level.

26. Melgoza is female and her national origin is Mexican-American.

27. In 2006, J. Robert Clapp, Senior Vice President and Executive Director of Rush, stated, "Melgoza was the first Mexican-American Assistant Vice President and executive leader hired by Rush." This was so despite an ongoing presence of Latinos and individuals of Mexican descent within Rush's service area.

5

28.     From October 2010 through July 14, 2016, Melgoza was the first and only female Mexican-American Associate Vice President despite individuals of Mexican-descent encompassing thirty percent (30%) of the population of the City of Chicago.

29.     There are currently no individuals of Mexican national origin within the top 100 executive leaders at Rush, yet 20% of the revenues are generated from patients of Mexican descent.

30.     During her employment with Rush, Melgoza performed her duties exceptionally, and consistently met corporate goals.

31.     Throughout her employment with Rush, Melgoza received consistently highly-favorable performance reviews, including an overall rating of "exceeds expectations" in July 2017.

32.     Throughout Melgoza's tenure as an Associate Vice President, Rush paid Melgoza $100,000.00 to $250,000.00 less per year than her male and/or non-Mexican-American colleagues performing substantially equal work, including but not limited to Mike Mulroe, Scott Sonnenchein, Edward Conway, Mike Lamont, Anthony Perry, Mike Dandorph, Richard Davis, Kurt Olsen, Jeremy Strong, Tim Carrigan, Leo Correa, Shaun Cooper, Ryan Schlifka, John Pontarelli, David Rice, Ray LaBrec, and Joseph Anderson.

33.     Throughout her tenure as an Associate Vice President for Rush, Melgoza made numerous requests for a higher salary given her highly-favorable performance reviews and increased responsibilities.

34.     Rush denied Melgoza's repeated requests for a higher salary as her duties continuously increased.

6

35.     During Melgoza's tenure as an Associate Vice President for Rush, she met with senior executives at Rush on multiple occasions and informed the executives about her interest in a promotion to a Vice President position, and eventually, to the Chief Operating Officer position given her vast portfolio and extensive experience.

36.     On multiple occasions from 2012 through 2015, Melgoza met with Mike Mulroe ("Mulore"), Rush Vice President, to request a review of her salary given her vast portfolio and extensive experience.

37.     On December 19, 2013, Melgoza requested a meeting and met with Rush Executive Vice President and Executive Director Mike Dandorph ("Dandorph") to review her curriculum vitae, experience, and current responsibilities and to express her desire to grow within the organization.

38.     During the December 19, 2013 meeting, Dandorph made an unwanted sexual advance to Melgoza after she expressed her desire to grow within the organization.  Dandorph informed Melgoza that he once had a Cuban girlfriend, that he did not marry his Cuban girlfriend, and that he owned a boat but desired to purchase a larger boat. Melgoza ended the meeting by shaking Dandorph's hand and leaving his office.

39.     After the December 19, 2013 meeting, Melgoza was not notified of any future opportunities and executive positions were not posted for advancement within the organization.

40.     On April 14, 2015, Melgoza met with Mulroe and provided in writing a number of concerns about his discriminatory behavior and retaliation, and requested equity in Rush's payment of her compensation, stating, "Please review my salary based on the dynamic span of my portfolio, education and experience.  I want to be treated and compensated equitably for my effort based on the market."

41.     Mulroe informed Melgoza that a market evaluation was not possible and that Lynne Wallace ("Wallace"), Rush Vice President of Human Resources, declined the review.

42.     On November 25, 2013, Melgoza met with Dr. David Ansell ("Dr. Ansell"), Rush Senior Vice President of Strategy and Community Engagement, to discuss Mulroe's discriminatory behavior and reluctance to conduct a market assessment for an equal market wage.   During that meeting, Dr. Ansell stated, "[Mulroe] probably pays you less than the fellow."

43.     Dandorph and Cynthia Barginere ("Barginere"), Rush Chief Operating Officer, were also notified of Mulroe's discriminatory behavior but failed to address the complaints.

44.     On July 14, 2016, Rush demoted Melgoza two levels down to a position of "Director" at Rush after she was informed that her position as Associate Vice President was eliminated. She no longer had a job as an Associate Vice President.

45.     Similarly-situated employees who were male were not demoted two levels down by Rush.

46.     Similarly-situated employees who were not of Mexican-American national origin were not demoted two levels down by Rush.

47.     Similarly-situated employees who did not complain about discrimination and unequal pay were not demoted two levels down by Rush.

48.     Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were not demoted two levels down by Rush.

49.     Similarly-situated employees who did not complain about the systematic discrimination at Rush were not demoted two levels down by Rush.

8

50. Similarly-situated employees who were not subjected to sexual advances or expected to fulfill sexual stereotypes of Mexican-American women were not demoted two levels by Rush.

51. At the time Rush demoted Melgoza, it also promoted a less-qualified male, Leo Correa ("Correa"), to the new position of Associate Vice President of Clinical Affairs and Cancer Services.

52. Melgoza was never made aware of this new position as it was not posted, nor was Melgoza interviewed for this positon despite her thirteen (13) years of experience in leading cancer service departments at Rush and externally. Had Melgoza known of the opening, she would have applied for it.

53. Rush deviated from and did not follow its policies and procedures on posting job positions and hiring when it promoted Correa.

54. At the time Rush demoted Melgoza, it transferred her non-cancer service departments to Mulroe. Mulroe was not demoted even though he was no longer supervising the cancer portfolio.

55. Numerous members of Rush's top executives informed Melgoza that the demotion to Director was not performance based.

56. After the demotion, Melgoza was informed that she would report to Correa.

57. At the time Rush demoted Melgoza, Mulroe informed Melgoza that if she didn't like her new position, she could accept a severance package from Rush, stating that Melgoza's employment with Rush would be terminated if she did not take the demotion.

58. Mulroe and Wallace failed to provide Melgoza with a severance package after numerous requests for the document.

9

59.     The demotion adversely impacted Melgoza by (a) capping her salary at a director level with raises not factored into her base pay after reaching a scale; (b) removing her from the Management Incentive Compensation Program and putting her into a "Shadow Program" with an unclear future; (c) removing substantial responsibilities from her job duties; (d) harming her ability to advance to higher levels of management within and outside the organization; (e) causing her professional embarrassment and emotional distress which also impacted her health; and (f) preventing moving patient care forward.

60.     Melgoza met with numerous members in Rush's executive ranks to discuss the termination threat, demotion, and the retaliatory behavior directed at her after her advocacy for diversity and requesting equitable pay. On March 22, 2017 and April 16, 2017, she met with Terry Peterson, Rush Vice President of Governmental Affairs and the Chairman of the Diversity Leadership Group and Chairman of the Chicago Transit Authority (CTA). She also met with Barginere, Wallace, Dr. Ansell, Dandorph, and Mary Ellen Schopp ("Schopp"), Rush Senior Vice President of Human Resources. All these Rush senior executives failed to end the discriminatory and retaliatory actions against Melgoza.

61.     Schopp recommended that Melgoza leave the organization and focus on being a mother, volunteer for school activities for her child, and find a hobby.

62.     Rush eventually offered a severance package.

63.     Melgoza rejected the severance package, and began working as a Director for Rush.

64.     In January 2017, Correa informed Melgoza that he was resigning his employment with Rush.

65. On January 25, 2017, Dr. Robert DeCresce ("Dr. DeCresce"), Rush Acting Cancer Center Medical Director and Operating Partner of Shore Capital Partners, informed Melgoza that she would report to him until further notice.

66. On February 3, 2017, Dr. Antonio Bianco ("Dr. Bianco"), Rush Vice President of Clinical Affairs and President/Owner of Bianco Labs requested a meeting with Melgoza on February 8, 2017 to discuss "leadership of the cancer center."

67. On February 8, 2017, during the meeting between Melgoza and Dr. Bianco, Melgoza was blind-sided by learning for the first time that the meeting was actually an interview for the Interim Cancer Position, which was open due to Correa's resignation. No copy of an active job description was provided for the "surprise" interview.

68. During the February 8th meeting, Melgoza provided a copy of her resume to Dr. Bianco, and after reviewing the resume, Dr. Bianco said to Melgoza, "You are a snob, you went to school with a lot of snobs. I used to know a woman who went to Smith [College]. She wasn't that great. I didn't care for her. She was a snob."

69. Melgoza reported Dr. Bianco's rude, discriminatory behavior and the lack of a formal posting of the job position with a job description to Schopp. Schopp told Melgoza that "[Melgoza] let things happen to her" and that she should go back to Dr. Bianco to "teach him how to be a better leader."

70. Melgoza reported Dr. Bianco's rude, discriminatory comments to Dr. DeCresce, who told her, "Don't worry, you are not a snob!" Dr. DeCresce did not follow-up further regarding Melgoza's complaints.

11

71.     Rush did not offer Melgoza the open Interim Cancer Position, and instead hired a less-qualified Caucasian female, Patty Nedved ("Nedved"), who lacked experience managing cancer departments.

72.     Rush deviated from and did not follow its policies and procedures on job hiring and posting when it hired Nedved.

73.     Melgoza later learned from Dr. DeCresce that there were two (2) candidates considered for Correa's position.  Both of the candidates were not of Mexican national origin. Another Rush executive employee informed Melgoza that the two (2) candidates did not have cancer experience and that Melgoza had the most "on the bench cancer experience at Rush, yet the position went to an individual without cancer experience."

74.     Upon information and belief, other candidates were provided advance notice to prepare for the interview, and were told of their "active status" for the position, allowing them the ability to compete for the position.

75.     On February 27, 2017, Melgoza met with Peter Butler ("Butler"), former Rush Chief Executive Officer and Chief Operating Officer to discuss the hostile and discriminatory environment at Rush.  Butler noted that Melgoza managed a complex portfolio exceptionally during his tenure at Rush, encouraged her to focus on moving forward with the current departments, and stated that he "would not have handled [the hiring] situation in that manner."

76.     On March 21, 2017, Melgoza met with Dr. Ansell to discuss the demotion of Melgoza and to inform him of the ongoing retaliation against her.  Dr. Ansell stated that Barginere made the decision to demote Melgoza.  Dr. Ansell, further stated, "[Barginere] was told to remove you. She removed you because she is weak.  She is not strong for diversity. That is what happens when these people get in power."  Melgoza asked Dr. Ansell to clarify who

issued the order to terminate her employment and what he meant by "these people," but he ran away from Melgoza in response.

77.     Similarly-situated individuals who were male were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

78.     Similarly-situated individuals who were not of Mexican-American national origin were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

79.     Similarly-situated individuals who were not asked to meet sexual expectations or subjected to stereotypes of women of Mexican-American descent at Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

80.     Similarly-situated individuals who did not complain about discrimination and unequal pay were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

81.     Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

82.     Following the promotion of Nedved, the gender and national origin discrimination and retaliation by Rush against Melgoza continued.  Melgoza learned that Dr. Bianco threatened to terminate Melgoza's employment.  Additionally, Dr. Bianco and executives publicly threatened to remove additional departments from her supervision that she capably supervised for many years.

83.     On January 16, 2015, Melgoza reached out to Dr. Larry Goodman ("Dr. Goodman"), President of Rush University Medical Center and the Executive Sponsor of Rush's Diversity Leadership Group, in an attempt to discuss diversity, future goals and the removal of discriminatory barriers at Rush.  Dr. Goodman never responded to the email.

84.     Dr. Goodman has advocated for inclusion and a diverse work environment, and speaks publicly about Rush's commitment to equality; however he refused to meet with Melgoza.  A second meeting was requested on April 25, 2017, but Dr. Goodman declined the meeting.

85.     Dr. Goodman has spoken about equity, inclusion, ethics and a diverse work environment; yet he condoned the overt, systemic discrimination against employees of Mexican descent, unequal pay for women, and exclusion of veterans, people with disabilities and other under-represented employees by not posting executive positions, promoting nepotism, violating the equal pay law and not addressing overt discrimination against Rush's only Mexican-American executive.

86.     During the March 21, 2016, Dr. Ansell stated that it was "unconscionable that Rush demoted its only Latina Female Executive and had no other Hispanic Executives within the Rush Executive ranks."  He also stated that he "threw a line" to Dr. Goodman and Barginere at a meeting related to the unconscionable bias against employees of Mexican descent.

87.     Executive leadership at Rush was spearheaded by Dr. Goodman who was enabled by William M. Goodyear, Chairman of the Rush University Medical Center Board of Directors, former Rush Chief Executive Officer and President of Navigant, to violate the EPA and Title VII in discriminating against women and employees of Mexican national origin. Dr. Goodman and Goodyear did not intervene and stop the discriminatory behavior; thus, facilitating an

14

environment where it is acceptable to violate civil rights laws related to equal pay and the discrimination of employees of Mexican national origin. Their inaction and failure to hold executives accountable support a corporate culture of systemic, intentional discrimination and retaliation against women and employees of Mexican national origin, and also negatively impact and discriminate against people with disabilities, veterans and other under-represented minorities. Instead of meeting with Melgoza, an employee of Mexican descent who lead nine to eleven departments with over 700 full time employees, Dr. Goodman opted to "dealsource" and be a social media influencer.

88.     On May 8, 2017, Melgoza filed a Charge of Discrimination against Defendant ("Charge of Discrimination") with the United States Equal Employment Opportunity Commission ("EEOC"). A copy of the Charge of Discrimination is attached as <u>Exhibit A</u>.

89.     Melgoza's Charge of Discrimination alleges retaliation and discrimination on the basis of gender and national origin against Defendant.

90.     On August 24, 2017, Melgoza received a "right to sue" letter for the Charge of Discrimination from the EEOC. A copy of the EEOC "right to sue" letter is attached as <u>Exhibit B</u>.

91.     The "right to sue" letter provides Plaintiff ninety (90) days from the date of her receipt of the letter to bring a lawsuit. Plaintiff filed this Complaint before the expiration of the ninety (90) day period.

92.     Plaintiff has fully exhausted all of her administrative remedies.

93.     Rush's discrimination and retaliation ~~continues.~~continued after she filed her EEOC Charge of Discrimination.

94. In March 2020, the World Health Organization declared the coronavirus ("COVID-19") outbreak as a pandemic, as the rates of infection continued to rise in many locations around the world and across the United States, including Chicago.

95. In her position as Director, Melgoza has been instrumental during the COVID-19 pandemic in assisting Rush by implementing cost containment initiatives and other patient care solutions across the system. Melgoza was a member of the COVID-19 Pandemic Mobilization Team and worked multiple shifts during the week and on weekends on the inpatient floors to educate staff on the use of personal protective (PPE) gear, transport patients, carry lab samples, and implement safety precautions.

96. During the COVID-19 pandemic and while working on the COVID-19 Pandemic Mobilization Team, Melgoza continued to expand, stabilize patient care, implement new technologies in breast imaging, and introduce novel therapies in cellular therapy for patients with complex cancers.

97. Also during the COVID-19 pandemic, Melgoza's supervisor Josh Ellis ("Ellis"), Associate Vice President of Operations in Cancer Center, informed Melgoza that Rush would be laying off one of Melgoza's immediate direct reports, Sharon D. Brown-Elms ("Bown-Elms"), Administrator of Breast Imaging , as part of a reduction in force due to the COVID-19 pandemic. Ms. Brown-Elms is an African-American female.

98. Rush had previously attempted to eliminate Brown-Elm's position, but Ellis paused the elimination. He now raised it again during the pandemic.

99. Melgoza was provided multiple dates regarding Brown-Elm's elimination. Though Melgoza was Brown-Elm's supervisor, Melgoza was also told not to be present for the elimination because Ellis would be terminating Brown-Elms directly.

16

100.    On July 10, 2020, Ellis informed Melgoza that Rush would inform Brown-Elms at 9:00 a.m. on July 14, 2020 that her employment at Rush would be terminated.

101.    By sharing the information with Melgoza about Rush's decision to terminate the employment of Melgoza's immediate direct report, Brown-Elms, Rush implied to Melgoza that her employment at Rush would not be impacted by the planned reducting in force.

102.    On July 10, 2020, after notifying Megloza of the planned meeting with Brown-Elms at 9:00 a.m. on July 14, 2020, Ellis sent Melgoza an electronic calendar invitation for a meeting between Ellis and Melgoza at 9:45 a.m. on July 14, 2020.

103.    After receiving Ellis' electronic calendar invitation for a meeting on July 14, 2020, on July 10, 2020, Melgoza asked Ellis to explain the topic of and whether she needed to prepare anything for the meeting scheduled by Ellis at 9:45 a.m.on July 14, 2020.

104.    Melgoza also reached out to Dr. Lisa Stempel, Chief of Breast Imaging, and Dr. Paula Grabler, Breast Imaging Medical Director at Rush Oak Park regarding the meeting. Both informed her that she would not be eliminated, and that the meeting was to update her regarding Ms. Brown-Elms elimination. Dr. Grabler confirmed this to Melgoza in writing on Friday, July 10, 2020.

105.    After Melgoza received Ellis' electronic calendar invitation for a meeting on July 14, 2020, on July 10, 2020, counsel for Melgoza contacted counsel for Rush and asked Rush to confirm the basis for the meeting scheduled by Ellis with Melgoza at 9:45 a.m. on July 14, 2020.

106.    Counsel for Rush never provided any information regarding the basis for the meeting scheduled by Ellis with Melgoza at 9:45 a.m. on July 14, 2020.

107.    At a July 10, 2020 Cancer Center Town Hall meeting among certain Rush employees, including Melgoza, Rush Medical Director of the Cancer Center, Dr. Mia Levy,

17

stated that the reduction in force in the cancer center positions at Rush "are minimal" and "very small."

108.    Later in the day on July 10, 2020, Ellis sent an email to Melgoza stating, in part, "I wanted to touch base after I meet with [Brown-Elms]. There's no need to prepare anything [for the July 14, 2020 meeting]."

109.    On July 14, 2020 at 9:45 a.m., Melgoza met via virtual video conference with Ellis, and Melgoza was surprised to see that Javette Simmons ("Simmons"), Rush HR Generalist, was also at the virtual video conference.

110.    Without warning, Ellis informed Melgoza that Rush was eliminating Melgoza's Director position effective July 19, 2020.

111.    Similar to Rush's "elimination" of Melgoza's Associate Vice President position (demotion) in 2016, Melgoza was told by Ellis that her termination was due to the Company's restructuring of its management positions. Ellis added that Rush was "top heavy."

112.    Between the years of  2019-2020, Rush added multiple positions to the cancer center including Ellis, Katharine E. Struck, the Chief Administrative Officer, and Elizabeth A. Cozzi, Director of Cancer Center (who has a similar job title as Melgoza).

113.    With over 13,000 employees, Rush, again, selected Melgoza, the only Mexican-American woman in leadership with complex and profitable cancer departments, for elimination.

114.    During the termination meeting, Melgoza expressed to Ellis and Simmons that she believed the elimination of her role was retaliatory and that she was selected because she had raised concerns about  discrimination, retaliation, equal pay violations and harassment at Rush, including through filing this lawsuit.

115.    Undettered, Ellis and Simmons reiterated that she was termianated and told her she would be offered a "severance package."

116.    Upon review, the severance package offered to Melgoza provided for a severance payment and other benefits in exchange for Melgoza signing a settlement agreement that would release all of her known and unknown legal claims against Rush – which necessarily would include her claims of discrimination and retalation  raised in this lawsuit. Signficantly, Melgoza's counsel was not informed by counsel for Rush that Melgoza would be offered this settlement or presented with a settlement agreement.

117.    Rush's proffered justification for Melgoza's termination is false and pretext for unlawful retaliation.

118.    Melgoza suffered an adverse action when she was terminated from her position on July 14, 2020.

119.    There is a causal link between Melgoza engaging in the abovementioned protected activity and her termination of employment.

120.    There is a causal link between Melgoza's ongoing lawsuit against Rush and her termination of employment.

### Count I – Violation of the Equal Pay Act of 1963

~~94.~~121.        Melgoza incorporates paragraphs 1 through ~~93~~120 as though fully stated here.

~~95.~~122.        At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

~~96.~~123.        Rush violated the EPA, § 206(d), by paying Melgoza less than male employees performing substantially equal work.

19

97.124.    Male employees at Rush who have the same skill, effort and responsibility needed to perform the work as Melgoza, performed under similar working conditions, were paid more than Melgoza in violation of the EPA, §206(d).

98.125.    Rush's violations of the EPA caused her significant monetary harm.

99.126.    Rush's violations of the EPA were willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)    all back pay lost as a result of the failure to pay equal wages;

(ii)    liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages;

(iii)    her attorneys' fees and costs; and

(iv)    such other and further relief as this Court deems just and proper under the circumstances.

**Count II – Violation of the Equal Pay Act of 1963**

100.127.    Melgoza incorporates paragraphs 1 through 93120 as though fully stated here.

101.128.    At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

102.129.    Rush illegally retaliated against Melgoza for exercising her rights under the EPA.

130.    Since 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment, in violation of the EPA.

103.131.      Rush's illegal retaliation against Melgoza caused her significant monetary harm.

104.132.      Rush's illegal retaliation against Melgoza was willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)      all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)     liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages and the demotion;

(iii)    restoration of Melgoza's title and position at Rush prior to the demotion and subsequent termination, or equivalent front pay;

(iv)     her attorneys' fees and costs; and

(v)      such other and further relief as this Court deems just and proper under the circumstances.

## Count III – Violation of Title VII of the Civil Rights Act of 1964

105.133.      Melgoza incorporates paragraphs 1 through 93120 as though fully stated here.

106.134.      At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

107.135.      Rush discriminated against Melgoza on the basis of her gender, female, in violation of § 2000e-2.

108.136.      Similarly-situated male employees at Rush did not receive the same treatment as Melgoza.

21

109.137.     Rush created a hostile working environment for Melgoza due to Melgoza's gender.

110.138.     Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

111.139.     Rush's violations of Melgoza's rights under Title VII were willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)     restoration of Melgoza's title and position at Rush prior to the demotion, or equivalent front pay;

(iii)     compensatory damages;

(iv)     punitive damages;

(v)     her attorneys' fees and costs; and

(vi)     such other and further relief as this Court deems just and proper under the circumstances.

### Count IV – Violation of Title VII of the Civil Rights Act of 1964

112.140.     Melgoza incorporates paragraphs 1 through 93120 as though fully stated here.

113.141.     At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

114.142.     Rush discriminated against Melgoza on the basis of her national origin, Mexican-American, in violation of § 2000e-2.

22

115.143.    Similarly-situated employees not of Mexican-American origin at Rush did not receive the same treatment as Melgoza.

116.144.    Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

117.145.    Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

118.146.    Rush's violations of Melgoza's rights under Title VII were willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

### Count V – Violation of Title VII of the Civil Rights Act of 1964

119.147.    Melgoza incorporates paragraphs 1 through 93120 as though fully stated here.

120.148.    At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

23

121.149.     Rush illegally retaliated against Melgoza for exercising her rights under Title VII.

150.     Since 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment, in violation of Title VII.

122.     Similarly-situated male employees at Rush who did not exercise their rights under Title VII at Rush did not receive the same treatment as Melgoza.

123.     Similarly-situated employees not of Mexican-American national origin at Rush who did not exercise their rights under Title VII did not receive the same treatment as Melgoza.

122.151.     Rush's illegal retaliation against Melgoza caused her significant emotional, physical, and monetary harm.

123.152.     Rush's illegal retaliation against Melgoza was willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)     restoration of Melgoza's title and position at Rush prior to the demotion and subsequent termination, or equivalent front pay;

(iii)     compensatory damages;

(iv)     punitive damages;

(v)     her attorneys' fees and costs; and

(vi)     such other and further relief as this Court deems just and proper under the circumstances.

**Count VI – Violation of Illinois Human Rights Act**

124.153.　　　Melgoza incorporates paragraphs 1 through 93120 as though fully stated here.

125.154.　　　At all times material to this Complaint, Rush was an employer within the meaning of the Illinois Human Rights Act, §2-101(B)(1)(a), and employed more than the statutory minimum of fifteen employees.

126.155.　　　Rush discriminated against Melgoza on the basis of her gender, female, and on the basis of her national origin, Mexican-American, in violation of the Illinois Human Rights Act.

127.156.　　　Similarly situated male employees at Rush did not receive the same treatment as Melgoza.

128.157.　　　Similarly-situated employees not of Mexican-American national origin at Rush did not receive the same treatment as Melgoza.

129.158.　　　Rush created a hostile working environment for Melgoza due to Melgoza's gender.

130.159.　　　Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

131.160.　　　Rush retaliated against Melgoza for exercising her rights in violation of the Illinois Human Rights Act, §6-101(A).

161.　　　Since 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of her employment, in violation of the Illinois Human Rights Act.

132.162.　　　Rush's violations of the Illinois Human Rights Act caused her significant emotional and monetary harm.

25

133.163.    Rush's violations of the Illinois Human Rights Act were willful.

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

    (i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

    (ii)    restoration of Melgoza's title and position at Rush prior to the demotion and subsequent termination, or equivalent front pay;

    (iii)   compensatory damages;

    (iv)   punitive damages;

    (v)    her attorneys' fees and costs; and

    (vi)   such other and further relief as this Court deems just and proper under the circumstances.

Dated: July 15, 2020                                        Respectfully submitted,

                                                            Norma Melgoza,
                                                            Plaintiff,


                                                            By:_____
                                                                One of her Attorneys

Peter M. Katsaros, Esq. (#3122661)
Ashley L. Orler, Esq. (#6297339)
Rebekah S. Mintzer (#63179231)
M. Elysia Baker, Esq. (#6308530)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300
pmkatsaros@gct.law
alorler@gct.law
rsmintzer@gct.law
alorler@gct.law
rsmintzer@gct.law

26

mebaker@gct.law

# EXHIBIT B

# JacksonLewis

**Jackson Lewis P.C.**
150 North Michigan Avenue, Suite 2500
Chicago IL 60601
(312) 787-4949 Direct
(312) 787-4995 Fax
jacksonlewis.com

My Direct Dial is: (312) 803-2508
My Email Address is: Jane.McFetridge@jacksonlewis.com

April 2, 2021

**VIA ELECTRONIC MAIL**
Ashley L. Orler
Golan Christie Taglia LLP
70 West Madison Street, Suite 1500
Chicago, IL 60602
alorler@gct.law

Re:  *Norma Melgoza v. Rush University Medical Center*
     Case No. 17-CV-6819

Dear Ashley,

We write this letter following-up on our previous discussions and the March 10th settlement conference, during which the parties were not able to reach a resolution.  We also received your April 1st email wherein you stated that Plaintiff does not intend to include her termination-related claims in the present litigation and proposed a briefing schedule pursuant to the Court's March 10th order (Dkt. No. 233).  Before confirming dates for the briefing schedule, we would like some clarification with respect to your correspondence.  You state that you will not be including the termination in the current litigation.  You do not state that you will not be pursuing the termination in separate proceedings.  This question is the gravamen of our concern and will obviously be the focus of our pleadings.  To date, Plaintiff has been coy about her intentions in that regard.  Since it directly impacts our approach to the briefing in question, we ask that Plaintiff make her intentions clear in this respect, in the interest of judicial economy, if for no other reasons.

To the extent Plaintiff, anticipates pursuing her termination claims separately, we encourage her to reconsider her decision for the reasons discussed below.

## I.     Relevant Background

Plaintiff filed the present litigation against Rush University Medical Center ("Rush") on September 21, 2017, while she was still employed with Rush.  Plaintiff's First Amended Complaint ("Complaint") includes six counts under the Equal Pay Act, Title VII, and the Illinois Human Rights Act.  Specifically, Plaintiff alleges that Rush discriminated against her based on her sex and national origin by paying her less than coworkers outside of her protected categories, failing to promote her, and harassing her.  Plaintiff also alleged that she reported concerns about the discrimination and was retaliated against for doing so.  In her Complaint, Plaintiff alleges that "Rush's discrimination and retaliation continues."  (Compl. at 93).

On July 14, 2020, Plaintiff was advised that her position was being eliminated effective July 19, 2020 in a reduction in force ("RIF") that impacted more than 230 employees. At the time of her termination, Defendant's motion for summary judgment was pending. On July 15, 2020, Plaintiff filed a motion to amend her Complaint ("Motion to Amend") and attached a draft Second Amended Complaint ("SAC") including new allegations based on her termination. The SAC added roughly four full pages of allegations related to the termination of Plaintiff's employment and asserted that her inclusion in the RIF was further indicia of Defendant's discriminatory and retaliatory animus toward her. The SAC contained no new allegations of discriminatory or retaliatory motives or animus. Nor did the new allegations include any indication that Plaintiff engaged in new protected activity. Indeed, Plaintiff simply alleged that "Since 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment…" (Doc.# 213-1 at ¶¶ 130, 150, 161).

On July 23, 2020, Plaintiff submitted a letter requesting withdrawal of her Motion to Amend in order "to move forward with the claims in her First Amended Complaint as expeditiously as possible." (Dkt. No. 215). The Court granted Plaintiff's request to withdraw her motion. (Dkt. No. 216).

On November 9, 2020, four months after Plaintiff's termination, the Court issued its opinion on the motion for summary judgment, granting it in part and denying it in part. Since the Court's decision on the motion for summary judgment, Plaintiff has been non-committal on whether or not she will pursue a claim based on her termination, despite inquiry from the undersigned counsel. Despite your April 1 email supposedly on this topic, Plaintiff continues to remain non-committal.

## II.     Plaintiff's Termination Claim is Based on the Same Operative Facts and Should Be Consolidated with the Instant Action

Under the theories of res judicata and claim preclusion, a final judgment in this matter will preclude the filing of new claims that could have been asserted before the final judgment. *Walczak v. Chicago Board of Education*, 739 F.3d 1013, 1016-1017 (7th Cir. 2014). The defense of claim preclusion "'provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action.' *Rose v. Bd. of Election Comm'rs for the City of Chi.,* 815 F.3d 372, 374 (7th Cir. 2016) (internal citations omitted); *Rein v. David A. Noyes & Co.,* 172 Ill. 2d 325, 665 N.E.2d 1199, 1204, 216 Ill. Dec. 642 (Ill. 1996). "Claim preclusion applies not only to matters that were actually decided in the original action but also to matters that could have been decided." *Walczak*, 739 F.3d at 1016-17.

In Illinois, claim preclusion has three elements: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of the causes of action; and (3) an identity of parties or their privies. *Dookeran v. Cty. of Cook, Ill*., 719 F.3d 570, 575 (7th Cir. 2013); *Cooney v. Rossiter*, 2012 IL 113227, ¶ 18, 986 N.E.2d 618, 621. "The second element is assessed by reference to the 'transactional test,' which provides that separate claims are considered the same cause of action for claim-preclusion purposes 'if they arise from a single group of operative facts,

Golan Christie Taglia LLP
April 2, 2021
Page 3

regardless of whether they assert different theories of relief.'" *Walczak*, 739 F.3d at 1016-17 (quoting *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 703 N.E.2d 883, 893, 234 Ill. Dec. 783 (Ill. 1998)); *see also Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012) (under the "transactional test," "the assertion of different kinds of theories of relief still constitutes a single cause of action" for purposes of claim preclusion if based on based on the same group of operative facts).

Plaintiff's claims based on her termination are clearly based on the same operative facts as her current retaliation and discrimination claims. This is evidenced by the fact that she initially sought to amend the Complaint to reflect her termination but did not include any new allegations of discriminatory or retaliatory animus. Plaintiff's draft SAC simply added a new adverse employment action on which to base her claims – essentially, she is asserting a continuing pattern of behavior. Indeed, in her draft SAC, Plaintiff repeatedly asserted that her termination was simply another example of discriminatory or retaliatory conduct bolstering her prior claims. Additionally, at the March 10th settlement conference, Plaintiff's included her termination as a component of her demand for damages. Undoubtedly, Plaintiff herself views her termination as intertwined with the present case.

"The principle that res judicata extends to all matters within the purview of the original action, whether or not they were actually raised, is tantamount to a rule requiring parties to consolidate all closely related matters into one suit. As such, the principle serves well the interest of judicial economy, and thus it is at the core of the res judicata doctrine." *Hagee v. Evanston*, 729 F.2d 510, 514 (7th Cir. 1984). "Plaintiff is the master of her complaint…[a]nd as the master of the complaint, the duty to consolidate the two suits arising out of the same transaction…was [Plaintiff's], not Defendant's." *Hill v. Potter*, 2012 U.S. Dist. LEXIS 5997 at *7 (N.D. Ill. Jan. 19, 2012). Based on the principles of res judicata and claim preclusion, if Plaintiff fails to amend her complaint to consolidate her claims in this lawsuit, she will be estopped from bringing claims based on her termination in the future.

Plaintiff has implied that she is uncertain how she intends to proceed relative to her termination claims. Considering the Motion to Amend and Plaintiff's evident animus toward Rush, it is more than just a little disingenuous to suggest that she is even considering not pursuing a claim based on her termination. However, Plaintiff will be required to show her hand on this well before the trial of the currently pending action. She will need to file an administrative charge by mid-May in order to preserve her claims relative to the termination. Given the progress with vaccines, coupled with speedy trial considerations for criminal trials once the courts reopen, it is very unlikely we will have a trial date in this matter by mid-May. Thus, it will be evident to all the game at which Plaintiff plays.

To the extent she then plans to assert that it is simply too late to join the two pending matters, we would make the following observations: (1) Plaintiff clearly knew she intended to pursue claims associated with her termination based on the Motion to Amend she filed on July 15, 2020, only to immediately withdraw; and (2) had she pursued the Second Amended Complaint, or immediately filed an EEOC charge followed by a request for issuance of a notice of right to sue, any discovery and motion practice required by the new claims would have been fully complete by the time of trial in the instant action. It is her choice – her gamble – to wait out the filing deadline

on the administrative charge for her termination. But such a gambit is not without risk or consequence. And it is Plaintiff who will have to bear the consequence.

Based on the foregoing, it seems that Plaintiff's intention is to attempt to press forward as soon as possible with a trial on the current matter, holding onto the possibility of a subsequent redundant piece of litigation – or to be able to relitigate the issues under a slightly modified theory in the event she is not successful in the current litigation or desires to enhance her damages in some way. Plaintiff appears to be trying to ratchet up defense costs for a not for profit healthcare institution in the middle of a global pandemic. To allow Plaintiff to proceed in this manner would be completely inefficient, extremely prejudicial to Rush, and antithetical to the interests of justice and judicial economy. As such, Rush believes Plaintiff should be required to amend her pleadings to reflect any claims she intends to bring as a result of her termination, be required to file an EEOC charge in relation to those claims, and agree to a stay of proceedings until issuance of a notice of right to sue on the termination claims, after which any ensuing legal action could be consolidated with or brought in the instant action.

While Plaintiff's initial explanation for withdrawing her Motion to Amend was to prevent delay, as discussed above, Plaintiff has yet to pursue a claim based on her termination but could have done or do so any time between July 2020 and May 2021. Plaintiff remains non-committal on the issue despite the fact that the Court will not be in a position to try Plaintiff's claims until *at least* the Fall of 2021 (months after she would need to bring or preserve her claims). During this "downtime" – from the time of her termination until the present and beyond – the parties could have been engaging in discovery and motion practice related to the termination claims. As such, Plaintiff's "delay" excuse is completely without merit. It is fairly evident that Plaintiff's strategy is indeed to delay filing of the administrative charge associated with the termination in order to better support a contention that it is a separate claim and that the consolidation of that claim with the pending matter would delay the resolution of the instant action. By doing so, she would thus effectively give herself "two bites at the same apple" – if she does not prove successful in the current action, or as successful as she would like to be, she could then essentially relitigate the issues in a subsequent action relating to the termination.

This letter will serve as Rush's repeated notice to Plaintiff that its position is that her termination claims should be consolidated with her present lawsuit and that failure to timely bring these claims will result in the claims being precluded. If Plaintiff later brings claims based on her termination, Rush will move to dismiss said claims based on the theory of res judicata and impermissible claims splitting. Further, if Plaintiff is able to proceed on her instant claims without amending her Complaint to add the termination claims, Rush will seek to limit Plaintiff's recovery to July 2020 when she was lawfully terminated. Rush will further seek to bar any evidence that would suggest that Plaintiff's termination was unlawful as it would unnecessarily prejudice the jury.

### III.    Recommendation

As described above, Rush maintains that Plaintiff's termination claims should be asserted in the present action or they will be barred on claims preclusion/res judicata grounds. To date, Plaintiff will commit to nothing more than she does not want/will not bring her termination claims

in *this* litigation. She has refused to commit to whether she will institute a separate action relative to her claims, indicating that she will make that decision closer the end of the statute of limitations, which we believe is May 15, 2021. While we certainly cannot make her commit to a position before that time, it would appear to be both inefficient and premature to brief the issue before we understand her actual intentions. Either she is going to pursue her termination claims in a separate administrative charge, followed by another lawsuit, or she is not. Her position in that regard – which she continues to refuse to identify – will impact the scope and subject matter of any brief the Defendant might file. We need to know what her position is before we begin briefing. We should not have to guess Plaintiff's intentions and believe that was the sentiment of Judge Rowland's previous order in this regard. Thus, Plaintiff can either commit to a position on that topic in advance of May 15 – which means we can begin briefing sooner – or we will have to wait until her position is crystalized by either the filing of a new administrative claim or not, on or before May 17 (May 15 is a Saturday so Plaintiff's last filing date, by our calculations, would be May 17).

Accordingly, Rush proposes the following: Plaintiff commits to her intentions relative to the pursuit of a second claim associated with her termination on or before ***Wednesday, April 7, 2021***. If Plaintiff does so, then we propose that Rush's deadline to file its Motion be set for May 14, 2021, with Plaintiff's Opposition due on June 4, 2021 and Rush's Reply due on June 18, 2021. (We recognize this is slightly different than the one proposed by you in recent correspondence but is necessitated by other professional commitments for Audrey and me). If Plaintiff is unwilling to identify her intentions about bringing a second claim associated with her termination before May 17, then the briefing on this topic will be as follows. Rush's deadline to file its Motion be set for June 4, 2021, with Plaintiff's Opposition due on July 2, 2021 and Rush's Reply due on July 16, 2021.

Plaintiff can obviate any delay by making her intentions known – either directly or through the filing of an administrative charge. If she remains unwilling to do so, then we would all necessarily need to wait till the statutory deadline runs to learn of Plaintiff's intentions. If Plaintiff wants this matter to move forward more quickly, the ability to do so is solely within her control.

If you have any questions or would like to discuss this matter further, do not hesitate to contact me directly.

Very truly yours,

JACKSON LEWIS P.C.

*Jane M. McFetridge*

Jane M. McFetridge

Cc:     Audrey Olson Gardner

# EXHIBIT C

**Gardner, Audrey Olson (Chicago)**

| | |
|---|---|
| **From:** | Ashley L. Orler <alorler@GCT.law> |
| **Sent:** | Friday, April 30, 2021 12:46 PM |
| **To:** | McFetridge, Jane M. (Chicago) |
| **Cc:** | Gardner, Audrey Olson (Chicago); Watkins, Brittany (Chicago); M. Elysia Baker Analo |
| **Subject:** | Melgoza v. Rush - EEOC Charge |
| **Attachments:** | Melgoza 2021 EEOC Charge.pdf |

**[EXTERNAL SENDER]**

Jane,

Attached is a copy of the EEOC Charge that will be submitted to the EEOC today.

Thank you,

**Ashley L. Orler** | Partner
**GOLAN** | **CHRISTIE** | **TAGLIA  LLP**
70 West Madison, Suite 1500
Chicago, Illinois 60602
(312) 696-2032
alorler@gct.law
Pronouns: she and her

CONFIDENTIALITY NOTICE: INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE.

This message is sent by or on behalf of a lawyer at the law firm of Golan Christie Taglia LLP (www.gct.law)  and is intended only for the use of the individual or entity to which it is addressed.  This message may contain information which is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to others.  If you have received this communication in error, please notify us immediately by reply e-mail or by telephone (call us collect at (312) 263-2300) and immediately delete this message and all its attachments.

# EXHIBIT D

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Illinois Department of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Norma Melgoza** | **(773) 504-3299** | **Aug. 26, 1970** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1457 N. Halsted Street, Unit 801** | **Chicago, Illinois 60642** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Rush University Medical Center** | **500+** | **(312) 942-5000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1653 W. Congress Parkway** | **Chicago, Illinois 60612** |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| DATE(S) DISCRIMINATION TOOK PLACE |
|---|
| Earliest      Latest |

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify) FMLA see below

**July 14, 2016**      **July 19, 2020**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I, Norma Melgoza, have been discriminated due to my Mexican American national origin and retaliated against by my former employer Rush University Medical Center ("Rush") in the following manner:

I am a woman and of Mexican national origin. I began my employment with Rush in November 2010. Rush involuntarily terminated my employment on July 14, 2020.

Throughout my tenure as an Associate Vice President, Rush paid me substantially less per year than my male and/or non-Mexican-American colleagues performing substantially equal work. I raised complaints about my unequal pay as a woman and requested equity in Rush's payment of my compensation. In my roles as an Assistant and Associate Vice President and Director at Rush, I also complained of discriminatory treatment and systematic discriminatory practices by Rush, including but not limited to its failure to post executive leadership positions and fairly evaluate candidates, and hiring relatives and friends which excludes women, veterans, the disabled, and individuals of Mexican descent.

On July 14, 2016, Rush demoted me two levels down to a position of "Director" at Rush after I was informed that my position as Associate Vice President was eliminated. On May 8, 2017, I filed a Charge of Discrimination (Charge 440-2017-03647) against Rush with the Equal Employment Opportunity Commission ("EEOC") alleging retaliation and discrimination on the basis of gender and national origin. A copy of the Charge of Discrimination is attached as Exhibit A. On September 21, 2017, after receiving a "right to sue" letter, I timely filed a lawsuit ("Lawsuit") against Rush in the United States District Court for the Northern District of Illinois. A copy of my Amended Complaint is attached as Exhibit B. My Lawsuit against Rush remains pending. [**See additional pages.**]

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>xx<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

*See Final Page*

| Date | Charging Party Signature |
|---|---|

After I filed the Lawsuit, Rush utilized a multitude of discriminatory and retaliatory practices, including the failure to promote; intimidation by eliminating my direct reports who were under-represented minority women; preventing access to key business tools and meetings that interfered with duties; increasing the heat in my office to make the environment uncomfortable; suppressing my wages; and ultimately, terminating my employment.

From mid-2018 through the termination of my employment, I applied to multiple available positions at Rush, all for which I was qualified. Individuals with less relevant experience who were not of Mexican American national origin or who had not previously alleged claims of discrimination and/or retaliation against Rush were hired for those positions. For example, Katie Struck, ("Struck") was appointed CAO of Cancer in May 2019, Josh Ellis ("Ellis") Associate Vice President of Operations in Cancer Center in summer 2019, and Danielle Chiementi ("Chiementi") Cancer Service Line Administrator in Spring 2019. Ellis was also appointed as Cancer Interim Administrator by K. Ranga Rama Krishnan ("Krishnan") in 2019.

Despite my expansive portfolio in cancer-related departments where I managed complex clinical cancer services, on May 2019, Ellis, provided an organizational chart of the Cancer Center without my position listed. He informed me that my position did not exist within the Cancer Center which further added to my distress and anxiety. As of 2019, Rush failed to produce a job description for all of my responsibilities as Director of the Cancer Center. On November 20, 2019, Ellis informed me that my salary was not budgeted in the Cancer Center, causing much anxiety about my career at Rush. On January 9, 2020, Ellis informed me that my position at Rush was not budgeted and asked me to figure out where my position fit.

After I filed the Lawsuit, I informed Ellis that my office was maintained at an ongoing 95 degrees which I found suffocating and difficult to work in. I asked him for help but this issue was never resolved.

Rush continued to discriminate and retaliate against the African-American women who reported to me, professionals with years of healthcare experience and performance ratings that exceeded expectations. On June 6, 2019, I was informed by Ellis and Dr. Paula Grabler, ("Grabler"), Medical Director of Breast Imaging, that my direct report, Shawnda Mays-Jackson ("Mays-Jackson"), the Director of Radiation Oncology, was eliminated due to performance issues. Mays-Jackson is an African-American woman whose performance exceeded expectations for the past 10 years. At that time, I questioned Ellis why her sudden performance issues were not brought to my attention given that I was her immediate supervisor. No response was ever provided. On December 7, 2020, Nancee Hofheimer ("Hofheimer") informed me that another direct report, Sharon Brown-Elms ("Brown-Elms"), Administrator for Breast Imaging, was being investigated for performance issues. Brown-Elms is African-American and had a 20-year career at Rush with exceptional performance ratings.

In August 2019, Ellis continued his retaliation and discrimination by downgrading my performance in the "Shadow Program", which impacted my wages. The Shadow Program was an "incentive program" Rush created just for me after it demoted me two levels down in 2016, but was never clearly defined by Rush. Ellis downgraded my performance in the Shadow Program and explained it was based on a delay of a contract held up by Rush's legal department and other executives. Karl Bergetz ("Bergetz"), Chief Legal Counsel for Rush, was responsible for the legal review of all contracts and ongoing litigation against Rush. In addition, Bergetz was appointed Acting Chief of Human Resources by Krishnan in summer 2019. In that role, Bergetz was managing legal affairs and overseeing employment and hiring practices across the organization for 14,000 employees. I submitted a written complaint to Krishnan, Omar Lateef (CEO), Dr. Mia Levy ("Levy") (Medical Director of the Cancer Center) and Struck regarding Ellis' failure to consider the delays created by the legal office and the organization that were outside of my control which suppressed my wages, were in retaliation due to the Litigation, and discriminatory. In November 2019, my complaints were referred to Hofheimer. I informed Hofheimer that Ellis and Struck were excluding me from key business meetings which was an act of retaliation and discrimination. Even though I raised these concerns, in March 2020, Ellis removed my access to key accounting units preventing me from ordering key patient supplies.

On November 15, 2019, Rush filed its Motion for Summary Judgment seeking judgment in its favor in my Lawsuit and dismissal of all counts of my Amended Complaint. Thereafter, Rush and I filed briefs related to Rush's summary judgment motion. On December 11, 2019, Judge Mary M. Rowland entered an order in the Lawsuit referring our matter to a Magistrate Judge for settlement. The parties did not reach a settlement at that time, and on March 12, 2020, Magistrate Judge Gabriel A. Fuentes entered an Order terminating the settlement referral to him.

[See additional pages.]

Despite my ongoing Lawsuit against Rush, at all times, I continued to perform my duties exceptionally, and consistently met corporate goals with an expanding portfolio of responsibilities In my position as Director, I was instrumental during the COVID-19 pandemic in assisting Rush by implementing cost containment initiatives and other patient care solutions across the system. I was a member of the COVID-19 Pandemic Mobilization Team and worked multiple shifts during the week and on weekends on the inpatient floors to educate staff on the use of personal protective (PPE) gear, transport patients, carry lab samples, and implement safety precautions. During the COVID-19 pandemic and while working on the COVID-19 Pandemic Mobilization Team, I continued to expand, stabilize patient care, implement new technologies in breast imaging, and introduce novel therapies in cellular therapy for patients with complex cancers. Rush used the Covid-19 pandemic as an excuse for eliminating my position.

During the COVID-19 pandemic, Ellis informed me that Rush would be laying off my immediate direct report, Brown-Elms, purportedly as part of a reduction in force due to the COVID-19 pandemic. Rush had previously attempted to eliminate Brown-Elm's position, but Ellis paused the elimination. He now raised it again during the pandemic. I was provided multiple dates regarding Brown-Elm's elimination. Though I was her supervisor, I was also told not to be present for the elimination because Ellis would be terminating Brown-Elms directly. On July 10, 2020, Ellis informed me that Rush would inform her at 9:00 a.m. on July 14, 2020. By sharing the information with me about Rush's decision to terminate the employment of my immediate direct report Rush implied to me that my employment at Rush would not be impacted by the purported reduction in force. On July 10, 2020, after notifying me of the planned meeting with Brown-Elms on July 14, 2020, Ellis sent me an electronic calendar invitation for a meeting between Ellis and me at 9:45 a.m. on July 14, 2020. After receiving Ellis' electronic calendar invitation for a meeting on July 14, 2020, I asked Ellis to explain the topic of the meeting and whether I needed to prepare anything for the meeting. I also reached out to Dr. Lisa Stempel, Chief of Breast Imaging, and Grabler regarding the meeting. Both informed me that I would not be eliminated, and that the meeting was to update me regarding Brown-Ems. Grabler confirmed this to me in writing on Friday, July 10, 2020.

After I received Ellis' electronic calendar invitation for a meeting on July 14, 2020, on July 10, 2020, my attorney contacted counsel for Rush and asked Rush to confirm the basis for the meeting scheduled by Ellis with me at 9:45 a.m. on July 14, 2020. Counsel for Rush never provided any information in response to my attorney's request.

At a July 10, 2020 Cancer Center Town Hall meeting among certain Rush employees, including me, Levy, stated that the reduction in force in the cancer center positions at Rush "are minimal" and "very small." Later in the day on July 10, 2020, Ellis sent an email to me stating, in part, "I wanted to touch base after I meet with [Brown-Elms]. There's no need to prepare anything [for the July 14, 2020 meeting]."

On July 14, 2020 at 9:45 a.m., I met via virtual video conference with Ellis, and I was surprised to see that Javette Simmons ("Simmons"), Rush HR Generalist, was also at the virtual video conference. Without warning, Ellis informed me that Rush was eliminating my Director position effective July 19, 2020. Similar to Rush's "elimination" of my Associate Vice President position (demotion) in 2016, I was told by Ellis that my termination was due to the Company's restructuring of its management positions. Ellis added that Rush was "top heavy." However, between the years of 2019-2020, Rush added multiple positions to the Cancer Center including Ellis, Struck, Chiemienti, and Elizabeth A. Cozzi ("Cozzi") (Director of Cancer Center, which is a similar job title as mine). With over 14,000 employees, Rush, again, selected me, the only Mexican-American woman in leadership with complex and profitable cancer departments, for elimination. To my knowledge, Struck, Ellis, Chiemienti, and Cozzi have not complained about Rush's harassing, discriminatory and/or retaliatory treatment. To my knowledge, Struck, Ellis, Chiemienti and Cozzi have not complained about Rush's unequal pay practices. To my knowledge, Struck, Ellis, Chiemienti, and Cozzi are not of Mexican-American national origin.

During the termination meeting, I expressed to Ellis and Simmons that I believed the elimination of my role was retaliatory and that I was selected because I had raised concerns about discrimination, retaliation, equal pay violations and harassment at Rush, including through filing the Lawsuit. Undeterred, Ellis and Simmons reiterated that I was terminated and told me I would be offered a "severance package."

Upon review, the severance package offered to me provided for a severance payment and other benefits in exchange for me signing a settlement agreement that would release all of my known and unknown legal claims against Rush – which necessarily would include my claims of discrimination and retaliation raised in the Lawsuit. Significantly, my attorney was not informed by counsel for Rush that I would be offered this settlement or presented with a settlement agreement.

[See additional pages.]

There is a causal link between my ongoing Lawsuit against Rush, including my refusal to settle my claims, and the termination of my employment. I believe Rush targeted me for termination in retaliation for my exercise of my rights under Title VII and other applicable fair employment laws.

I declare under penalty of perjury that the above is true and correct.

April 30, 2021
*Date*

Norma Milgoza /
*Charging Party Signature* Ashley Orler,
her authorized
representative

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NORMA MELGOZA,** | |
| **Plaintiff,** | **Case No. 17-cv-6819** |
| **v.** | |
| **RUSH UNIVERSITY MEDICAL CENTER, a not-for-profit corporation,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

<u>**AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO THE AMENDED COMPLAINT**</u>

Defendant, Rush University Medical Center ("Rush" or "Defendant"), by and through its attorneys Jackson Lewis P.C. and for its answer to Plaintiff, Norma Melgoza's ("Melgoza" or "Plaintiff"), Amended Complaint states as follows:

<u>**Nature of Action**</u>

<u>**COMPLAINT ¶1:**</u>

This lawsuit arises under the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq.* ("EPA"), for Rush's discrimination against Melgoza on the basis of her gender by paying wages to her at a rate less than the rate at which it pays male employees performing substantially equal work, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

<u>**ANSWER:**</u>

Rush admits that Plaintiff purports to bring a claim under the Equal Pay Act of 1963 ("EPA"). Rush denies the remaining allegations in Complaint Paragraph 1 and specifically denies that it violated the EPA or is otherwise liable to Plaintiff.

47992782v.1

**COMPLAINT ¶2:**

This lawsuit also arises under the Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment and systematic discriminatory practices by Rush, including but not limited to failure to post executive leadership positions and fairly evaluate candidates, and hiring relatives and friends which excludes women, veterans, the disabled, and individuals of Mexican descent. Rush created a hostile environment for Melgoza and others by promoting systematic discrimination against women, veterans, the disabled and those of Mexican descent.

**ANSWER:**

Rush admits that Plaintiff purports to bring a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"). Rush denies the remaining allegations in Complaint Paragraph 2 and specifically denies that it violated the Title VII or is otherwise liable to Plaintiff.

**COMPLAINT ¶3:**

This lawsuit also arises under the Illinois Human Rights Act, 775 ILCS 5/1-101, for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

**ANSWER:**

Rush admits that Plaintiff purports to bring a claim under the Illinois Human Rights Act ("IHRA"). Rush denies the remaining allegations in Complaint Paragraph 3 and specifically denies that it violated the IHRA or is otherwise liable to Plaintiff.

## Parties

**COMPLAINT ¶4:**

Melgoza, at all times relevant to this dispute, worked and resided in this judicial district.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times relevant to this dispute." Rush admits that, at certain times, Plaintiff has worked and resided in this judicial district.

**COMPLAINT ¶5:**

Melgoza is a current employee of Rush and works for Rush in this judicial district.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 5.

**COMPLAINT ¶6:**

Rush is an Illinois not-for-profit corporation with its principal place of business at 1653 West Congress Parkway, Chicago, Illinois.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 6.

**Jurisdiction and Venue**

**COMPLAINT ¶7:**

This Court has jurisdiction over Counts I and II under the express provisions of the EPA, 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, over Counts III, IV and V under the express provisions of Title VII, § 2000e-5(f)(3) and 28 U.S.C. § 1331, and over Count VI under 28 U.S.C. § 1367 as the facts constituting this count are so related to the claims in the other counts that it forms part of the same case or controversy.

**ANSWER:**

For the purposes of this action only, Rush admits that the Court has subject matter jurisdiction over this action. Rush denies the remaining allegations in Complaint Paragraph 7.

**COMPLAINT ¶8:**

Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391, because all the significant events giving rise to the claims occurred in this judicial district.

**ANSWER:**

For the purposes of this action only, Rush admits that venue is proper in this judicial district. Rush denies the remaining allegations in Complaint Paragraph 8.

**COMPLAINT ¶9:**

Venue is also proper in the Northern District of Illinois, Eastern Division because Defendant does business and has employees located within this judicial district.

**ANSWER:**

For the purposes of this action only, Rush admits that venue is proper in this judicial

district. Rush denies the remaining allegations in Complaint Paragraph 9.

## Factual Allegations

**COMPLAINT ¶10:**

Rush University Medical Center Obligated Group is a not-for-profit healthcare, education, and research enterprise, comprising of Defendant, Rush Health, Rush Oak Park Hospital and Rush University. Rush University has an enrollment of 2,500 students. In 2016 Rush's operation was licensed to operate 1,100 beds, handled 184,000 emergency room visits, had 251,000 patient days and listed 10,000 employees. Rush's total operating revenue from U.S. government administrated Medicare and Medicaid was forty-three percent (43%).

**ANSWER:**

Rush admits that Rush University Medical Center Obligated Group is a non-profit

healthcare organization that includes Rush Health, Rush Oak Park Hospital, Rush Copley Medical

Center and Rush University Medical Center. Rush denies the remaining allegations in Complaint

Paragraph 10.

**COMPLAINT ¶11:**

Melgoza has a Bachelor of Arts Degree from Smith College and a Master's Degree in Public Administration in Health Policy and Management from the Robert F. Wagner Graduate School of Public Service at New York University ("NYU"). Melgoza received academic awards both at Smith College and NYU, and was the recipient of the Robert F. Wagner Public Service award during her years at NYU.

**ANSWER:**

Rush admits that Melgoza has a Bachelor of Arts Degree from Smith College and a

Master's Degree in Public Administration in Health Policy and Management from the Robert F.

Wagner Graduate School of Public Service at New York University. Rush lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Complaint

Paragraph 11.

**COMPLAINT ¶12:**

Melgoza is a Fellow with the American College of Health Care Executives and is certified in Healthcare management.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 12.

**COMPLAINT ¶13:**

In October 2013, Melgoza received a Leadership Executive Program Certificate from the American College of Health Care Executives. She was selected by the Latino Forum of Healthcare Executives as a scholarship recipient for her leadership abilities and commitment to patient excellence. The intent of the scholarship was to promote healthcare leaders in the U.S.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 13.

**COMPLAINT ¶14:**

Melgoza has worked in the healthcare industry for over twenty-five years, and immediately prior to her employment by Rush, was the Assistant President of Services Lines of Cancer, Medicine, Geriatrics, Women & Children, and Surgery for Mount Sinai Hospital.

**ANSWER:**

Upon information and belief, Rush admits that Plaintiff was employed by Mount Sinai Hospital as Assistant Vice President of Service Lines, Medicine & Surgery prior to her employment by Rush. Rush lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 14.

**COMPLAINT ¶15:**

Melgoza has been employed by Rush from 2006 through the present.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 15.

5

**COMPLAINT ¶16:**

From November 2006 through October 2010, Melgoza was employed by Rush as an Assistant Vice President, and her responsibilities included, inter alia, management of the radiology, non-invasive cardiology, neurodiagnostics, radiation oncology, breast imaging, bone marrow transplant, photopheresis, emergency department, transfer center agreements, transfer center, dialysis, and respiratory therapy departments.

**ANSWER:**

Rush admits that it employed Plaintiff as an Assistant Vice President from November 2006 through October 13, 2010. Rush admits that Plaintiff managed various departments at various times in that position. Rush denies the remaining allegations in Complaint Paragraph 16.

**COMPLAINT ¶17:**

From November 2006 through October 2010, Melgoza was a key executive in the implementation of the hospital-wide EPIC software system and the migration to a new picture archiving system (PACS) for the new, non-invasive platform, and a strategic leader in the opening of Rush's new patient tower.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 17.

**COMPLAINT ¶18:**

During her tenure as an Assistant Vice President for Rush, Melgoza served as the Executive of Rush's Cancer Committee.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 18.

**COMPLAINT ¶19:**

In 2006, the Rush Cancer Committee appointed Melgoza as the Cancer Conference Coordinator for the organization. In this role, Melgoza oversaw Rush's multi-disciplinary cancer conferences by ensuring compliance with American College of Surgeons Commission on Cancer standards by monitoring cancer care discussions and multidisciplinary standards required for Rush's Commission on Cancer accreditation.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 19.

6

**COMPLAINT ¶20:**

From November 2010 through July 14, 2016, Melgoza worked as an Associate Vice President for Rush, and her responsibilities included, inter alia, management of the non-invasive platform for the opening of the new patient tower, management of the radiation oncology / Women's Cancer Center, breast imaging, bone marrow transplant, inpatient dialysis, photopheresis, plasmapheresis, radiation safety, occupational safety, evening / weekend administrators, environmental services, linen services, guest relations, volunteer services, interpreter services and security departments. She also served as a voting member on the Rush Medical Center Institutional Review Board.

**ANSWER:**

Rush admits that Plaintiff worked as an Associate Vice President for Rush and that she had

various managerial duties in that role. Rush further admits that, at certain times, Plaintiff served

as a voting member on the Rush Medical Center Institutional Review Board. Rush denies the

remaining allegations in Complaint Paragraph 20.

**COMPLAINT ¶21:**

Many of the departments that Melgoza capably managed during her tenure as Associate Vice President for Rush involved cancer treatment research, quality management, accreditation and cancer prevention.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 21.

**COMPLAINT ¶22:**

Melgoza worked diligently on improving patient care and creating a positive environment for Rush employees with a focus on innovation, excellence, empathy and service to its patients and the community at large.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 22.

**COMPLAINT ¶23:**

During Melgoza's tenure as an Associate Vice President for Rush, she was responsible for budgets exceeding $200 million revenue, over 700 full-time employees, and between nine (9) and eleven (11) clinical and support departments at one time.

**ANSWER:**

Rush admits that at certain times as an Associate Vice President, Plaintiff was responsible for various departments. Rush denies the remaining allegations in Complaint Paragraph 23.

**COMPLAINT ¶24:**

Melgoza was a founding member of the Rush Diversity Leadership Council in 2006, and a member of the Rush Women's Leadership Council.

**ANSWER:**

Rush admits that Plaintiff was, at certain times, a member of the Rush Diversity Leadership Council and the Rush Woman's Leadership Counsel. Rush denies the remaining allegations in Complaint Paragraph 24

**COMPLAINT ¶25:**

Throughout her employment by Rush, Melgoza actively promoted diversity in the workplace, including but not limited to the advancement of Hispanics, including Mexican-Americans, and women to positions in management, including the executive level.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 25.

**COMPLAINT ¶26:**

Melgoza is female and her national origin is Mexican-American.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 26.

**COMPLAINT ¶27:**

In 2006, J. Robert Clapp, Senior Vice President and Executive Director of Rush, stated, "Melgoza was the first Mexican-American Assistant Vice President and executive leader hired by Rush." This was so despite an ongoing presence of Latinos and individuals of Mexican descent within Rush's service area.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 27.

**COMPLAINT ¶28:**

From October 2010 through July 14, 2016, Melgoza was the first and only female Mexican-American Associate Vice President despite individuals of Mexican-descent encompassing thirty percent (30%) of the population of the City of Chicago.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 28.

**COMPLAINT ¶29:**

There are currently no individuals of Mexican national origin within the top 100 executive leaders at Rush, yet 20% of the revenues are generated from patients of Mexican descent.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 29.

**COMPLAINT ¶30:**

During her employment with Rush, Melgoza performed her duties exceptionally, and consistently met corporate goals.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 30.

**COMPLAINT ¶31:**

Throughout her employment with Rush, Melgoza received consistently highly-favorable performance reviews, including an overall rating of "exceeds expectations" in July 2017.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 31.

**COMPLAINT ¶32:**

Throughout Melgoza's tenure as an Associate Vice President, Rush paid Melgoza $100,000.00 to $250,000.00 less per year than her male and/or non-Mexican-American colleagues performing substantially equal work, including but not limited to Mike Mulroe, Scott Sonnenchein, Edward Conway, Mike Lamont, Anthony Perry, Mike Dandorph, Richard Davis, Kurt Olsen, Jeremy Strong, Tim Carrigan, Leo Correa, Shaun Cooper, Ryan Schlifka, John Pontarelli, David Rice, Ray LaBrec, and Joseph Anderson.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 32.

**COMPLAINT ¶33:**

Throughout her tenure as an Associate Vice President for Rush, Melgoza made numerous requests for a higher salary given her highly-favorable performance reviews and increased responsibilities.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 33.

**COMPLAINT ¶34:**

Rush denied Melgoza's repeated requests for a higher salary as her duties continuously increased.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 34.

**COMPLAINT ¶35:**

During Melgoza's tenure as an Associate Vice President for Rush, she met with senior executives at Rush on multiple occasions and informed the executives about her interest in a promotion to a Vice President position, and eventually, to the Chief Operating Officer position given her vast portfolio and extensive experience.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 35.

**COMPLAINT ¶36:**

On multiple occasions from 2012 through 2015, Melgoza met with Mike Mulroe ("Mulore"), Rush Vice President, to request a review of her salary given her vast portfolio and extensive experience.

**ANSWER:**

Rush admits that Plaintiff met with Mike Mulroe at various times from 2012 through 2015.

Rush denies the remaining allegations in Complaint Paragraph 36.

**COMPLAINT ¶37:**

On December 19, 2013, Melgoza requested a meeting and met with Rush Executive Vice President and Executive Director Mike Dandorph ("Dandorph") to review her curriculum vitae, experience, and current responsibilities and to express her desire to grow within the organization.

**ANSWER:**

Rush admits that Plaintiff met with Mike Dandorph on December 19, 2013. Rush denies

the remaining allegations in Complaint Paragraph 37.

**COMPLAINT ¶38:**

During the December 19, 2013 meeting, Dandorph made an unwanted sexual advance to Melgoza after she expressed her desire to grow within the organization. Dandorph informed Melgoza that he once had a Cuban girlfriend, that he did not marry his Cuban girlfriend, and that he owned a boat but desired to purchase a larger boat. Melgoza ended the meeting by shaking Dandorph's hand and leaving his office.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 38.

**COMPLAINT ¶39:**

After the December 19, 2013 meeting, Melgoza was not notified of any future opportunities and executive positions were not posted for advancement within the organization.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 39.

**COMPLAINT ¶40:**

On April 14, 2015, Melgoza met with Mulroe and provided in writing a number of concerns about his discriminatory behavior and retaliation, and requested equity in Rush's payment of her compensation, stating, "Please review my salary based on the dynamic span of my portfolio, education and experience. I want to be treated and compensated equitably for my effort based on the market."

**ANSWER:**

Rush admits that Plaintiff met with Mulroe on April 14, 2015. The remaining allegations

in Complaint Paragraph 40 purport to characterize the contents of a written document, which

speaks for itself. To the extent those allegations are inconsistent with or mischaracterize that

document, they are denied.

**COMPLAINT ¶41:**

Mulroe informed Melgoza that a market evaluation was not possible and that Lynne Wallace ("Wallace"), Rush Vice President of Human Resources, declined the review.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 41.

**COMPLAINT ¶42:**

On November 25, 2013, Melgoza met with Dr. David Ansell ("Dr. Ansell"), Rush Senior Vice President of Strategy and Community Engagement, to discuss Mulroe's discriminatory behavior and reluctance to conduct a market assessment for an equal market wage. During that meeting, Dr. Ansell stated, "[Mulroe] probably pays you less than the fellow."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 42.

**COMPLAINT ¶43:**

Dandorph and Cynthia Barginere ("Barginere"), Rush Chief Operating Officer, were also notified of Mulroe's discriminatory behavior but failed to address the complaints.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 43.

**COMPLAINT ¶44:**

On July 14, 2016, Rush demoted Melgoza two levels down to a position of "Director" at Rush after she was informed that her position as Associate Vice President was eliminated. She no longer had a job as an Associate Vice President.

**ANSWER:**

Rush admits that Plaintiff's position as Associate Vice President was eliminated on or about July 14, 2016. Rush further admits that Plaintiff was given the option to accept another position at Rush and accepted a Director position. Rush denies the remaining allegations in Complaint Paragraph 44.

**COMPLAINT ¶45:**

Similarly-situated employees who were male were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 45.

**COMPLAINT ¶46:**

Similarly-situated employees who were not of Mexican-American national origin were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 46.

**COMPLAINT ¶47:**

Similarly-situated employees who did not complain about discrimination and unequal pay were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 47.

**COMPLAINT ¶48:**

Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 48.

**COMPLAINT ¶49:**

Similarly-situated employees who did not complain about the systematic discrimination at Rush were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 49.

**COMPLAINT ¶50:**

Similarly-situated employees who were not subjected to sexual advances or expected to fulfill sexual stereotypes of Mexican-American women were not demoted two levels by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 50.

**COMPLAINT ¶51:**

At the time Rush demoted Melgoza, it also promoted a less-qualified male, Leo Correa ("Correa"), to the new position of Associate Vice President of Clinical Affairs and Cancer Services.

**ANSWER:**

Rush admits that it promoted Leo Correa to Associate Vice President of Clinical Affairs and Cancer Services, but denies that this occurred at the same time that Plaintiff's position as Associate Vice President was eliminated on or about July 14, 2016. Rush denies the remaining allegations in Complaint Paragraph 51.

**COMPLAINT ¶52:**

Melgoza was never made aware of this new position as it was not posted, nor was Melgoza interviewed for this positon despite her thirteen (13) years of experience in leading cancer service departments at Rush and externally. Had Melgoza known of the opening, she would have applied for it.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 52.

**COMPLAINT ¶53:**

Rush deviated from and did not follow its policies and procedures on posting job positions and hiring when it promoted Correa.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 53.

**COMPLAINT ¶54:**

At the time Rush demoted Melgoza, it transferred her non-cancer service departments to Mulroe. Mulroe was not demoted even though he was no longer supervising the cancer portfolio.

**ANSWER:**

Rush admits that Mulroe was not demoted. Rush denies the remaining allegations in Complaint Paragraph 54.

14

**COMPLAINT ¶55:**

Numerous members of Rush's top executives informed Melgoza that the demotion to Director was not performance based.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 55.

**COMPLAINT ¶56:**

After the demotion, Melgoza was informed that she would report to Correa.

**ANSWER:**

Rush admits that Melgoza reported to Correa in her Director position. Rush denies the

remaining allegations in Complaint Paragraph 56.

**COMPLAINT ¶57:**

At the time Rush demoted Melgoza, Mulroe informed Melgoza that if she didn't like her new position, she could accept a severance package from Rush, stating that Melgoza's employment with Rush would be terminated if she did not take the demotion.

**ANSWER:**

Rush admits that after Plaintiff's Associate Vice President position was eliminated, it

provided Plaintiff the option of accepting another position at Rush or seeking severance. Rush

denies the remaining allegations in Complaint Paragraph 57.

**COMPLAINT ¶58:**

Mulroe and Wallace failed to provide Melgoza with a severance package after numerous requests for the document.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 58.

**COMPLAINT ¶59:**

The demotion adversely impacted Melgoza by (a) capping her salary at a director level with raises not factored into her base pay after reaching a scale; (b) removing her from the Management Incentive Compensation Program and putting her into a "Shadow Program" with an unclear future; (c) removing substantial responsibilities from her job duties; (d) harming her ability

to advance to higher levels of management within and outside the organization; (e) causing her professional embarrassment and emotional distress which also impacted her health; and (f) preventing moving patient care forward..

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 58.

**COMPLAINT ¶60:**

Melgoza met with numerous members in Rush's executive ranks to discuss the termination threat, demotion, and the retaliatory behavior directed at her after her advocacy for diversity and requesting equitable pay. On March 22, 2017 and April 16, 2017, she met with Terry Peterson, Rush Vice President of Governmental Affairs and the Chairman of the Diversity Leadership Group and Chairman of the Chicago Transit Authority (CTA). She also met with Barginere, Wallace, Dr. Ansell, Dandorph, and Mary Ellen Schopp ("Schopp"), Rush Senior Vice President of Human Resources. All these Rush senior executives failed to end the discriminatory and retaliatory actions against Melgoza.

**ANSWER:**

Rush admits that Plaintiff met with Terry Peterson, Barginere, Dr. Ansell, and Mary Ellen

Schopp at various times in 2017. Rush denies the remaining allegations in Complaint Paragraph

60.

**COMPLAINT ¶61:**

Schopp recommended that Melgoza leave the organization and focus on being a mother, volunteer for school activities for her child, and find a hobby.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 61.

**COMPLAINT ¶62:**

Rush eventually offered a severance package.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 62.

**COMPLAINT ¶63:**

Melgoza rejected the severance package, and began working as a Director for Rush.

16

**ANSWER:**

Rush admits that Plaintiff began working as a Director. Rush denies the remaining allegations in Complaint Paragraph 63.

**COMPLAINT ¶64:**

In January 2017, Correa informed Melgoza that he was resigning his employment with Rush.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in Complaint Paragraph 64.

**COMPLAINT ¶65:**

On January 25, 2017, Dr. Robert DeCresce ("Dr. DeCresce"), Rush Acting Cancer Center Medical Director and Operating Partner of Shore Capital Partners, informed Melgoza that she would report to him until further notice.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 65.

**COMPLAINT ¶66:**

On February 3, 2017, Dr. Antonio Bianco ("Dr. Bianco"), Rush Vice President of Clinical Affairs and President/Owner of Bianco Labs requested a meeting with Melgoza on February 8, 2017 to discuss "leadership of the cancer center."

**ANSWER:**

Rush admits that Dr. Bianco met with Plaintiff on February 8, 2017 and that Plaintiff received an invitation with the subject listed as "Interim Leadership for the Cancer Center." Rush denies the remaining allegations in Complaint Paragraph 66.

**COMPLAINT ¶67:**

On February 8, 2017, during the meeting between Melgoza and Dr. Bianco, Melgoza was blind-sided by learning for the first time that the meeting was actually an interview for the Interim Cancer Position, which was open due to Correa's resignation. No copy of an active job description was provided for the "surprise" interview.

17

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding what Plaintiff believed. Rush denies the remaining allegations in Complaint Paragraph 67.

**COMPLAINT ¶68:**

During the February 8th meeting, Melgoza provided a copy of her resume to Dr. Bianco, and after reviewing the resume, Dr. Bianco said to Melgoza, "You are a snob, you went to school with a lot of snobs. I used to know a woman who went to Smith [College]. She wasn't that great. I didn't care for her. She was a snob."

**ANSWER:**

Rush admits that Plaintiff provided a copy of her résumé to Dr. Bianco. Rush denies the remaining allegations in Complaint Paragraph 68.

**COMPLAINT ¶69:**

Melgoza reported Dr. Bianco's rude, discriminatory behavior and the lack of a formal posting of the job position with a job description to Schopp. Schopp told Melgoza that "[Melgoza] let things happen to her" and that she should go back to Dr. Bianco to "teach him how to be a better leader."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 69.

**COMPLAINT ¶70:**

Melgoza reported Dr. Bianco's rude, discriminatory comments to Dr. DeCresce, who told her, "Don't worry, you are not a snob!" Dr. DeCresce did not follow-up further regarding Melgoza's complaints.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 70.

**COMPLAINT ¶71:**

Rush did not offer Melgoza the open Interim Cancer Position, and instead hired a less-qualified Caucasian female, Patty Nedved ("Nedved"), who lacked experience managing cancer departments.

**ANSWER:**

Rush admits that Plaintiff was not offered the Interim Cancer Position and that Nedved filled that role after years of employment with Rush, including time serving as Rush's Acting Chief Nursing Officer. Rush denies the remaining allegations in Complaint Paragraph 71.

**COMPLAINT ¶72:**

Rush deviated from and did not follow its policies and procedures on job hiring and posting when it hired Nedved.

**ANSWER:**

Rush denies the remaining allegations in Complaint Paragraph 72.

**COMPLAINT ¶73:**

Melgoza later learned from Dr. DeCresce that there were two (2) candidates considered for Correa's position. Both of the candidates were not of Mexican national origin. Another Rush executive employee informed Melgoza that the two (2) candidates did not have cancer experience and that Melgoza had the most "on the bench cancer experience at Rush, yet the position went to an individual without cancer experience."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 73.

**COMPLAINT ¶74:**

Upon information and belief, other candidates were provided advance notice to prepare for the interview, and were told of their "active status" for the position, allowing them the ability to compete for the position.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 74.

**COMPLAINT ¶75:**

On February 27, 2017, Melgoza met with Peter Butler ("Butler"), former Rush Chief Executive Officer and Chief Operating Officer to discuss the hostile and discriminatory environment at Rush. Butler noted that Melgoza managed a complex portfolio exceptionally during his tenure at Rush, encouraged her to focus on moving forward with the current departments, and stated that he "would not have handled [the hiring] situation in that manner."

19

**ANSWER:**

Rush admits that Plaintiff met with Butler at various times. Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported purpose for seeking a meeting with Butler. Rush denies the remaining allegations in Complaint Paragraph 75.

**COMPLAINT ¶76:**

On March 21, 2017, Melgoza met with Dr. Ansell to discuss the demotion of Melgoza and to inform him of the ongoing retaliation against her. Dr. Ansell stated that Barginere made the decision to demote Melgoza. Dr. Ansell, further stated, "[Barginere] was told to remove you. She removed you because she is weak. She is not strong for diversity. That is what happens when these people get in power." Melgoza asked Dr. Ansell to clarify who issued the order to terminate her employment and what he meant by "these people," but he ran away from Melgoza in response.

**ANSWER:**

Rush admits that Plaintiff met with Dr. Ansell at various times. Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported purpose for seeking a meeting with Dr. Ansell. Rush denies the remaining allegations in Complaint Paragraph 76.

**COMPLAINT ¶77:**

Similarly-situated individuals who were male were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 77.

**COMPLAINT ¶78:**

Similarly-situated individuals who were not of Mexican-American national origin were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 78.

**COMPLAINT ¶79:**

Similarly-situated individuals who were not asked to meet sexual expectations or subjected to stereotypes of women of Mexican-American descent at Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 79.

**COMPLAINT ¶80:**

Similarly-situated individuals who did not complain about discrimination and unequal pay were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 80.

**COMPLAINT ¶81:**

Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 81.

**COMPLAINT ¶82:**

Following the promotion of Nedved, the gender and national origin discrimination and retaliation by Rush against Melgoza continued. Melgoza learned that Dr. Bianco threatened to terminate Melgoza's employment. Additionally, Dr. Bianco and executives publicly threatened to remove additional departments from her supervision that she capably supervised for many years.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 82.

**COMPLAINT ¶83:**

On January 16, 2015, Melgoza reached out to Dr. Larry Goodman ("Dr. Goodman"), President of Rush University Medical Center and the Executive Sponsor of Rush's Diversity Leadership Group, in an attempt to discuss diversity, future goals and the removal of discriminatory barriers at Rush. Dr. Goodman never responded to the email.

**ANSWER:**

Rush admits that Plaintiff emailed Dr. Goodman on January 16, 2015 and that Dr. Goodman did not respond to that email. Rush denies the remaining allegations in Complaint Paragraph 83.

**COMPLAINT ¶84:**

Dr. Goodman has advocated for inclusion and a diverse work environment, and speaks publicly about Rush's commitment to equality; however he refused to meet with Melgoza. A second meeting was requested on April 25, 2017, but Dr. Goodman declined the meeting.

**ANSWER:**

Rush admits that Dr. Goodman has advocated for an inclusive, diverse work environment, and Rush's commitment to equality. Rush further admits that Dr. Goodman declined to meet with Plaintiff. Rush denies the remaining allegations in Complaint Paragraph 84.

**COMPLAINT ¶85:**

Dr. Goodman has spoken about equity, inclusion, ethics and a diverse work environment; yet he condoned the overt, systemic discrimination against employees of Mexican descent, unequal pay for women, and exclusion of veterans, people with disabilities and other under-represented employees by not posting executive positions, promoting nepotism, violating the equal pay law and not addressing overt discrimination against Rush's only Mexican-American executive.

**ANSWER:**

Rush admits that Dr. Goodman has advocated for an inclusive, equitable, ethical, and diverse work environment. Rush denies the remaining allegations in Complaint Paragraph 85.

**COMPLAINT ¶86:**

During the March 21, 2016, Dr. Ansell stated that it was "unconscionable that Rush demoted its only Latina Female Executive and had no other Hispanic Executives within the Rush Executive ranks." He also stated that he "threw a line" to Dr. Goodman and Barginere at a meeting related to the unconscionable bias against employees of Mexican descent.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 86.

**COMPLAINT ¶87:**

Executive leadership at Rush was spearheaded by Dr. Goodman who was enabled by William M. Goodyear, Chairman of the Rush University Medical Center Board of Directors, former Rush Chief Executive Officer and President of Navigant, to violate the EPA and Title VII in discriminating against women and employees of Mexican national origin. Dr. Goodman and Goodyear did not intervene and stop the discriminatory behavior; thus, facilitating an environment where it is acceptable to violate civil rights laws related to equal pay and the discrimination of employees of Mexican national origin. Their inaction and failure to hold executives accountable support a corporate culture of systemic, intentional discrimination and retaliation against women and employees of Mexican national origin, and also negatively impact and discriminate against people with disabilities, veterans and other under-represented minorities. Instead of meeting with Melgoza, an employee of Mexican descent who lead nine to eleven departments with over 700 full time employees, Dr. Goodman opted to "dealsource" and be a social media influencer.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 87.

**COMPLAINT ¶88:**

On May 8, 2017, Melgoza filed a Charge of Discrimination against Defendant ("Charge of Discrimination") with the United States Equal Employment Opportunity Commission ("EEOC"). A copy of the Charge of Discrimination is attached as Exhibit A.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 88.

**COMPLAINT ¶89:**

Melgoza's Charge of Discrimination alleges retaliation and discrimination on the basis of gender and national origin against Defendant.

**ANSWER:**

The allegations in Complaint Paragraph 89 purports to characterize the contents of a written document that speaks for itself. To the extent the allegations mischaracterize or are inconsistent with that document, they are denied.

**COMPLAINT ¶90:**

On August 24, 2017, Melgoza received a "right to sue" letter for the Charge of Discrimination from the EEOC. A copy of the EEOC "right to sue" letter is attached as Exhibit B.

**ANSWER:**

Upon information and belief, Rush admits the allegations in Complaint Paragraph 90.

**COMPLAINT ¶91:**

The "right to sue" letter provides Plaintiff ninety (90) days from the date of her receipt of the letter to bring a lawsuit. Plaintiff filed this Complaint before the expiration of the ninety (90) day period.

**ANSWER:**

The allegations in Complaint Paragraph 91 purport to characterize the contents of a written document that speaks for itself. To the extent the allegations mischaracterize or are inconsistent with that document, they are denied.

**COMPLAINT ¶92:**

Plaintiff has fully exhausted all of her administrative remedies.

**ANSWER:**

Rush admits that Plaintiff has exhausted her administrative remedies with the EEOC with respect to the allegations brought in her May 8, 2017 charge. Rush denies the remaining allegations in Complaint Paragraph 92.

**COMPLAINT ¶93:**

Rush's discrimination and retaliation continues.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 93.

**Count I — Violation of the Equal Pay Act of 1963**

**COMPLAINT ¶94:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 94.

**COMPLAINT ¶95:**

At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed employees. Rush denies the remaining allegations in Complaint Paragraph 95.

**COMPLAINT ¶96:**

Rush violated the EPA, § 206(d), by paying Melgoza less than male employees performing substantially equal work.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 96.

**COMPLAINT ¶97:**

Male employees at Rush who have the same skill, effort and responsibility needed to perform the work as Melgoza, performed under similar working conditions, were paid more than Melgoza in violation of the EPA, §206(d).

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 97.

**COMPLAINT ¶98:**

Rush's violations of the EPA caused her significant monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 98.

25

**COMPLAINT ¶99:**

Rush's violations of the EPA were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 99.

**COMPLAINT PRAYER 1**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages;

(ii)    liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages;

(iii)   her attorneys' fees and costs; and

(iv)    such other and further relief as thiS Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## Count II — Violation of the Equal Pay Act of 1963

**COMPLAINT ¶100:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 100.

**COMPLAINT ¶101:**

At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

26

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed employees. Rush denies the remaining allegations in Complaint Paragraph 101.

**COMPLAINT ¶102:**

Rush illegally retaliated against Melgoza for exercising her rights under the EPA.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 102.

**COMPLAINT ¶103:**

Rush's illegal retaliation against Melgoza caused her significant monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 103.

**COMPLAINT ¶104:**

Rush's illegal retaliation against Melgoza was willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 104.

**COMPLAINT PRAYER 2:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)    all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)   liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages and the demotion;

(iii)  restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iv)   her attorneys' fees and costs; and

(v)     such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count III — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶105:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 105.

**COMPLAINT ¶106:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 106.

**COMPLAINT ¶107:**

Rush discriminated against Melgoza on the basis of her gender, female, in violation of § 2000e-2.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 107.

28

**COMPLAINT ¶108:**

Similarly-situated male employees at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 108.

**COMPLAINT ¶109:**

Rush created a hostile working environment for Melgoza due to Melgoza's gender.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 109.

**COMPLAINT ¶110:**

Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 110.

**COMPLAINT ¶111:**

Rush's violations of Melgoza's rights under Title VII were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 111.

**COMPLAINT PRAYER 3:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)      all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)     restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)    compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count IV — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶112:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 112.

**COMPLAINT ¶113:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 113.

**COMPLAINT ¶114:**

Rush discriminated against Melgoza on the basis of her national origin, Mexican-American, in violation of § 2000e-2.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 114.

**COMPLAINT ¶115:**

Similarly-situated employees not of Mexican-American origin at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 115.

**COMPLAINT ¶116:**

Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 116

**COMPLAINT ¶117:**

Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 117

**COMPLAINT ¶118:**

Rush's violations of Melgoza's rights under Title VII were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 118

**COMPLAINT PRAYER 4:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

31

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count V — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶119:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 119.

**COMPLAINT ¶120:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 120.

**COMPLAINT ¶121:**

Rush illegally retaliated against Melgoza for exercising her rights under Title VII.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 121.

**COMPLAINT ¶122:**

Similarly-situated male employees at Rush who did not exercise their rights under Title VII at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 122.

**COMPLAINT ¶123:**

Similarly-situated employees not of Mexican-American national origin at Rush who did not exercise their rights under Title VII did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 123.

**COMPLAINT ¶124:**

Rush's illegal retaliation against Melgoza caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 124.

**COMPLAINT ¶125:**

Rush's illegal retaliation against Melgoza was willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 125.

**COMPLAINT PRAYER 5:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count VI — Violation of Illinois Human Rights Act

**COMPLAINT ¶126:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 92 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 126.

**COMPLAINT ¶127:**

At all times material to this Complaint, Rush was an employer within the meaning of the Illinois Human Rights Act, §2-101(B)(1)(a), and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 127.

**COMPLAINT ¶128:**

Rush discriminated against Melgoza on the basis of her gender, female, and on the basis of her national origin, Mexican-American, in violation of the Illinois Human Rights Act.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 128.

**COMPLAINT ¶129:**

Similarly situated male employees at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 129.

**COMPLAINT ¶130:**

Similarly-situated employees not of Mexican-American national origin at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 130.

**COMPLAINT ¶131:**

Rush created a hostile working environment for Melgoza due to Melgoza's gender.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 131.

**COMPLAINT ¶132:**

Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 132.

**COMPLAINT ¶133:**

Rush retaliated against Melgoza for exercising her rights in violation of the Illinois Human Rights Act, §6-101(A).

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 133.

**COMPLAINT ¶134:**

Rush's violations of the Illinois Human Rights Act caused her significant emotional and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 134.

**COMPLAINT ¶135:**

Rush's violations of the Illinois Human Rights Act were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 135.

**COMPLAINT PRAYER 6:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

1.      To the extent Plaintiff failed to exercise reasonable diligence in the mitigation of damages, she is not entitled to relief.

2.      Plaintiff's claims are barred to the extent they occurred and/or accrued outside of the applicable statute of limitations.

3.      Plaintiff's claims are barred to the extent relief is sought for actions outside the scope of her EEOC charge.

4.      All or part of Plaintiff's claims under Title VII are barred to the extent they fall outside of the 300-day statute of limitations for filing a charge of discrimination.

5.      Plaintiff is not entitled to punitive damages or other damages because Defendant made good faith efforts to comply with all applicable statutes and common laws and acted at all times to protect Plaintiff's statutorily-protected rights.

6.      Plaintiff's claims arising under the Equal Pay Act are barred to the extent she seeks relief for acts falling outside of the applicable statutes of limitations.

7.      Plaintiff's claims arising under the Equal Pay Act fail because any alleged discrepancy in pay was the result of factors other than sex.

8.      To the extent Plaintiff alleges that any employee of Defendant acted in an unlawful manner, such conduct, if it occurred, was outside the course and scope of that individual's employment, was not authorized or condoned by Defendant, and was undertaken without the knowledge or consent of Defendant. Thus, Defendant is not liable for any such conduct, if it occurred.

9.      Defendant denies that gender or national origin were factors or motives in any of the employment decisions concerning Plaintiff. However, in the event that the fact finder

determines otherwise, Defendant avers that it would have made the same decisions even in the absence of any alleged impermissible factor/motivation.

10. Plaintiff is barred from relief because Defendant exercised reasonable care to prevent and correct any harassing conduct and Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by Defendant or to avoid harm otherwise.

11. Any relief to which Plaintiffs may be entitled is barred or otherwise affected by the after-acquired evidence doctrine.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

Defendant/Counterclaimant Rush University Medical Center ("Counterclaimant" or "Rush") hereby files this counterclaim for declaratory judgment against Plaintiff/Counterclaim-Defendant ("Counterclaim-Defendant" or "Melgoza"), stating as follows:

### Nature of the Action

1. Rush seeks declaratory relief pursuant to 28 U.S.C. § 2201 because Melgoza is actively pursuing claims regarding her July 2020 termination resulting from a COVID-19 reduction in force in a separate proceeding rather than asserting them in this case. Melgoza's efforts are a misuse of the judicial process and an effort to inflict harm upon Rush. The parties remain in an active dispute regarding whether Melgoza's termination claims may proceed in a separate action, and that dispute will continue until a court definitively declares whether Melgoza's termination claims may continue in a second action, or whether, to the contrary, they are barred under the doctrines of res judicata and/or impermissible claim splitting. In the absence of such a declaration, the parties' dispute will continue to fester, resulting in parallel lawsuits, the possibility of conflicting verdicts, potential double recovery to Melgoza, and great and unnecessary expense to Rush, among other things.

**Parties**

2.      Rush is a not-for-profit healthcare corporation with a principal place of business at 1653 West Congress Parkway, Chicago, Illinois 60612.

3.      Melgoza is a former employee of Rush who resides in this district.

**Jurisdiction and Venue**

4.      This Court has jurisdiction over Rush's counterclaim for declaratory relief pursuant to 28 U.S.C. § 1367(a) because the claim arises out of the same case or controversy as Melgoza's claims against Rush.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

**Factual Background**

6.      Melgoza commenced employment with Rush in 2006 as an Assistant Vice President.

7.      On July 24, 2018, Melgoza filed an Amended Complaint ("Complaint") against Rush in the Northern District of Illinois, Case No. 1:17-cv-06819 (the "Litigation"), asserting six claims under the Equal Pay Act of 1963; Title VII of the Civil Rights Act of 1964 ("Title VII"); and the Illinois Human Rights Act.  The Litigation is currently pending.

8.      In support of her claims, Melgoza alleges that Rush discriminated against her based on sex and national origin by paying her less than coworkers outside of her protected categories, failing to promote her, and harassing her.  Notably, Melgoza's Complaint alleges "Rush's discrimination and retaliation continues."

9.      On July 14, 2020, Rush advised Melgoza that her position was being eliminated effective July 19, 2020 in a COVID-19 related reduction in force ("RIF") impacting more than 230 employees.

10.     Immediately after learning of her termination, on July 15, 2020, Melgoza filed a motion to amend her Complaint ("Motion to Amend") in the Litigation and attached a draft Second Amended Complaint ("SAC") including new allegations based on her termination.

11.     In her Motion to Amend, Melgoza acknowledged that her termination allegations inherently relate to the claims in her Complaint:

> [T]hough [Melgoza's] Second Amended Complaint incorporates new *allegations*, it does not raise new *claims*…her July 14, 2020 termination is the culmination of Rush's years' long continuing campaign of retaliation against [Melgoza] for the protected activity alleged in her prior pleadings as well as the instant litigation. [Melgoza] does not seek to add additional counts to her Amended Complaint as her recent termination is an extension of the same underlying facts previously alleged and violative of the same laws[.]

12.     The SAC added roughly four full pages of allegations related to her termination and asserted that her inclusion in the RIF was further indicia of Rush's discriminatory and retaliatory animus toward her. It did not contain any new allegations of discriminatory or retaliatory motives or animus. Nor did it assert that she engaged in new protected activity. To the contrary, Melgoza simply alleged that "[s]ince 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment[.]"

13.     On July 23, 2020, Melgoza submitted a letter requesting withdrawal of her Motion to Amend in order "to move forward with the claims in her First Amended Complaint as expeditiously as possible." The Court granted Melgoza's request to withdraw her motion.

14.     On November 9, 2020, the Court granted issued an opinion granting in part and denying in part on Rush's motion for summary judgment which had been pending in the Litigation. After the Court's ruling, the parties submitted a joint status report wherein Melgoza requested that a trial date be scheduled "as soon as practical."

15. Rush stated its belief that "the matter should be stayed until [Melgoza] makes clear her intentions relative to any action she intends to take regarding the termination of her employment with Rush." Rush further articulated, in detail, its consistent position that allowing Melgoza to pursue her termination claims separately would constitute impermissible claims splitting.

16. The Court ordered the parties to discuss settlement. Thus, on February 24, 2021 and March 10, 2021, the parties attended a virtual telephonic settlement conference with the Court but were unable to resolve their dispute.

17. During and after the settlement conference, Melgoza made clear to Rush and the Court that the damages she was claiming in the Litigation included those allegedly resulting from her 2020 termination but refused to state whether she would also be pursuing a separate cause of action for the termination.

18. In light of Melgoza's ongoing obfuscation of her intentions relative to the termination claims, Rush sent Melgoza a letter on April 2, 2021 asking her to confirm her intended course of action relative to those claims.

19. On April 9, 2021, Melgoza finally acknowledged she intended to file an EEOC charge relating to her termination and would not assert her termination claims in the Litigation.

20. Melgoza filed her EEOC charge on April 30, 2021. Notably, her charge sets forth many of the same allegations already asserted in her Complaint and withdrawn SAC and are based on the same operative facts as the claims made in the Litigation.

21. Melgoza has nevertheless refused to assert her termination claims in the Litigation and is actively proceeding to initiate a second duplicative lawsuit against Rush.

22. Melgoza's efforts are a clear attempt to force Rush to incur unnecessary expenses defending a second litigation. Furthermore, it is clear that Plaintiff is attempting to hedge her bets

by creating a second action as a "back up" should she fail to prevail on her claims in the Litigation, or is otherwise dissatisfied with the results.

23.     Absent the relief requested herein, Rush will needlessly be forced to expend resources seeking to dismiss the second lawsuit on the grounds of res judicata and/or impermissible claim splitting.

**Actual Controversy**

24.     There is an actual controversy between the parties that is substantial and concrete concerning Melgoza's right to assert claims relating to her July 2020 termination in a separate proceeding.

25.     Resolution of the substantive claims in the Litigation will not address the parties' ongoing dispute.

26.     In the absence of a declaration, the parties will remain uncertain as to what is or is not permitted in terms of Melgoza's ability to file her termination claims in a separate action; this controversy will continue; and additional litigation will ensue in the future.  Moreover, Rush will suffer irreparable harm and incur unnecessary expense defending and seeking to dismiss a duplicative second action.  Additionally, if Melgoza proceeds in a second action, there may unnecessarily be two trials on overlapping periods of Melgoza's employment, resulting in increased litigation regarding the proper scope of damages and the evidence that may be used during the trials, as well as two potentially conflicting verdicts and/or an improper double recovery by Melgoza.

27.     Rush respectfully submits that declaratory relief under 28 U.S.C. § 2201 is therefore justified.

WHEREFORE, Rush University Medical Center respectfully prays that the Court:

A.  Enter judgment in favor of Rush and against Melgoza.

42

B. Declare that Melgoza is prohibited from asserting the claims relating to her July 2020 termination in a separate proceeding pursuant to the doctrines of res judicata and/or impermissible claim splitting.

C. Grant such additional relief as the Court deems just and appropriate.

Dated: May ___, 2021

Respectfully submitted,

RUSH UNIVERSITY MEDICAL CENTER

/s/ Jane M. McFetridge
One of Its Attorneys

Jane M. McFetridge (ARDC No. 6201580)
Audrey Olson Gardner (ARDC No. 6337084)
JACKSON LEWIS P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Tel.: 312.787.4949
Jane.McFetridge@jacksonlewis.com
Audrey.Gardner@jacksonlewis.com

43

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May __, 2021, she caused a true and correct copy of the foregoing *Defendant's Amended Answer, Affirmative Defenses, and Counterclaim to the Amended Complaint* to be filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record via the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Jane M. McFetridge

4818-5076-3496, v. 1

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **NORMA MELGOZA,** | |
| **Plaintiff,** | **Case No. 17-cv-6819** |
| **v.** | |
| **RUSH UNIVERSITY MEDICAL CENTER, a not-for-profit corporation,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## AMENDED ANSWER, ~~AND~~ AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO THE AMENDED COMPLAINT

Defendant, Rush University Medical Center ("Rush" or "Defendant"), by and through its attorneys ~~Seyfarth Shaw LLP~~Jackson Lewis P.C. and for its answer to Plaintiff, Norma Melgoza's ("Melgoza" or "Plaintiff"), Amended Complaint states as follows:

### Nature of Action

## COMPLAINT ¶1:

This lawsuit arises under the Equal Pay Act of 1963 as amended, 29 U.S.C. § 206(d), *et seq.* ("EPA"), for Rush's discrimination against Melgoza on the basis of her gender by paying wages to her at a rate less than the rate at which it pays male employees performing substantially equal work, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

## ANSWER:

Rush admits that Plaintiff purports to bring a claim under the Equal Pay Act of 1963 ("EPA"). Rush denies the remaining allegations in Complaint Paragraph 1 and specifically denies that it violated the EPA or is otherwise liable to Plaintiff.

47992782v.1

**COMPLAINT ¶2:**

This lawsuit also arises under the Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment and systematic discriminatory practices by Rush, including but not limited to failure to post executive leadership positions and fairly evaluate candidates, and hiring relatives and friends which excludes women, veterans, the disabled, and individuals of Mexican descent. Rush created a hostile environment for Melgoza and others by promoting systematic discrimination against women, veterans, the disabled and those of Mexican descent.

**ANSWER:**

Rush admits that Plaintiff purports to bring a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"). Rush denies the remaining allegations in Complaint Paragraph 2 and specifically denies that it violated the Title VII or is otherwise liable to Plaintiff.

**COMPLAINT ¶3:**

This lawsuit also arises under the Illinois Human Rights Act, 775 ILCS 5/1-101, for Rush's discrimination against Melgoza on the basis of her gender and national origin, and Rush's retaliation against Melgoza after she complained of discriminatory treatment.

**ANSWER:**

Rush admits that Plaintiff purports to bring a claim under the Illinois Human Rights Act ("IHRA"). Rush denies the remaining allegations in Complaint Paragraph 3 and specifically denies that it violated the IHRA or is otherwise liable to Plaintiff.

## Parties

**COMPLAINT ¶4:**

Melgoza, at all times relevant to this dispute, worked and resided in this judicial district.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times relevant to this dispute." Rush admits that, at certain times, Plaintiff has worked and resided in this judicial district.

2

**COMPLAINT ¶5:**

Melgoza is a current employee of Rush and works for Rush in this judicial district.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 5.

**COMPLAINT ¶6:**

Rush is an Illinois not-for-profit corporation with its principal place of business at 1653 West Congress Parkway, Chicago, Illinois.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 6.

## Jurisdiction and Venue

**COMPLAINT ¶7:**

This Court has jurisdiction over Counts I and II under the express provisions of the EPA, 29 U.S.C. § 216(b) and 28 U.S.C. § 1331, over Counts III, IV and V under the express provisions of Title VII, § 2000e-5(f)(3) and 28 U.S.C. § 1331, and over Count VI under 28 U.S.C. § 1367 as the facts constituting this count are so related to the claims in the other counts that it forms part of the same case or controversy.

**ANSWER:**

For the purposes of this action only, Rush admits that the Court has subject matter jurisdiction over this action. Rush denies the remaining allegations in Complaint Paragraph 7.

**COMPLAINT ¶8:**

Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391, because all the significant events giving rise to the claims occurred in this judicial district.

**ANSWER:**

For the purposes of this action only, Rush admits that venue is proper in this judicial district. Rush denies the remaining allegations in Complaint Paragraph 8.

**COMPLAINT ¶9:**

Venue is also proper in the Northern District of Illinois, Eastern Division because Defendant does business and has employees located within this judicial district.

**ANSWER:**

For the purposes of this action only, Rush admits that venue is proper in this judicial

district. Rush denies the remaining allegations in Complaint Paragraph 9.

## Factual Allegations

**COMPLAINT ¶10:**

Rush University Medical Center Obligated Group is a not-for-profit healthcare, education, and research enterprise, comprising of Defendant, Rush Health, Rush Oak Park Hospital and Rush University. Rush University has an enrollment of 2,500 students. In 2016 Rush's operation was licensed to operate 1,100 beds, handled 184,000 emergency room visits, had 251,000 patient days and listed 10,000 employees. Rush's total operating revenue from U.S. government administrated Medicare and Medicaid was forty-three percent (43%).

**ANSWER:**

Rush admits that Rush University Medical Center Obligated Group is a non-profit

healthcare organization that includes Rush Health, Rush Oak Park Hospital, Rush Copley Medical

Center and Rush University Medical Center. Rush denies the remaining allegations in Complaint

Paragraph 10.

**COMPLAINT ¶11:**

Melgoza has a Bachelor of Arts Degree from Smith College and a Master's Degree in Public Administration in Health Policy and Management from the Robert F. Wagner Graduate School of Public Service at New York University ("NYU"). Melgoza received academic awards both at Smith College and NYU, and was the recipient of the Robert F. Wagner Public Service award during her years at NYU.

**ANSWER:**

Rush admits that Melgoza has a Bachelor of Arts Degree from Smith College and a

Master's Degree in Public Administration in Health Policy and Management from the Robert F.

Wagner Graduate School of Public Service at New York University. Rush lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Complaint

Paragraph 11.

**COMPLAINT ¶12:**

Melgoza is a Fellow with the American College of Health Care Executives and is certified in Healthcare management.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 12.

**COMPLAINT ¶13:**

In October 2013, Melgoza received a Leadership Executive Program Certificate from the American College of Health Care Executives. She was selected by the Latino Forum of Healthcare Executives as a scholarship recipient for her leadership abilities and commitment to patient excellence. The intent of the scholarship was to promote healthcare leaders in the U.S.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 13.

**COMPLAINT ¶14:**

Melgoza has worked in the healthcare industry for over twenty-five years, and immediately prior to her employment by Rush, was the Assistant President of Services Lines of Cancer, Medicine, Geriatrics, Women & Children, and Surgery for Mount Sinai Hospital.

**ANSWER:**

Upon information and belief, Rush admits that Plaintiff was employed by Mount Sinai Hospital as Assistant Vice President of Service Lines, Medicine & Surgery prior to her employment by Rush. Rush lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Complaint Paragraph 14.

**COMPLAINT ¶15:**

Melgoza has been employed by Rush from 2006 through the present.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 15.

**COMPLAINT ¶16:**

From November 2006 through October 2010, Melgoza was employed by Rush as an Assistant Vice President, and her responsibilities included, inter alia, management of the radiology, non-invasive cardiology, neurodiagnostics, radiation oncology, breast imaging, bone marrow transplant, photopheresis, emergency department, transfer center agreements, transfer center, dialysis, and respiratory therapy departments.

**ANSWER:**

Rush admits that it employed Plaintiff as an Assistant Vice President from November 2006

through October 13, 2010. Rush admits that Plaintiff managed various departments at various

times in that position. Rush denies the remaining allegations in Complaint Paragraph 16.

**COMPLAINT ¶17:**

From November 2006 through October 2010, Melgoza was a key executive in the implementation of the hospital-wide EPIC software system and the migration to a new picture archiving system (PACS) for the new, non-invasive platform, and a strategic leader in the opening of Rush's new patient tower.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 17.

**COMPLAINT ¶18:**

During her tenure as an Assistant Vice President for Rush, Melgoza served as the Executive of Rush's Cancer Committee.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 18.

**COMPLAINT ¶19:**

In 2006, the Rush Cancer Committee appointed Melgoza as the Cancer Conference Coordinator for the organization. In this role, Melgoza oversaw Rush's multi-disciplinary cancer conferences by ensuring compliance with American College of Surgeons Commission on Cancer standards by monitoring cancer care discussions and multidisciplinary standards required for Rush's Commission on Cancer accreditation.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 19.

6

**COMPLAINT ¶20:**

From November 2010 through July 14, 2016, Melgoza worked as an Associate Vice President for Rush, and her responsibilities included, inter alia, management of the non-invasive platform for the opening of the new patient tower, management of the radiation oncology / Women's Cancer Center, breast imaging, bone marrow transplant, inpatient dialysis, photopheresis, plasmapheresis, radiation safety, occupational safety, evening / weekend administrators, environmental services, linen services, guest relations, volunteer services, interpreter services and security departments. She also served as a voting member on the Rush Medical Center Institutional Review Board.

**ANSWER:**

Rush admits that Plaintiff worked as an Associate Vice President for Rush and that she had

various managerial duties in that role. Rush further admits that, at certain times, Plaintiff served

as a voting member on the Rush Medical Center Institutional Review Board. Rush denies the

remaining allegations in Complaint Paragraph 20.

**COMPLAINT ¶21:**

Many of the departments that Melgoza capably managed during her tenure as Associate Vice President for Rush involved cancer treatment research, quality management, accreditation and cancer prevention.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 21.

**COMPLAINT ¶22:**

Melgoza worked diligently on improving patient care and creating a positive environment for Rush employees with a focus on innovation, excellence, empathy and service to its patients and the community at large.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 22.

**COMPLAINT ¶23:**

During Melgoza's tenure as an Associate Vice President for Rush, she was responsible for budgets exceeding $200 million revenue, over 700 full-time employees, and between nine (9) and eleven (11) clinical and support departments at one time.

**ANSWER:**

Rush admits that at certain times as an Associate Vice President, Plaintiff was responsible for various departments. Rush denies the remaining allegations in Complaint Paragraph 23.

**COMPLAINT ¶24:**

Melgoza was a founding member of the Rush Diversity Leadership Council in 2006, and a member of the Rush Women's Leadership Council.

**ANSWER:**

Rush admits that Plaintiff was, at certain times, a member of the Rush Diversity Leadership Council and the Rush Woman's Leadership Counsel. Rush denies the remaining allegations in Complaint Paragraph 24

**COMPLAINT ¶25:**

Throughout her employment by Rush, Melgoza actively promoted diversity in the workplace, including but not limited to the advancement of Hispanics, including Mexican-Americans, and women to positions in management, including the executive level.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 25.

**COMPLAINT ¶26:**

Melgoza is female and her national origin is Mexican-American.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 26.

**COMPLAINT ¶27:**

In 2006, J. Robert Clapp, Senior Vice President and Executive Director of Rush, stated, "Melgoza was the first Mexican-American Assistant Vice President and executive leader hired by Rush." This was so despite an ongoing presence of Latinos and individuals of Mexican descent within Rush's service area.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 27.

**COMPLAINT ¶28:**

From October 2010 through July 14, 2016, Melgoza was the first and only female Mexican-American Associate Vice President despite individuals of Mexican-descent encompassing thirty percent (30%) of the population of the City of Chicago.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 28.

**COMPLAINT ¶29:**

There are currently no individuals of Mexican national origin within the top 100 executive leaders at Rush, yet 20% of the revenues are generated from patients of Mexican descent.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 29.

**COMPLAINT ¶30:**

During her employment with Rush, Melgoza performed her duties exceptionally, and consistently met corporate goals.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 30.

**COMPLAINT ¶31:**

Throughout her employment with Rush, Melgoza received consistently highly-favorable performance reviews, including an overall rating of "exceeds expectations" in July 2017.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 31.

**COMPLAINT ¶32:**

Throughout Melgoza's tenure as an Associate Vice President, Rush paid Melgoza $100,000.00 to $250,000.00 less per year than her male and/or non-Mexican-American colleagues performing substantially equal work, including but not limited to Mike Mulroe, Scott Sonnenchein, Edward Conway, Mike Lamont, Anthony Perry, Mike Dandorph, Richard Davis, Kurt Olsen, Jeremy Strong, Tim Carrigan, Leo Correa, Shaun Cooper, Ryan Schlifka, John Pontarelli, David Rice, Ray LaBrec, and Joseph Anderson.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 32.

9

**COMPLAINT ¶33:**

Throughout her tenure as an Associate Vice President for Rush, Melgoza made numerous requests for a higher salary given her highly-favorable performance reviews and increased responsibilities.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 33.

**COMPLAINT ¶34:**

Rush denied Melgoza's repeated requests for a higher salary as her duties continuously increased.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 34.

**COMPLAINT ¶35:**

During Melgoza's tenure as an Associate Vice President for Rush, she met with senior executives at Rush on multiple occasions and informed the executives about her interest in a promotion to a Vice President position, and eventually, to the Chief Operating Officer position given her vast portfolio and extensive experience.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 35.

**COMPLAINT ¶36:**

On multiple occasions from 2012 through 2015, Melgoza met with Mike Mulroe ("Mulore"), Rush Vice President, to request a review of her salary given her vast portfolio and extensive experience.

**ANSWER:**

Rush admits that Plaintiff met with Mike Mulroe at various times from 2012 through 2015.

Rush denies the remaining allegations in Complaint Paragraph 36.

**COMPLAINT ¶37:**

On December 19, 2013, Melgoza requested a meeting and met with Rush Executive Vice President and Executive Director Mike Dandorph ("Dandorph") to review her curriculum vitae, experience, and current responsibilities and to express her desire to grow within the organization.

**ANSWER:**

Rush admits that Plaintiff met with Mike Dandorph on December 19, 2013. Rush denies the remaining allegations in Complaint Paragraph 37.

**COMPLAINT ¶38:**

During the December 19, 2013 meeting, Dandorph made an unwanted sexual advance to Melgoza after she expressed her desire to grow within the organization. Dandorph informed Melgoza that he once had a Cuban girlfriend, that he did not marry his Cuban girlfriend, and that he owned a boat but desired to purchase a larger boat. Melgoza ended the meeting by shaking Dandorph's hand and leaving his office.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 38.

**COMPLAINT ¶39:**

After the December 19, 2013 meeting, Melgoza was not notified of any future opportunities and executive positions were not posted for advancement within the organization.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 39.

**COMPLAINT ¶40:**

On April 14, 2015, Melgoza met with Mulroe and provided in writing a number of concerns about his discriminatory behavior and retaliation, and requested equity in Rush's payment of her compensation, stating, "Please review my salary based on the dynamic span of my portfolio, education and experience. I want to be treated and compensated equitably for my effort based on the market."

**ANSWER:**

Rush admits that Plaintiff met with Mulroe on April 14, 2015. The remaining allegations in Complaint Paragraph 40 purport to characterize the contents of a written document, which speaks for itself. To the extent those allegations are inconsistent with or mischaracterize that document, they are denied.

11

**COMPLAINT ¶41:**

Mulroe informed Melgoza that a market evaluation was not possible and that Lynne Wallace ("Wallace"), Rush Vice President of Human Resources, declined the review.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 41.

**COMPLAINT ¶42:**

On November 25, 2013, Melgoza met with Dr. David Ansell ("Dr. Ansell"), Rush Senior Vice President of Strategy and Community Engagement, to discuss Mulroe's discriminatory behavior and reluctance to conduct a market assessment for an equal market wage. During that meeting, Dr. Ansell stated, "[Mulroe] probably pays you less than the fellow."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 42.

**COMPLAINT ¶43:**

Dandorph and Cynthia Barginere ("Barginere"), Rush Chief Operating Officer, were also notified of Mulroe's discriminatory behavior but failed to address the complaints.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 43.

**COMPLAINT ¶44:**

On July 14, 2016, Rush demoted Melgoza two levels down to a position of "Director" at Rush after she was informed that her position as Associate Vice President was eliminated. She no longer had a job as an Associate Vice President.

**ANSWER:**

Rush admits that Plaintiff's position as Associate Vice President was eliminated on or about July 14, 2016. Rush further admits that Plaintiff was given the option to accept another position at Rush and accepted a Director position. Rush denies the remaining allegations in Complaint Paragraph 44.

**COMPLAINT ¶45:**

Similarly-situated employees who were male were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 45.

**COMPLAINT ¶46:**

Similarly-situated employees who were not of Mexican-American national origin were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 46.

**COMPLAINT ¶47:**

Similarly-situated employees who did not complain about discrimination and unequal pay were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 47.

**COMPLAINT ¶48:**

Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 48.

**COMPLAINT ¶49:**

Similarly-situated employees who did not complain about the systematic discrimination at Rush were not demoted two levels down by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 49.

**COMPLAINT ¶50:**

Similarly-situated employees who were not subjected to sexual advances or expected to fulfill sexual stereotypes of Mexican-American women were not demoted two levels by Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 50.

**COMPLAINT ¶51:**

At the time Rush demoted Melgoza, it also promoted a less-qualified male, Leo Correa ("Correa"), to the new position of Associate Vice President of Clinical Affairs and Cancer Services.

**ANSWER:**

Rush admits that it promoted Leo Correa to Associate Vice President of Clinical Affairs and Cancer Services, but denies that this occurred at the same time that Plaintiff's position as Associate Vice President was eliminated on or about July 14, 2016. Rush denies the remaining allegations in Complaint Paragraph 51.

**COMPLAINT ¶52:**

Melgoza was never made aware of this new position as it was not posted, nor was Melgoza interviewed for this positon despite her thirteen (13) years of experience in leading cancer service departments at Rush and externally. Had Melgoza known of the opening, she would have applied for it.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Complaint Paragraph 52.

**COMPLAINT ¶53:**

Rush deviated from and did not follow its policies and procedures on posting job positions and hiring when it promoted Correa.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 53.

**COMPLAINT ¶54:**

At the time Rush demoted Melgoza, it transferred her non-cancer service departments to Mulroe. Mulroe was not demoted even though he was no longer supervising the cancer portfolio.

**ANSWER:**

Rush admits that Mulroe was not demoted. Rush denies the remaining allegations in Complaint Paragraph 54.

**COMPLAINT ¶55:**

Numerous members of Rush's top executives informed Melgoza that the demotion to Director was not performance based.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 55.

**COMPLAINT ¶56:**

After the demotion, Melgoza was informed that she would report to Correa.

**ANSWER:**

Rush admits that Melgoza reported to Correa in her Director position. Rush denies the

remaining allegations in Complaint Paragraph 56.

**COMPLAINT ¶57:**

At the time Rush demoted Melgoza, Mulroe informed Melgoza that if she didn't like her new position, she could accept a severance package from Rush, stating that Melgoza's employment with Rush would be terminated if she did not take the demotion.

**ANSWER:**

Rush admits that after Plaintiff's Associate Vice President position was eliminated, it

provided Plaintiff the option of accepting another position at Rush or seeking severance. Rush

denies the remaining allegations in Complaint Paragraph 57.

**COMPLAINT ¶58:**

Mulroe and Wallace failed to provide Melgoza with a severance package after numerous requests for the document.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 58.

**COMPLAINT ¶59:**

The demotion adversely impacted Melgoza by (a) capping her salary at a director level with raises not factored into her base pay after reaching a scale; (b) removing her from the Management Incentive Compensation Program and putting her into a "Shadow Program" with an unclear future; (c) removing substantial responsibilities from her job duties; (d) harming her ability

to advance to higher levels of management within and outside the organization; (e) causing her professional embarrassment and emotional distress which also impacted her health; and (f) preventing moving patient care forward..

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 58.

**COMPLAINT ¶60:**

Melgoza met with numerous members in Rush's executive ranks to discuss the termination threat, demotion, and the retaliatory behavior directed at her after her advocacy for diversity and requesting equitable pay. On March 22, 2017 and April 16, 2017, she met with Terry Peterson, Rush Vice President of Governmental Affairs and the Chairman of the Diversity Leadership Group and Chairman of the Chicago Transit Authority (CTA). She also met with Barginere, Wallace, Dr. Ansell, Dandorph, and Mary Ellen Schopp ("Schopp"), Rush Senior Vice President of Human Resources. All these Rush senior executives failed to end the discriminatory and retaliatory actions against Melgoza.

**ANSWER:**

Rush admits that Plaintiff met with Terry Peterson, Barginere, Dr. Ansell, and Mary Ellen

Schopp at various times in 2017. Rush denies the remaining allegations in Complaint Paragraph

60.

**COMPLAINT ¶61:**

Schopp recommended that Melgoza leave the organization and focus on being a mother, volunteer for school activities for her child, and find a hobby.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 61.

**COMPLAINT ¶62:**

Rush eventually offered a severance package.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 62.

**COMPLAINT ¶63:**

Melgoza rejected the severance package, and began working as a Director for Rush.

**ANSWER:**

Rush admits that Plaintiff began working as a Director. Rush denies the remaining allegations in Complaint Paragraph 63.

**COMPLAINT ¶64:**

In January 2017, Correa informed Melgoza that he was resigning his employment with Rush.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in Complaint Paragraph 64.

**COMPLAINT ¶65:**

On January 25, 2017, Dr. Robert DeCresce ("Dr. DeCresce"), Rush Acting Cancer Center Medical Director and Operating Partner of Shore Capital Partners, informed Melgoza that she would report to him until further notice.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 65.

**COMPLAINT ¶66:**

On February 3, 2017, Dr. Antonio Bianco ("Dr. Bianco"), Rush Vice President of Clinical Affairs and President/Owner of Bianco Labs requested a meeting with Melgoza on February 8, 2017 to discuss "leadership of the cancer center."

**ANSWER:**

Rush admits that Dr. Bianco met with Plaintiff on February 8, 2017 and that Plaintiff received an invitation with the subject listed as "Interim Leadership for the Cancer Center." Rush denies the remaining allegations in Complaint Paragraph 66.

**COMPLAINT ¶67:**

On February 8, 2017, during the meeting between Melgoza and Dr. Bianco, Melgoza was blind-sided by learning for the first time that the meeting was actually an interview for the Interim Cancer Position, which was open due to Correa's resignation. No copy of an active job description was provided for the "surprise" interview.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief regarding the truth of the allegations regarding what Plaintiff believed. Rush denies the remaining allegations in Complaint Paragraph 67.

**COMPLAINT ¶68:**

During the February 8th meeting, Melgoza provided a copy of her resume to Dr. Bianco, and after reviewing the resume, Dr. Bianco said to Melgoza, "You are a snob, you went to school with a lot of snobs. I used to know a woman who went to Smith [College]. She wasn't that great. I didn't care for her. She was a snob."

**ANSWER:**

Rush admits that Plaintiff provided a copy of her résumé to Dr. Bianco. Rush denies the remaining allegations in Complaint Paragraph 68.

**COMPLAINT ¶69:**

Melgoza reported Dr. Bianco's rude, discriminatory behavior and the lack of a formal posting of the job position with a job description to Schopp. Schopp told Melgoza that "[Melgoza] let things happen to her" and that she should go back to Dr. Bianco to "teach him how to be a better leader."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 69.

**COMPLAINT ¶70:**

Melgoza reported Dr. Bianco's rude, discriminatory comments to Dr. DeCresce, who told her, "Don't worry, you are not a snob!" Dr. DeCresce did not follow-up further regarding Melgoza's complaints.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 70.

**COMPLAINT ¶71:**

Rush did not offer Melgoza the open Interim Cancer Position, and instead hired a less-qualified Caucasian female, Patty Nedved ("Nedved"), who lacked experience managing cancer departments.

**ANSWER:**

Rush admits that Plaintiff was not offered the Interim Cancer Position and that Nedved filled that role after years of employment with Rush, including time serving as Rush's Acting Chief Nursing Officer. Rush denies the remaining allegations in Complaint Paragraph 71.

**COMPLAINT ¶72:**

Rush deviated from and did not follow its policies and procedures on job hiring and posting when it hired Nedved.

**ANSWER:**

Rush denies the remaining allegations in Complaint Paragraph 72.

**COMPLAINT ¶73:**

Melgoza later learned from Dr. DeCresce that there were two (2) candidates considered for Correa's position. Both of the candidates were not of Mexican national origin. Another Rush executive employee informed Melgoza that the two (2) candidates did not have cancer experience and that Melgoza had the most "on the bench cancer experience at Rush, yet the position went to an individual without cancer experience."

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 73.

**COMPLAINT ¶74:**

Upon information and belief, other candidates were provided advance notice to prepare for the interview, and were told of their "active status" for the position, allowing them the ability to compete for the position.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 74.

**COMPLAINT ¶75:**

On February 27, 2017, Melgoza met with Peter Butler ("Butler"), former Rush Chief Executive Officer and Chief Operating Officer to discuss the hostile and discriminatory environment at Rush. Butler noted that Melgoza managed a complex portfolio exceptionally during his tenure at Rush, encouraged her to focus on moving forward with the current departments, and stated that he "would not have handled [the hiring] situation in that manner."

**ANSWER:**

Rush admits that Plaintiff met with Butler at various times. Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported purpose for seeking a meeting with Butler. Rush denies the remaining allegations in Complaint Paragraph 75.

**COMPLAINT ¶76:**

On March 21, 2017, Melgoza met with Dr. Ansell to discuss the demotion of Melgoza and to inform him of the ongoing retaliation against her. Dr. Ansell stated that Barginere made the decision to demote Melgoza. Dr. Ansell, further stated, "[Barginere] was told to remove you. She removed you because she is weak. She is not strong for diversity. That is what happens when these people get in power." Melgoza asked Dr. Ansell to clarify who issued the order to terminate her employment and what he meant by "these people," but he ran away from Melgoza in response.

**ANSWER:**

Rush admits that Plaintiff met with Dr. Ansell at various times. Rush lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiff's purported purpose for seeking a meeting with Dr. Ansell. Rush denies the remaining allegations in Complaint Paragraph 76.

**COMPLAINT ¶77:**

Similarly-situated individuals who were male were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 77.

**COMPLAINT ¶78:**

Similarly-situated individuals who were not of Mexican-American national origin were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 78.

**COMPLAINT ¶79:**

Similarly-situated individuals who were not asked to meet sexual expectations or subjected to stereotypes of women of Mexican-American descent at Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 79.

**COMPLAINT ¶80:**

Similarly-situated individuals who did not complain about discrimination and unequal pay were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 80.

**COMPLAINT ¶81:**

Similarly-situated employees who did not advocate for the advancement of diversity in the executive ranks of Rush were allowed to prepare for interviews and/or were hired to work in positions more advanced than Director at Rush.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 81.

**COMPLAINT ¶82:**

Following the promotion of Nedved, the gender and national origin discrimination and retaliation by Rush against Melgoza continued. Melgoza learned that Dr. Bianco threatened to terminate Melgoza's employment. Additionally, Dr. Bianco and executives publicly threatened to remove additional departments from her supervision that she capably supervised for many years.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 82.

**COMPLAINT ¶83:**

On January 16, 2015, Melgoza reached out to Dr. Larry Goodman ("Dr. Goodman"), President of Rush University Medical Center and the Executive Sponsor of Rush's Diversity Leadership Group, in an attempt to discuss diversity, future goals and the removal of discriminatory barriers at Rush. Dr. Goodman never responded to the email.

**ANSWER:**

Rush admits that Plaintiff emailed Dr. Goodman on January 16, 2015 and that Dr. Goodman did not respond to that email. Rush denies the remaining allegations in Complaint Paragraph 83.

**COMPLAINT ¶84:**

Dr. Goodman has advocated for inclusion and a diverse work environment, and speaks publicly about Rush's commitment to equality; however he refused to meet with Melgoza. A second meeting was requested on April 25, 2017, but Dr. Goodman declined the meeting.

**ANSWER:**

Rush admits that Dr. Goodman has advocated for an inclusive, diverse work environment, and Rush's commitment to equality. Rush further admits that Dr. Goodman declined to meet with Plaintiff. Rush denies the remaining allegations in Complaint Paragraph 84.

**COMPLAINT ¶85:**

Dr. Goodman has spoken about equity, inclusion, ethics and a diverse work environment; yet he condoned the overt, systemic discrimination against employees of Mexican descent, unequal pay for women, and exclusion of veterans, people with disabilities and other under-represented employees by not posting executive positions, promoting nepotism, violating the equal pay law and not addressing overt discrimination against Rush's only Mexican-American executive.

**ANSWER:**

Rush admits that Dr. Goodman has advocated for an inclusive, equitable, ethical, and diverse work environment. Rush denies the remaining allegations in Complaint Paragraph 85.

**COMPLAINT ¶86:**

During the March 21, 2016, Dr. Ansell stated that it was "unconscionable that Rush demoted its only Latina Female Executive and had no other Hispanic Executives within the Rush Executive ranks." He also stated that he "threw a line" to Dr. Goodman and Barginere at a meeting related to the unconscionable bias against employees of Mexican descent.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 86.

**COMPLAINT ¶87:**

Executive leadership at Rush was spearheaded by Dr. Goodman who was enabled by William M. Goodyear, Chairman of the Rush University Medical Center Board of Directors, former Rush Chief Executive Officer and President of Navigant, to violate the EPA and Title VII in discriminating against women and employees of Mexican national origin. Dr. Goodman and Goodyear did not intervene and stop the discriminatory behavior; thus, facilitating an environment where it is acceptable to violate civil rights laws related to equal pay and the discrimination of employees of Mexican national origin. Their inaction and failure to hold executives accountable support a corporate culture of systemic, intentional discrimination and retaliation against women and employees of Mexican national origin, and also negatively impact and discriminate against people with disabilities, veterans and other under-represented minorities. Instead of meeting with Melgoza, an employee of Mexican descent who lead nine to eleven departments with over 700 full time employees, Dr. Goodman opted to "dealsource" and be a social media influencer.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 87.

**COMPLAINT ¶88:**

On May 8, 2017, Melgoza filed a Charge of Discrimination against Defendant ("Charge of Discrimination") with the United States Equal Employment Opportunity Commission ("EEOC"). A copy of the Charge of Discrimination is attached as Exhibit A.

**ANSWER:**

Rush admits the allegations in Complaint Paragraph 88.

**COMPLAINT ¶89:**

Melgoza's Charge of Discrimination alleges retaliation and discrimination on the basis of gender and national origin against Defendant.

**ANSWER:**

The allegations in Complaint Paragraph 89 purports to characterize the contents of a written

document that speaks for itself. To the extent the allegations mischaracterize or are inconsistent

with that document, they are denied.

**COMPLAINT ¶90:**

On August 24, 2017, Melgoza received a "right to sue" letter for the Charge of Discrimination from the EEOC. A copy of the EEOC "right to sue" letter is attached as Exhibit B.

23

**ANSWER:**

Upon information and belief, Rush admits the allegations in Complaint Paragraph 90.

**COMPLAINT ¶91:**

The "right to sue" letter provides Plaintiff ninety (90) days from the date of her receipt of the letter to bring a lawsuit. Plaintiff filed this Complaint before the expiration of the ninety (90) day period.

**ANSWER:**

The allegations in Complaint Paragraph 91 purport to characterize the contents of a written document that speaks for itself. To the extent the allegations mischaracterize or are inconsistent with that document, they are denied.

**COMPLAINT ¶92:**

Plaintiff has fully exhausted all of her administrative remedies.

**ANSWER:**

Rush admits that Plaintiff has exhausted her administrative remedies with the EEOC with respect to the allegations brought in her May 8, 2017 charge. Rush denies the remaining allegations in Complaint Paragraph 92.

**COMPLAINT ¶93:**

Rush's discrimination and retaliation continues.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 93.

**Count I — Violation of the Equal Pay Act of 1963**

**COMPLAINT ¶94:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 94.

**COMPLAINT ¶95:**

At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed employees. Rush denies the remaining allegations in Complaint Paragraph 95.

**COMPLAINT ¶96:**

Rush violated the EPA, § 206(d), by paying Melgoza less than male employees performing substantially equal work.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 96.

**COMPLAINT ¶97:**

Male employees at Rush who have the same skill, effort and responsibility needed to perform the work as Melgoza, performed under similar working conditions, were paid more than Melgoza in violation of the EPA, §206(d).

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 97.

**COMPLAINT ¶98:**

Rush's violations of the EPA caused her significant monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 98.

**COMPLAINT ¶99:**

Rush's violations of the EPA were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 99.

**COMPLAINT PRAYER 1**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages;

(ii)    liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages;

(iii)   her attorneys' fees and costs; and

(iv)    such other and further relief as thiS Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## Count II — Violation of the Equal Pay Act of 1963

**COMPLAINT ¶100:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 100.

**COMPLAINT ¶101:**

At all times material to this Complaint, Rush was an employer within the meaning of the EPA, § 203(d).

26

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed employees. Rush denies the remaining allegations in Complaint Paragraph 101.

**COMPLAINT ¶102:**

Rush illegally retaliated against Melgoza for exercising her rights under the EPA.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 102.

**COMPLAINT ¶103:**

Rush's illegal retaliation against Melgoza caused her significant monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 103.

**COMPLAINT ¶104:**

Rush's illegal retaliation against Melgoza was willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 104.

**COMPLAINT PRAYER 2:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    liquidated damages equal to the amount of back pay lost as a result of the failure to pay equal wages and the demotion;

(iii)   restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iv)    her attorneys' fees and costs; and

(v)     such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## Count III — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶105:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 105.

**COMPLAINT ¶106:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 106.

**COMPLAINT ¶107:**

Rush discriminated against Melgoza on the basis of her gender, female, in violation of § 2000e-2.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 107.

**COMPLAINT ¶108:**

Similarly-situated male employees at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 108.

**COMPLAINT ¶109:**

Rush created a hostile working environment for Melgoza due to Melgoza's gender.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 109.

**COMPLAINT ¶110:**

Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 110.

**COMPLAINT ¶111:**

Rush's violations of Melgoza's rights under Title VII were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 111.

**COMPLAINT PRAYER 3:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)     her attorneys' fees and costs; and

(vi)     such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count IV — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶112:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 112.

**COMPLAINT ¶113:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 113.

**COMPLAINT ¶114:**

Rush discriminated against Melgoza on the basis of her national origin, Mexican-American, in violation of § 2000e-2.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 114.

**COMPLAINT ¶115:**

Similarly-situated employees not of Mexican-American origin at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 115.

**COMPLAINT ¶116:**

Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 116

**COMPLAINT ¶117:**

Rush's violations of Melgoza's rights under Title VII caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 117

**COMPLAINT ¶118:**

Rush's violations of Melgoza's rights under Title VII were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 118

**COMPLAINT PRAYER 4:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

(v)    her attorneys' fees and costs; and

(vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## Count V — Violation of Title VII of the Civil Rights Act of 1964

**COMPLAINT ¶119:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 93 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 119.

**COMPLAINT ¶120:**

At all times material to this Complaint, Rush was an employer within the meaning of Title VII, § 2000e, and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 120.

**COMPLAINT ¶121:**

Rush illegally retaliated against Melgoza for exercising her rights under Title VII.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 121.

**COMPLAINT ¶122:**

Similarly-situated male employees at Rush who did not exercise their rights under Title VII at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 122.

**COMPLAINT ¶123:**

Similarly-situated employees not of Mexican-American national origin at Rush who did not exercise their rights under Title VII did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 123.

**COMPLAINT ¶124:**

Rush's illegal retaliation against Melgoza caused her significant emotional, physical, and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 124.

**COMPLAINT ¶125:**

Rush's illegal retaliation against Melgoza was willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 125.

**COMPLAINT PRAYER 5:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i)     all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii)    restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii)   compensatory damages;

(iv)    punitive damages;

    (v)     her attorneys' fees and costs; and

    (vi)    such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

### Count VI — Violation of Illinois Human Rights Act

**COMPLAINT ¶126:**

Melgoza incorporates paragraphs 1 through 93 as though fully stated here.

**ANSWER:**

Rush incorporates its responses to Complaint Paragraphs 1 through 92 as if set forth fully here and denies any remaining allegations in Complaint Paragraph 126.

**COMPLAINT ¶127:**

At all times material to this Complaint, Rush was an employer within the meaning of the Illinois Human Rights Act, §2-101(B)(1)(a), and employed more than the statutory minimum of fifteen employees.

**ANSWER:**

Rush lacks knowledge or information sufficient to form a belief as to what Plaintiff believes to be "all times material to this Complaint." Rush admits that, at certain times, it has employed more than 15 employees. Rush denies the remaining allegations in Complaint Paragraph 127.

**COMPLAINT ¶128:**

Rush discriminated against Melgoza on the basis of her gender, female, and on the basis of her national origin, Mexican-American, in violation of the Illinois Human Rights Act.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 128.

**COMPLAINT ¶129:**

Similarly situated male employees at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 129.

**COMPLAINT ¶130:**

Similarly-situated employees not of Mexican-American national origin at Rush did not receive the same treatment as Melgoza.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 130.

**COMPLAINT ¶131:**

Rush created a hostile working environment for Melgoza due to Melgoza's gender.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 131.

**COMPLAINT ¶132:**

Rush created a hostile working environment for Melgoza due to Melgoza's national origin, Mexican-American.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 132.

**COMPLAINT ¶133:**

Rush retaliated against Melgoza for exercising her rights in violation of the Illinois Human Rights Act, §6-101(A).

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 133.

**COMPLAINT ¶134:**

Rush's violations of the Illinois Human Rights Act caused her significant emotional and monetary harm.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 134.

**COMPLAINT ¶135:**

Rush's violations of the Illinois Human Rights Act were willful.

**ANSWER:**

Rush denies the allegations in Complaint Paragraph 135.

**COMPLAINT PRAYER 6:**

WHEREFORE, Plaintiff, Norma Melgoza, respectfully requests that this Court, after a jury trial, enter judgment in her favor and against Defendant, Rush University Medical Center, and award damages equal to:

(i) all back pay lost as a result of the failure to pay equal wages and the demotion;

(ii) restoration of Melgoza's title and position at Rush prior to the demotion or equivalent front pay;

(iii) compensatory damages;

(iv) punitive damages;

(v) her attorneys' fees and costs; and

(vi) such other and further relief as this Court deems just and proper under the circumstances.

**ANSWER:**

The foregoing paragraph constitutes Plaintiff's prayer for relief, to which no response is required. To the extent a response is required, Rush denies the allegations stated and denies that Plaintiff is entitled to any relief whatsoever.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

1.      To the extent Plaintiff failed to exercise reasonable diligence in the mitigation of damages, she is not entitled to relief.

2.      Plaintiff's claims are barred to the extent they occurred and/or accrued outside of the applicable statute of limitations.

3.      Plaintiff's claims are barred to the extent relief is sought for actions outside the scope of her EEOC charge.

4.      All or part of Plaintiff's claims under Title VII are barred to the extent they fall outside of the 300-day statute of limitations for filing a charge of discrimination.

5.      Plaintiff is not entitled to punitive damages or other damages because Defendant made good faith efforts to comply with all applicable statutes and common laws and acted at all times to protect Plaintiff's statutorily-protected rights.

6.      Plaintiff's claims arising under the Equal Pay Act are barred to the extent she seeks relief for acts falling outside of the applicable statutes of limitations.

7.      Plaintiff's claims arising under the Equal Pay Act fail because any alleged discrepancy in pay was the result of factors other than sex.

8.      To the extent Plaintiff alleges that any employee of Defendant acted in an unlawful manner, such conduct, if it occurred, was outside the course and scope of that individual's employment, was not authorized or condoned by Defendant, and was undertaken without the knowledge or consent of Defendant. Thus, Defendant is not liable for any such conduct, if it occurred.

9.      Defendant denies that gender or national origin were factors or motives in any of the employment decisions concerning Plaintiff. However, in the event that the fact finder

determines otherwise, Defendant avers that it would have made the same decisions even in the absence of any alleged impermissible factor/motivation.

10.     Plaintiff is barred from relief because Defendant exercised reasonable care to prevent and correct any harassing conduct and Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by Defendant or to avoid harm otherwise.

11.     Any relief to which Plaintiffs may be entitled is barred or otherwise affected by the after-acquired evidence doctrine.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

Defendant/Counterclaimant Rush University Medical Center ("Counterclaimant" or "Rush") hereby files this counterclaim for declaratory judgment against Plaintiff/Counterclaim-Defendant ("Counterclaim-Defendant" or "Melgoza"), stating as follows:

### Nature of the Action

1.      Rush seeks declaratory relief pursuant to 28 U.S.C. § 2201 because Melgoza is actively pursuing claims regarding her July 2020 termination resulting from a COVID-19 reduction in force in a separate proceeding rather than asserting them in this case. Melgoza's efforts are a misuse of the judicial process and an effort to inflict harm upon Rush. The parties remain in an active dispute regarding whether Melgoza's termination claims may proceed in a separate action, and that dispute will continue until a court definitively declares whether Melgoza's termination claims may continue in a second action, or whether, to the contrary, they are barred under the doctrines of res judicata and/or impermissible claim splitting. In the absence of such a declaration, the parties' dispute will continue to fester, resulting in parallel lawsuits, the possibility of conflicting verdicts, potential double recovery to Melgoza, and great and unnecessary expense to Rush, among other things.

### Parties

2.      Rush is a not-for-profit healthcare corporation with a principal place of business at 1653 West Congress Parkway, Chicago, Illinois 60612.

3.      Melgoza is a former employee of Rush who resides in this district.

### Jurisdiction and Venue

4.      This Court has jurisdiction over Rush's counterclaim for declaratory relief pursuant to 28 U.S.C. § 1367(a) because the claim arises out of the same case or controversy as Melgoza's claims against Rush.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

### Factual Background

6.      Melgoza commenced employment with Rush in 2006 as an Assistant Vice President.

7.      On July 24, 2018, Melgoza filed an Amended Complaint ("Complaint") against Rush in the Northern District of Illinois, Case No. 1:17-cv-06819 (the "Litigation"), asserting six claims under the Equal Pay Act of 1963; Title VII of the Civil Rights Act of 1964 ("Title VII"); and the Illinois Human Rights Act.  The Litigation is currently pending.

8.      In support of her claims, Melgoza alleges that Rush discriminated against her based on sex and national origin by paying her less than coworkers outside of her protected categories, failing to promote her, and harassing her.  Notably, Melgoza's Complaint alleges "Rush's discrimination and retaliation continues."

9.      On July 14, 2020, Rush advised Melgoza that her position was being eliminated effective July 19, 2020 in a COVID-19 related reduction in force ("RIF") impacting more than 230 employees.

10.     Immediately after learning of her termination, on July 15, 2020, Melgoza filed a motion to amend her Complaint ("Motion to Amend") in the Litigation and attached a draft Second Amended Complaint ("SAC") including new allegations based on her termination.

11.     In her Motion to Amend, Melgoza acknowledged that her termination allegations inherently relate to the claims in her Complaint:

> [T]hough [Melgoza's] Second Amended Complaint incorporates new *allegations*, it does not raise new *claims*…her July 14, 2020 termination is the culmination of Rush's years' long continuing campaign of retaliation against [Melgoza] for the protected activity alleged in her prior pleadings as well as the instant litigation.  [Melgoza] does not seek to add additional counts to her Amended Complaint as her recent termination is an extension of the same underlying facts previously alleged and violative of the same laws[.]

12.     The SAC added roughly four full pages of allegations related to her termination and asserted that her inclusion in the RIF was further indicia of Rush's discriminatory and retaliatory animus toward her.  It did not contain any new allegations of discriminatory or retaliatory motives or animus.  Nor did it assert that she engaged in new protected activity.  To the contrary, Melgoza simply alleged that "[s]ince 2013, Rush has engaged in a continuing campaign of retaliation against Melgoza for her abovementioned protected activity, culminating in her July 14, 2020 termination of employment[.]"

13.     On July 23, 2020, Melgoza submitted a letter requesting withdrawal of her Motion to Amend in order "to move forward with the claims in her First Amended Complaint as expeditiously as possible."  The Court granted Melgoza's request to withdraw her motion.

14.     On November 9, 2020, the Court granted issued an opinion granting in part and denying in part on Rush's motion for summary judgment which had been pending in the Litigation. After the Court's ruling, the parties submitted a joint status report wherein Melgoza requested that a trial date be scheduled "as soon as practical."

15.     Rush stated its belief that "the matter should be stayed until [Melgoza] makes clear her intentions relative to any action she intends to take regarding the termination of her employment with Rush."  Rush further articulated, in detail, its consistent position that allowing Melgoza to pursue her termination claims separately would constitute impermissible claims splitting.

16.     The Court ordered the parties to discuss settlement.  Thus, on February 24, 2021 and March 10, 2021, the parties attended a virtual telephonic settlement conference with the Court but were unable to resolve their dispute.

17.     During and after the settlement conference, Melgoza made clear to Rush and the Court that the damages she was claiming in the Litigation included those allegedly resulting from her 2020 termination but refused to state whether she would also be pursuing a separate cause of action for the termination.

18.     In light of Melgoza's ongoing obfuscation of her intentions relative to the termination claims, Rush sent Melgoza a letter on April 2, 2021 asking her to confirm her intended course of action relative to those claims.

19.     On April 9, 2021, Melgoza finally acknowledged she intended to file an EEOC charge relating to her termination and would not assert her termination claims in the Litigation.

20.     Melgoza filed her EEOC charge on April 30, 2021.  Notably, her charge sets forth many of the same allegations already asserted in her Complaint and withdrawn SAC and are based on the same operative facts as the claims made in the Litigation.

21.     Melgoza has nevertheless refused to assert her termination claims in the Litigation and is actively proceeding to initiate a second duplicative lawsuit against Rush.

22.     Melgoza's efforts are a clear attempt to force Rush to incur unnecessary expenses defending a second litigation.  Furthermore, it is clear that Plaintiff is attempting to hedge her bets

41

by creating a second action as a "back up" should she fail to prevail on her claims in the Litigation, or is otherwise dissatisfied with the results.

23.     Absent the relief requested herein, Rush will needlessly be forced to expend resources seeking to dismiss the second lawsuit on the grounds of res judicata and/or impermissible claim splitting.

**Actual Controversy**

24.     There is an actual controversy between the parties that is substantial and concrete concerning Melgoza's right to assert claims relating to her July 2020 termination in a separate proceeding.

25.     Resolution of the substantive claims in the Litigation will not address the parties' ongoing dispute.

26.     In the absence of a declaration, the parties will remain uncertain as to what is or is not permitted in terms of Melgoza's ability to file her termination claims in a separate action; this controversy will continue; and additional litigation will ensue in the future. Moreover, Rush will suffer irreparable harm and incur unnecessary expense defending and seeking to dismiss a duplicative second action. Additionally, if Melgoza proceeds in a second action, there may unnecessarily be two trials on overlapping periods of Melgoza's employment, resulting in increased litigation regarding the proper scope of damages and the evidence that may be used during the trials, as well as two potentially conflicting verdicts and/or an improper double recovery by Melgoza.

27.     Rush respectfully submits that declaratory relief under 28 U.S.C. § 2201 is therefore justified.

WHEREFORE, Rush University Medical Center respectfully prays that the Court:

A.  Enter judgment in favor of Rush and against Melgoza.

B.  Declare that Melgoza is prohibited from asserting the claims relating to her July 2020 termination in a separate proceeding pursuant to the doctrines of res judicata and/or impermissible claim splitting.

C.  Grant such additional relief as the Court deems just and appropriate.

Dated: May ___, 2021                                         Respectfully submitted,

                                                             RUSH UNIVERSITY MEDICAL CENTER

                                                             /s/ Jane M. McFetridge
                                                             One of Its Attorneys

Jane M. McFetridge (ARDC No. 6201580)
Audrey Olson Gardner (ARDC No. 6337084)
JACKSON LEWIS P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois  60601
Tel.: 312.787.4949
Jane.McFetridge@jacksonlewis.com
Audrey.Gardner@jacksonlewis.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May ___, 2021, she caused a true and correct copy of the foregoing *Defendant's Amended Answer, Affirmative Defenses, and Counterclaim to the Amended Complaint* to be filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record via the Court's electronic filing system. Parties may access this filing through the Court's system.

_____ /s/ Jane M. McFetridge

4823-6384-3560, v. 3